**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
                                                         :
GAMZE ZIVALI, Individually and on behalf   :   ECF Case
of all other Similarly Situated Employees,           :
                                                         :
                      Plaintiff,                         :
                                                         :
             v.                                          :   Case No.  08-cv-10310 (JSR)
                                                         :
AT&T MOBILITY LLC,                                 :
                                                         :
                      Defendant.                        :
                                                         :
                                                         :
                                                         :
-------------------------------------------------------- x
```

### DEFENDANT AT&T MOBILITY LLC'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION TO DECERTIFY COLLECTIVE ACTION

Dated: November 8, 2010
New York, New York

*Of Counsel:*                                          Elizabeth Wallin
Thomas P. Gies (*admitted pro hac vice*)                General Attorney
Andrew W. Bagley (*admitted pro hac vice*)              AT&T Mobility LLC
Crowell & Moring LLP                                   5601 Legacy Dr.
1001 Pennsylvania Ave.                                 Plano, TX  75024
Washington, DC  20004

Gary A. Stahl (GS-3987)
Crowell & Moring LLP
590 Madison Ave., 20th Floor
New York, NY  10022

### Attorneys for Defendant, AT&T Mobility LLC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... i
I.      Introduction.................................................................................................................... 1
II.     Applicable Legal Standard............................................................................................. 1
III.    Mobility Has Lawful Systems and Policies for Proper Payment of All Time Worked .... 3
        A.      The Timekeeping System Allows for Easy Capture of *All* Hours Worked .......... 5
        B.      Mobility Policies, Reiterated in Training, Mandate Accurate Timekeeping.......... 6
        C.      Plaintiff's New Theory That Mobility Had an Unlawful *Practice* of Discouraging the
        Reporting of Off-Duty Work Is Unavailing........................................................................ 7
IV.     Disparate Factual and Employment Settings Mandate Decertification ........................... 8
        A.      Requests for Adjustments Show a Wide Range of Practices .............................. 8
        B.      Varying Off-Duty Claims Involve Inherently Individualized Situations ............ 11
                1.      Opt-Ins Were Not Similarly Situated Regarding Off-Duty Email Usage .... 11
                2.      Opt-Ins Were Not Similarly Situated Regarding Off-Duty "Texting" ....... 13
                3.      Opt-Ins Were Not Similarly Situated Regarding Off-Duty Telephone Calls and In-
                Person Customer Interactions ..................................................................... 16
                4.      Opt-Ins Were Not Similarly Situated Regarding Work Allegedly Performed During
                Meal Breaks ............................................................................................... 18
                5.      Opt-Ins Were Not Similarly Situated Regarding Opening/Closing Activities............. 21
                6.      Opt-Ins Were Not Similarly Situated Regarding Off-Duty Trainings, Other Meetings
                and Conference Calls Held Off-Site ............................................................ 22
                7.      Opt-Ins Were Not Similarly Situated Regarding Off-Duty Work at Home/Reviewing
                Product Information .................................................................................... 23
        C.      Hours Worked, Triggering Overtime or Not, Vary By Plaintiff ........................ 24
        D.      ASMs Are Not Similarly Situated to RSCs ..................................................... 25
        E.      Plaintiffs Are Left with Allegations of Policy Lapses Due to Human Error........ 26
V.      Defenses Individual to Each Opt-In Preclude Collective Treatment ............................. 27
        A.      Actual or Constructive Knowledge Varies ...................................................... 27
        B.      Use of Complaint Procedures to Report Timekeeping Issues Has Varied ......... 28
        C.      Some Off-Duty Work Is *De Minimis* ............................................................. 29
VI.     Fairness and Procedural Considerations Mandate Decertification ................................ 30
        A.      Due Process Must Be Guaranteed ................................................................... 30
        B.      Cross-Examination Is Required to Test Credibility and Candor of Opt-Ins ....... 31
        C.      The Mini-Trials Required Here Are Antithetical to Collective Treatment ......... 33
VII.    CONCLUSION ............................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*Barrus v. Dick's Sporting Goods, Inc.*,
  465 F. Supp. 2d 224 (W.D.N.Y. 2006) ........................................................ 4

*Basco v. Wal-Mart Stores, Inc.*,
  No. A-00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) ..................... 2, 30

*Bayles v. Am. Med. Response*,
  950 F. Supp. 1053 (D. Colo. 1996) ........................................................... 2

*Castle v. Wells Fargo Fin., Inc.*,
  No. C 06-4347 SI, 2008 WL 495705, (N.D. Cal. Feb. 20, 2008) ............... 25, 28, 29

*Colson v. Avnet, Inc.*,
  687 F. Supp. 2d 914 (D. Ariz. 2010) ......................................................... 26

*Debose v. Broward Health*,
  2009 WL 4884535 (S.D. Fla. Dec. 17, 2009) ........................................... 29

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) .................................................................................. 27

*Diaz v. Elecs. Boutique of Am., Inc.*,
  No. 04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ........ 2, 35

*Donaldson v. Microsoft Corp.*,
  205 F.R.D. 558 (W.D. Wash. 2001) .......................................................... 26

*Eng-Hatcher v. Sprint Nextel Corp.*,
  No. 07 Civ. 7350, 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) ............. 1, 3, 7, 25

*England v. New Century Fin. Corp.*,
  370 F. Supp. 2d 504, 507-08 (M.D. La. 2005) .......................................... 2

*Epps v. Oak Street Mortg., LLC*,
  2006 WL 1460273 (M.D. Fla. 2006) ......................................................... 7

*Goldberg v. Kelly*,
  397 U.S. 254, 269 (1970) ......................................................................... 30

*Hallissey v. America Online, Inc.*,
  No. 99-3785, 2008 WL 465112 (S.D.N.Y. Feb. 19, 2008) .......................... 26

*Harding v. Time Warner, Inc.*,
  No. 09cv1212-WQH-WMc, 2010 WL 457690 (S.D. Cal. Jan. 26, 2010) ..... 4

*Hinojos v. Home Depot, Inc.*,
  No. 2:06-CV-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ................ 27, 30, 31

*Holzapfel v. Town of Newberg*,
  145 F.3d 516 (2d Cir. 1998) ..................................................................... 10, 27

*In re Chevron*,
  109 F.3d 1016 (5th Cir. 1997) .................................................................. 31

*Jimenez v. Domino's*,
  238 F.R.D. 241 (C.D. Cal. 2006) ............................................................... 31

*Johnson v. TGF Precision Haircutters, Inc.*,
  No. Civ. A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ........ 2, 10

*King v. CVS/Caremark Corp.*, No. 07-21824-CIV-GRAHAM/TORRES, 2008 WL 5973490 (S.D.
  Fla. Sept. 11, 2008) ................................................................................. 2

*Kuebel v. Black & Decker Inc.*,
  No. 08-CV-6020T, 2010 WL 1930659 (W.D.N.Y. May 12, 2010) ........................................ 27
*Laroque v. Domino's Pizza, LLC*,
  557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008) ...................................................................... 2
*Lusardi v. Xerox Corp.*,
  118 F.R.D. 351 (D.N.J. 1987) ........................................................................................ 33
*Marlo v. United Parcel Serv., Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008) ............................................................................. 27, 35
*Mathews  v. ALC Partner, Inc.*,
  No. 2:08-CV-10636, 2009 WL 2591497 (E.D. Mich. Aug. 24, 2009) ................................ 26
*Mooney v. Aramco Servs. Co.*,
  54 F.3d 1207, 1213-14 (5th Cir. 1995) .................................................................... 27, 35
*Newton v. City of Henderson*,
  47 F.3d 746 (5th Cir. 1995) ........................................................................................... 27
*Norris-Wilson v. Delta-T Group, Inc.*,
  No. 09CV0916, 2010 WL 2196066 (S.D. Cal. June 1, 2010) ............................................ 2
*Osuna v. Wal-Mart*,
  2004 WL 3255430 (Ariz. Super. Dec. 23, 2004) ............................................................ 31
*Pacheco v. Boar's Head Provisions Co.*,
  671 F. Supp. 2d 957 (W.D. Mich. 2009) .................................................................. 26, 33
*Proctor v. Allsups Convenience Stores, Inc.*,
  250 F.R.D. 278 (N.D. Tex. 2008) ............................................................................... 2, 10
*Reed v. Mobile County School Sys.*,
  246 F. Supp. 2d 1227 (S.D. Ala. 2003) .......................................................................... 26
*Reich v. S. Md. Hosp., Inc.*,
  43 F.3d 949 (4th Cir. 1995) ............................................................................................ 33
*Rodgers v. CVS Pharmacy, Inc.*,
  No. 8105-CV770T-27MSS, 2006 WL 752831 (M.D. Fla. Mar. 23, 2006) ............................ 4
*Saxton v. Title Max of Ala., Inc.*,
  431 F. Supp. 2d 1185 (N.D. Ala. 2006) .......................................................................... 10
*Seever v. Carrols Corp.*,
  528 F. Supp. 2d 159 (W.D.N.Y. 2007) ..................................................................... 27, 31
*Simmons v. T-Mobile USA, Inc.*,
  No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007) .......................................... 3, 7
*Singh v. City of New York*,
  418 F. Supp. 2d 390 (S.D.N.Y. 2005) ...................................................................... 27, 29
*Smith v. T-Mobile USA, Inc.*,
  No. CV-05-5274, 2007 WL 2385131, at *5-8 (C.D. Cal. Aug. 15, 2007) ............................ 31
*Thompson v. Speedway SuperAmerica LLC*,
  No. 08-CV-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009) ......................................... 27
*Vaicaitiene v. Partners in Care, Inc.*,
  No. 04-9125, 2005 WL 1593053 (S.D.N.Y. July 6, 2005) ............................................... 26
*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) .......................................................................................... 35
*W. Elec. Co. v. Stern*,
  544 F.2d 1196, 1199 (3d Cir. 1976) ............................................................................... 30

*Williams v. Accredited Home Lenders, Inc.*,
    No. 1:05-CV-1681-TWT, 2006 WL 2085312 (N.D. Ga. July 25, 2006)............................. 28
*Williams v. Sprint/United Mgmt. Co.*,
    No. 03-2200, 2006 WL 1867471 (D. Kan. June 30, 2006).................................................... 32
*Wong v. HSBC Mortgage Corp.*,
    No. C-07-2446, 2010 WL 3833952 (N.D. Cal. Sept. 29, 2010) ............................................ 26
*Zivali*,
    646 F. Supp. 2d 658 (S.D.N.Y. 2009) .................................................................................. 1

**<u>Statutes</u>**

29 U.S.C. § 216(b) ..................................................................................................................... 1

**<u>Other Authorities</u>**

7B Charles Alan Wright, et al.,
    *Federal Practice & Procedure* § 1807 (3d ed. 2005) ............................................................. 2
*Controlling Smart Phone Abuse, The Fair Labor Standards Act's Definition of "Work* in *Non-*
    *Exempt Employee Claims For Overtime*, 58 U. Kan. L. Rev. 737, 772-73 (Mar. 2010)." .......... 30

## I.      Introduction

"There are eight million stories in the Naked City.  This has been one of them."  As with each episode of the iconic 1958 television cop show, every story in this case is different.

On July 14, 2009, the Court granted plaintiff Gamze Zivali's ("Zivali") motion to certify this case as a collective action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).  The Court's decision was based on Zivali's "modest showing" that she and other employees of defendant AT&T Mobility LLC ("Mobility") working as Assistant Store Managers ("ASM") or Retail Sales Consultants ("RSC") at Mobility's approximately 2,000 retail stores across the country are similarly situated with respect to the operation of the "MyTime timekeeping system." *See Zivali*, 646 F. Supp. 2d 658, 661 (S.D.N.Y. 2009) ("Cert. Order").

Now that discovery has concluded, this collective action should be decertified.  The basic premise supporting conditional certification – plaintiffs' claims about the design and administration of MyTime – is untenable.  Instead, the remaining hodgepodge of individualized allegations makes this the antithesis of a case involving individuals who are "similarly situated" with respect to any policy or practice that violates the FLSA.

## II.     Applicable Legal Standard

Plaintiffs may proceed on a collective basis in an FLSA case only if they are similarly situated to those whom they seek to represent.  29 U.S.C. § 216(b).  Following discovery, "courts must apply a more 'stringent standard' of proof in determining whether plaintiffs are similarly situated."[1]  Zivali has the burden of producing "substantial evidence" that the more than 4,000

---

[1]      *See, e.g., Eng-Hatcher v. Sprint Nextel Corp.*, No. 07 Civ. 7350, 2009 U.S. Dist. LEXIS 127262, at *8-17 (S.D.N.Y. Nov. 13, 2009) (rejecting certification of collective action of putative class of retail sales consultants at Sprint's retail cellular stores alleging various types of "off the clock" work).  "Because of the heavier burden of proof [at the second stage] for deciding whether the group is 'similarly situated,' courts have recognized that few actions will be certified at this stage." *Norris-Wilson v. Delta-T Group, Inc.*, No. 09CV0916, 2010 WL 2196066, at *2

individuals from around the country who have become opt-in plaintiffs in this case ("the opt-

ins") were the victims of a "single decision, policy, or plan" that violates the FLSA.[2]  Zivali can

no longer rely on unsubstantiated assertions of a nationwide policy or practice to require

employees to work off-duty without compensation.  Rather, she must present **substantial**

**evidence** of a uniform, unlawful policy that permits these claims to be adjudicated in a collective

action.  Relevant factors include (1) the disparate factual and employment settings of the opt-ins,

(2) the various defenses available to Mobility that may be individual to each plaintiff, and

(3) fairness and procedural considerations.  *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d

346, 352 (E.D.N.Y. 2008).  Courts regularly decertify FLSA cases where opt-ins make

individualized allegations of non-compensated off-duty work,[3] including several decisions

involving employees in this segment of the retail industry.[4]  Decertification is likewise

---

(S.D. Cal. June 1, 2010), *citing* 7B Charles Alan Wright, et al., *Federal Practice & Procedure* §
1807 (3d ed. 2005).

[2]    *See, e.g., England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507-08 (M.D. La. 2005)
("similarly situated" standard requires that putative class "were together victims of a single
decision, policy, or plan") (citation omitted).

[3]    *See, e.g., Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 282-83 (N.D. Tex.
2008); *Bayles v. Am. Med. Response*, 950 F. Supp. 1053, 1061-63 (D. Colo. 1996) (decertifying
action where claims of work during sleep and meal times turned on "significant individual
issues"); *King v. CVS/Caremark Corp.*, No. 07-21824-CIV-GRAHAM/TORRES, 2008 WL
5973490, at *2-5 (S.D. Fla. Sept. 11, 2008) (decertifying conditionally certified collective action
because of numerous factual disparities – most notably in managers' procedures regarding
timekeeping at various locations – in plaintiff's claims, including claims about off-duty errands
for employer and work during lunch breaks); *Johnson v. TGF Precision Haircutters, Inc.*, No.
Civ. A. H-03-3641, 2005 WL 1994286, at *8 (S.D. Tex. Aug. 17, 2005).  *Cf. Basco v. Wal-Mart
Stores, Inc.*, No. A-00-3184, 2004 WL 1497709, at *8 (E.D. La. July 2, 2004) (denying motion
for conditional certification because off-the-clock claims appeared "extremely anecdotal" under
either step one or step two analysis); *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-
0840E(SR), 2005 WL 2654270, at *5 (W.D.N.Y. Oct. 17, 2005) (denying certification in part
because claims of "off-the-clock" work are too individualized).

[4]    *See Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at *8-17; *Simmons v. T-Mobile USA, Inc.*,
No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007) (denying conditional certification of
class of retail employees at T-Mobile stores in Texas because case involved "claims of 'off the
clock' unpaid overtime, where allegedly dozens (if not hundreds) of different low-level

compelled here.

Zivali has no evidence that the opt-ins were victims of a policy or widespread unlawful practice.  The variety of claims asserted by the opt-ins, and Mobility's defenses to those claims, make this case impossible to manage as a collective action consistent with due process.  There is no common nexus between the opt-ins' claims because Mobility's time reporting system is inherently flexible in accommodating employees with varying work schedules.  As confirmed by the opt-in depositions, an individual opt-in's failure to take advantage of the system and accurately report all time worked reveals little more than her own personal story.

## III. Mobility Has Lawful Systems and Policies for Proper Payment of All Time Worked

Mobility has established and enforces policies and practices designed to capture and pay all time worked by its employees, whether the work takes place at or away from a retail store.  Karen Bennett Dec. ¶ 21-23.[5]  This principle is set forth in its Code of Business Conduct ("COBC"), which applies to all employees.[6]  These practices make it easy for any employee to

---

supervisors with wide management discretion in practice violate Defendant's clear, lawful written policies at some or many of Defendant's more than one hundred different retail locations"); *Smith v. T-Mobile USA, Inc.*, No. CV-05-5274, 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007) (denying certification of nationwide collective action of retail T-Mobile retail store employees where allegation that T-Mobile unlawfully required employees to work off-the-clock arises out of different fact patterns).

[5]   True and correct copies of declarations (referred to herein as "Dec.") from corporate-level Mobility employees are filed separately as Exhibits A through J.  True and correct copies of declarations obtained from store-level employees cited herein are attached, in alphabetical order, to the Declaration of Thomas P. Gies.  For the Court's convenience, Mobility has catalogued, by topic, the contents of the 29 opt-in depositions and 85 declarations of current and former store-level employees submitted herewith starting at paragraph 87 of Exhibit K, Declaration of Thomas Gies ("Index").

[6]   The current version of the COBC provides:  "Nonexempt (overtime eligible) employees must accurately report all hours worked each day and each week and may not work overtime unless it is approved by a supervisor in advance.  However, all overtime hours worked by non exempt employees must be paid regardless of whether they were approved.  Managers are prohibited from requiring or permitting nonexempt employees to work 'off-duty.'  Failure to accurately

report hours worked and to raise concerns about the administration of these policies.[7]

Zivali's claim[8] that the universal use of MyTime justifies collective action treatment of this case is misguided. The use of MyTime, without more, is simply insufficient to establish that the opt-ins are similarly situated.[9] MyTime is a positive-pay system that records time, by the minute, based on actual times entered, not *scheduled* hours and breaks. *See* Fogle Dec. ¶ 5. This case thus does not involve a timekeeping system with a potentially problematic design feature, such as an automatic deduction element.[10] Rather, any claim for unpaid overtime necessarily involves an inquiry into facts beyond the design of MyTime. That inquiry, in turn, inevitably requires an analysis of individual stories regarding the nature and duration of any alleged off-duty work, whether it was reported or otherwise known to Mobility, whether it was paid, and, if not, why not. Each of these differences makes collective action treatment inappropriate.

---

report and pay overtime for nonexempt employees violates the law." Bennett Dec. ¶ 22 and exhibits 3 and 4 thereto.

[7] An employee who believes that her RSM (or delegate) has not compensated her properly for all time worked has many avenues to obtain relief. These avenues include (a) a local Human Resources representative, (b) a more senior manager (e.g., ARSM), (c) for those RSCs who are represented by the Communications Workers of America ("CWA"), the local CWA representative, and (d) Mobility's toll-free Ethics line, among others. Reminders of the need to report such violations are posted in every retail store and appear on every employee's MyTime log-in screen. Pallia Dec. ¶¶ 13-16; Terry Fogle Dec. ¶ 13-15.

[8] The Court adopted Zivali's claim that "MyTime cannot, at the time work is completed, accurately capture hours with respect to certain work activities." Cert. Order, p. 5. In its Motion for Summary Judgment, Mobility demonstrates that MyTime, which provides an easy method for the non-contemporaneous capture of time, is lawful under the FLSA.

[9] *Rodgers v. CVS Pharmacy, Inc.*, No. 8105-CV770T-27MSS, 2006 WL 752831, at *5 (M.D. Fla. Mar. 23, 2006) (denying conditional certification of FLSA action alleging time shaving to avoid overtime where putative class members' utilization of same company computer system to clock in and out is insufficient to prove class members were similarly situated)

[10] *Cf. Barrus v. Dick's Sporting Goods, Inc.*, 465 F. Supp. 2d 224, 226-27 (W.D.N.Y. 2006) (timekeeping system automatically deducted time for scheduled lunch breaks and overtime); *Harding v. Time Warner, Inc.*, No. 09cv1212-WQH-WMc, 2010 WL 457690, at *2, 5 (S.D. Cal. Jan. 26, 2010) (alleging improper rounding feature in timekeeping system).

## A.    The Timekeeping System Allows for Easy Capture of *All* Hours Worked

Hourly employees are required to record their time as soon as they arrive at the store.

Pallia Dec. ¶ 5.  They go to any available computer and log into the Kronos ("MyTime")

timekeeping system, through a process known as the "punch in."  Employees use the same

process to log in and out for their meal break and at the end of the work day.  *Id*.  The system

log-on screen reminds employees they are "required to record all of [their] time worked" and if

they are "directed to report [their] time inaccurately," they are instructed to "immediately advise

local Human Resources or report this to the Ethics line."  Fogle Dec. ¶ 7.

When employees are unable to access MyTime while performing work away from the

store, or when they forget to punch in or out while at the store, they are required to report this

time.[11]  Employees simply notify their store manager ("RSM") or an assistant store manager

("ASM") if the RSM has delegated this responsibility.[12]  Bennett Dec. ¶ 23.  MyTime allows

RSMs (and ASMs, if authorized) to manually adjust the time record to accurately capture all

such time worked (the "adjustment feature").  Pallia Dec. ¶¶ 6-8; Fogle Dec. ¶¶ 10-12.  The

adjustment feature can be used during the payroll period, or after payroll has run, to correct any

---

[11]   Each RSM has the discretion to decide how he or she wants to receive adjustment requests –
verbally, by e-mail, by text, or with a time correction form.  Pallia Dec. ¶ 7 ("The request need
not be formal.  While some managers ask for requests to be made by e-mail, others accept oral
requests, or text messages, or handwritten notes.");  Fogle Dec. ¶ 10; *compare* Funchess Dec. ¶ 5
("I make sure to tell my manager what happened and she adjusts the time.");  Stanfield Dec. ¶ 5
("If I miss a punch at lunch or any other time, I just email my RSM, and she makes the
changes.");  Guevara Dec. ¶ 5 ("I created My-Time edit forms for employees to use when
requesting changes to their time.");  Iracheta Dec. ¶ 11 ("At times I tell my manager verbally, but,
usually, I tell him via email.");  Burks Dec. ¶ 8 (RSCs "write the time down on a piece of paper");
*see also* Index ¶ 88.

[12]   Each RSM has the discretion to decide whether and to whom he or she wants to delegate
adjustment rights.  Fogle Dec. ¶ 9 ("Each manager decides for him or herself who (if anyone) to
choose as a delegate for timekeeping purposes");  *compare* Guevara Dec. ¶ 5-6 ("I am the only
person in the store with the authority to modify employees' time.")  *with* Kinnebrew Dec. ¶ 6
(ASMs are delegates).

reported concerns about the accuracy of an employee's paycheck.  If used after a pay period has

closed, the adjustment feature creates an "historical edit" that may result in the issuance of a

separate payroll check to the employee.  Fogle Dec. ¶ 14.

**B.       Mobility Policies, Reiterated in Training, Mandate Accurate Timekeeping**

Mobility devotes substantial resources both to ensuring widespread knowledge of its

policies and systems and in monitoring compliance.  *Bennett Dec.* ¶¶ 25-30, 33-34.  When

employees join Mobility, they take a number of training classes, including a detailed review of

the COBC called "Time Reporting Training for Retail Sales Employees" and a course called

"FLSA For Non-Exempt Employees" (previously "Pay Practices – FLSA Basics").  Bennett Dec.

¶¶ 25-27.  The training, which employees must repeat annually,[13] emphasizes that Mobility pays

its employees for all hours worked and emphasizes that work performed outside the store ***must***

be reported to management so it can be paid.  *Id. at* ¶¶ 27-28.[14]  The training explicitly addresses

the treatment of work performed away from the store, including checking e-mails or handling

calls from managers from home.  *Id. at* ¶ 27.[15]  RSMs, as well as managers, are trained on the

---

[13]   *See, e.g.,* Ibanez ¶ 3 ("In addition to the initial training on the overtime policy that is
provided when an hourly employee is hired, all ASMs and RSCs are required to recertify on the
overtime policy every year"); Davis ¶10; Reznicek ¶ 4; E. Brown ¶ 10; Williams ¶ 29; Baker ¶ 8;
Kinnebrew ¶ 3.

[14]   *See, e.g.*, Valenzuela Dep. 41:3-13 (acknowledged training that "the focus, once you get [to a
store is to] make sure you clock in"); Bonomo Dep. 47:6-24 (received training on timekeeping
policies and how to use MyTime); Gutierrez Dep. 12:10-12, 13:3-5 (same); Farley Dep. 41:1-
42:1 (same); Schneider Dep. 81:18-82:4 (same); Sterling Dep. 17:11-15 (same); Hendricks Dep.
14:20-15:8 (same); *see also* Index ¶ 87.

[15]   To further ensure compliance, Mobility regularly surveys practices at retail stores and
maintains procedures to track timekeeping reporting errors.  Bennett Dec. ¶ 33 (Sales Operations
helps design questions to include in monthly store reviews); Fogle Dec. ¶¶ 16-17 (analyses of
time reporting data).  Mistakes and other areas of concern are referred to local management for
correction, including discipline against managers found to have violated policy.  Fogle Dec. ¶¶
16; Bennett Dec. ¶ 33; Pallia Dec. ¶¶ 17-18 (discipline against managers includes termination for
willful violations of time policies).  Mobility also makes it easy for employees to report

adjustment feature and routinely reiterate the message that all work performed must be compensated. *Id.*[16]

### C.   Plaintiff's New Theory That Mobility Had an Unlawful *Practice* of Discouraging the Reporting of Off-Duty Work Is Unavailing

Recognizing that Mobility's policies and training comply with the FLSA, Zivali is likely to abandon the principal argument made in support of her motion for conditional certification in favor of the newly minted claim that Mobility's desire to control overtime conflicts with its obligation to pay employees for all hours worked. Zivali may argue that an incentive to reduce overtime causes a widespread practice of not using the adjustment feature. In addition to being wrong on the law,[17] this theory is capsized by the evidence. Mobility routinely has paid overtime to employees, in amounts totaling *more than $412 million* between 2006 and 2010. Christopher Dondzila Dec. ¶ 3; *see also* Index ¶¶ 93-94.[18] Analysis of opt-ins' MyTime records by Mobility expert Paul White[19] revealed that, in almost one-third of the workweeks examined, time edits

---

concerns, whether to more senior management, HR, or anonymously to the Ethics line. Bennett Dec. ¶ 23; Pallia Dec. ¶ 13-16.

[16]   RSMs reinforce this training in their stores. For example, Alex Desai, an RSC in suburban Washington, D.C., stated: "My manager constantly reminds me that, if I perform any work when I am not logged into MyTime, I should let him know so that I can be compensated. He last reminded me of this policy last week." Desai Dec. ¶ 10; *see also* Haussling ¶¶ 9-11 (as an RSM, "I have meetings every Saturday with my RSCs and I emphasize at every one of those meetings that they must report all the time they work.").

[17]   This same argument was *rejected* by Judge Jones in *Eng-Hatcher* 2009 U.S. Dist. LEXIS 127262, at *9-11. There, the court found that the plaintiff's claims that Sprint's alleged strict control over its labor costs operated to suppress overtime were "merely theorizing." *See also, e.g., Simmons v. T-Mobile USA, Inc.*, 2007 WL 210008, at *5-7 ; *Epps v. Oak Street Mortgage, LLC*, 2006 WL 1460273, at *7 (M.D. Fla. 2006) (decertifying collective action where, even assuming defendant had a corporate policy of discouraging overtime, proof of violation would depend on how and whether each manager implemented the policy as to each plaintiff).

[18]   Managers routinely scheduled and paid overtime for a variety of business reasons, especially at busier stores and in short-staffing situations. *See* Index ¶¶ 94-95. In total, the opt-ins were paid *more than $21,000,000 in overtime* between 2006 and the present. Dondzila Dec. ¶ 4.

[19]   Paul F. White, Ph.D., a labor economist and Director of ERS Group, analyzed timekeeping data to determine whether there was any statistical evidence suggesting consistent patterns of

made by managers using the adjustment feature actually *triggered* overtime payments where the opt-ins would not otherwise have received such overtime.  White Report, p. 43.  This evidence surely does not describe a company averse to paying overtime.  To the contrary, Mobility does everything it can to compensate its employees for all the work they perform, inside or away from a store, and to make it easy to report any concerns about payment.

## IV.   Disparate Factual and Employment Settings Mandate Decertification

The varying type, frequency and reasons for the off-duty work alleged by the opt-ins present inherently individualized stories.  A series of such episodes is not appropriate for collective action treatment.

### A.   Requests for Adjustments Show a Wide Range of Practices

The evidence shows substantial variety as to the key issue in the case – the use of the adjustment feature.  Several opt-ins testified that they understood the adjustment feature.[20] Several opt-ins acknowledged the regular receipt of payment for work reported through the adjustment feature.  *See, e.g.,* Sterling Dep. 56:4-20 (his RSM or fellow ASMs made any and all adjustments he requested to his time); Linnenbaugh Dep. 18:11-20 (all adjustments he sought were made by managers).  Some opt-ins conceded they reported and were compensated for time worked while off duty; others allege they either did not report time or were not compensated

---

edits to time punches in "Analysis of Timekeeping and Payroll Data For Assistant Managers and Retail Sales Consultants at AT&T Mobility LLC" ("White Report").  He found no consistent patterns; instead he found statistically significant variation from store to store and manager to manager.  *Id.* at 2.

[20]   Easdon Dep. 9:10-10:1, 10:2-12 ("I understood that I was to be paid for every minute that I worked, so, you know, and adjustments would be made by the manager."); Harrell Dep. 27:19-28:2 (received training about requesting adjustments from manager); Sterling Dep. 34:1-16 (same); Farley Dep. 41:1-42:1 (requested manager to adjust time for missed punches and they were made); Hendricks Dep. 16:17-19, 50:10-20 (requested time adjustments due to missed punches); Sterling Dep. 19:15-20:15, 34:17-36:9, 37:12-18 (manager makes adjustments due to missed punches and as an ASM, would also do the same for RSCs).

after reporting it.[21]  Some opt-ins conceded that the frequency of their requests for overtime and

for time adjustments varied:  "It would vary – vary from what I'm doing, where I'm at, if I'm

covering another store, if I'm running late, if I'm running early.  It varied. . . .Couldn't get stuck

on a number because it varied."  Sanchez Dep. 33:22-34:10.[22]  Some employees reported that

they felt no pressure from managers to work off-duty without reporting the time and, in fact, that

their RSMs reminded them to report all time worked.  Greg Wilcox, a Seattle ASM and former

Boise RSC, stated:  "I always feel comfortable reporting the time that I work, even if it was

unscheduled. . . .Mobility explicitly requires me to report all overtime that I work and I have

always reported all of my time worked, both in Idaho and now in Washington, since the start of

my employment with Mobility, without feeling any pressure about working too much overtime."

Wilcox Dec. ¶ 9.  Opt-in David Bennett claimed that he requested adjustments from one RSM

approximately three times which were not made but admitted that it is possible the RSM forgot

and that, had he gone to the ARSM, his time likely would have been adjusted.  D. Bennett Dep.

38:13-41:25.  Bennett admitted that when he asked his last RSM for adjustments to his time via

email, the RSM made the adjustments.  *Id.* at 55:10-56:3, 80:24-81:21.[23]  The critical variances

---

[21]   Mosblech Dep. 21:7-21, 58:14-18, 58:23-59:3 (taught that time adjustments can be requested
for off-duty work because paying employees for all time worked is "important"); Harrell Dep.
25:14-26:5, 26:10-11 (managers taught that "[w]hen you were at your location, you reported the
time you worked.  If you went off site for a business event, that time was also reported, or a
training event, that time was also reported."); Harrell Dep. 20:5-16, 75:7-24 (based on how
employee was "trained into the company," did not know that time spent off the clock performing
certain other activities, such as text messaging, was compensable time); *see also* Index ¶¶ 92-93.
[22]   Sanchez also summed up the differences in management styles regarding approval of
overtime requests in advance.  He testified that his requests for overtime "definitely varied.  If it
was something that I knew maybe I could get it approved for, I would ask. . .There were
overtime approved for certain scenarios.  What they were for, I couldn't recall.  And how
frequent they were, I couldn't recall."  *Id.* at 43:1-17.  Sanchez described one busy store, staffed
with two sales leads, an ASM, and an RSM, as running a "tight ship."  Sanchez Dep. 38:19-39:3.
[23]   *See also* Easdon Dep. 30:7-13 (requested adjustments were approved); Spraggins Dec. ¶ 28
("I love Mobility, but I don't love them that much to not get paid for my time at work").

in these episodes, including management responses to such requests, obviously requires individualized determinations.[24]

Moreover, expert analysis of MyTime data for the opt-ins demonstrates a wide range among the stores in the frequency by which managers edited the time records of the opt-ins. White Report at p. 33. An analysis of punch adjustments on days with even-to-even edits (those days where managers made changes to what might otherwise appeared as a series of complete punches) showed some stores where none of the opt-ins' punches were edited and some stores where far greater than 50 percent of the employees/days contained even-to-even edits. *Id.* at p. 34. The reasons why some stores had more adjustments than others is another issue that will have to be explored individually.

Some opt-ins testified they did not report some of their time because they were unsure or did not believe it was compensable. *See* Sterling Dep. 65:2-76:6 (never sought compensation for 2 minutes of time opening or closing because did not think it was compensable work until he got notice of the lawsuit). Other opt-ins said they performed off-duty work, *without* informing management, for their own benefit.[25] For example, some said they were motivated to work off duty because they thought such conduct would increase their commissions.[26] Others recognized

---

[24] *See, e.g., Proctor*, 250 F.R.D. at 283 (claims varied from store to store depending on manager); *Saxton v. Title Max of Ala., Inc.*, 431 F. Supp. 2d 1185, 1188 (N.D. Ala. 2006) (evidence would be highly specific and subject to variables, including whether store manager neglected to enforce overtime policy); *Johnson*, 2005 WL 1994286, at *4-8 (decertification granted where alleged violations highly variable depending on circumstances and attitudes of individual managers).

[25] Such time is presumptively not compensable. *See Holzapfel v. Town of Newberg*, 145 F.3d 516, 523 (2d Cir. 1998) ("If the employee was motivated primarily by his or her own pleasure, then the time was not expended primarily for the employer's benefit and it is not compensable").

[26] Sanchez Dep. 19:14-20 (chose to work through lunches to make sales); Smay Dep. 95:7-14 (not told that he had to review product information off duty but if he did it on-duty, it would cut into his sales time); Harrell Dep. 52:6-53:8 (chose to respond to emails from customers off the clock because it helped drive sales and, as a result, he would receive more commissions).

they were not supposed to work while off duty but simply wanted to be "team players."[27]

### B. Varying Off-Duty Claims Involve Inherently Individualized Situations

The type and extent of work allegedly performed off-duty varies widely. Some opt-ins, like Zivali, seek overtime pay for multiple types of work they allegedly performed while not logged into MyTime including: (i) reviewing and responding to emails and text messages; (ii) servicing customers outside of the retail store; (iii) working through lunch breaks; (iv) opening and closing the stores; (v) participating in trainings and conference calls; (vi) reviewing product information; and (vii) participating in a variety of company-related activities outside of normal business hours. Others allege some but not all of these claims.[28]

### 1. Opt-Ins Were Not Similarly Situated Regarding Off-Duty Email Usage

Zivali alleges she was required to read and respond to work emails on her BlackBerry when she was away from the store. Leaving aside the veracity of the claim, it is simply not reflective of the experiences of most opt-ins. In fact, a substantial portion of the opt-ins *do not* even receive corporate emails on their "company official use" ("COU") devices and, thus, can

---

[27] Timper Dep. 33:7-24; 35:17-22, 74:20-25, 83:2-18 (nobody told her she needed to respond to texts from customers and employees while off duty but she did it because it was just "common sense" and "common courtesy" and because "that is my job as a manager to help, lead my team and help them with their problems"); Walsh Dep. 104:5-7; 15-22 (no one instructed him to interrupt lunch but "it would have been rude of me to just ignore them"); Valenzuela Dep. 76:23-78:20 (spent an hour at Wal-Mart helping an elderly lady trouble-shoot her phone but never informed manager of it because it was "just helping a lady out"); Walsh Dep. 67:4-19 (responded to email off duty because he wanted to move up the ranks).

[28] For example, Thomas Farley makes no claim for overtime relating to work performed away from the store. Farley's only claim is for the time required to open and close the store, for which he had never requested an adjustment and had never thought of as time worked until he saw the notice of lawsuit. Farley Dep. 9:24-10:2. The variance in the number and type of claims warrants decertification. *See, e.g., Anderson v. Cagle's, Inc.*, 488 F.3d 945, 954, n.8 (11th Cir. 2007) (affirming decertification where availability of defenses to some but not all of the putative class members "clearly poses significant case management concerns") (citations omitted).

have no claim for off-duty email usage.[29]  Access to corporate email on COU devices is a

function of market-specific policies.[30]  In some markets, ASMs have access to corporate email

on their COU devices, but RSCs do not.[31]  Even within markets, corporate email access has

varied over time based on manager or opt-in preferences.  For example, opt-in James Joven did

not have email on his COU until a new RSM transferred to the store in mid-2006.  When another

RSM transferred into the store in mid-2009, email was removed from his COU again.  *See* Joven

Dep. 24:21-25:12; *see also* Kaddoura Dep. 85:16-25 (had email on COU but then opted out);

Valenzuela Dep. 64:20-65:23 (no longer receives email while off-duty).

Moreover, the evidence belies Zivali's argument that access to corporate email on a COU

device leads to uncompensated overtime.  Managers in many markets who authorized corporate

email to be made available to non-exempt employees on their COU devices also have required

them to sign an acknowledgement that the device is not to be used for business purposes off

hours but if it is, that any such use should be reported to management for payment.[32]

Testimony varies regarding manager expectations as to whether employees with access to

corporate email should review and respond to email received when off duty.  Some opt-ins

testified that Mobility managers never expected employees to review and respond to company

---

[29]   *See* Bennett Dec. ¶¶ 13-14, 42; Schneider Dep. 70:7-12 (never received or responded to
emails from customers while an RSC because no access to COU off duty); Easdon Dep. 27:24-
28:2, 39:10-13 (no email on COU); *see also* Index ¶ 102.

[30]   *See* Bennett Dec. ¶ 45; Wottle Dec. ¶ 5; Fleissner Dec. ¶ 5; Satin Dec. ¶ 5; Holland Dec. ¶ 5;
Index ¶ 102.

[31]   Bennett Dec. ¶ 42; Schneider Dep. 33:6-11 (only as ASM, not RSC); Ashcraft Dec. ¶ 7 (not
aware of any RSCs who currently have access to their corporate email on their COU; knows a
few had access in the past).

[32]   Sterling Dep. 44:18-47:18 (signed COU policy requiring him to not review email while off
the clock); Pallia Dec. ¶ 20 (attaching form signed by opt in Sterling); Bennett Dec. ¶ 45; Wottle
Dec. ¶ 6; Cruz ¶¶ 20-21; Valdez ¶ 13; Farthing ¶ 20 (same).

emails at all hours of the day without compensation.[33]  Some leave their COU devices at the store while others take their COU devices with them but rarely check them, turn them off completely when they leave the store, or set an out-of-office notice on their e-mail.[34]  Still others testified their off-duty email use varied in frequency based on varying factors such as daily sales. Carrega Dep. 47:24-48:3 (would send emails to ARSM while off duty summarizing his future action plan only on days with no sales); *see also* Index ¶ 105.

Testimony also varies as to whether off-duty email usage was reported and compensated. Opt-in Tom Linnenbaugh requested, and received, a two-minute adjustment for time it took him to write an email to his manager after logging out of MyTime.  Ex. PP (request for adjustment); Ex. QQ (time record showing adjustment made).  Angela Bellotti, an ASM in Rochester, New York, recalled getting paid for five minutes spent reviewing an email at home regarding the status of a parts shipment.  Bellotti Dec. ¶ 3.  Others have not reported the time because it "does not require more than a second or two."  Fitzgerald Dec. ¶ 9; *see also* Index ¶ 106.

## 2.    Opt-Ins Were Not Similarly Situated Regarding Off-Duty "Texting"

Testimony about receipt and transmission of text messages is also all over the map.  As with email usage, the extent of this practice will have to be examined on an individual basis to determine whether it was off duty, whether it was for personal or business reasons, and whether

---

[33]  *See* Harrell Dep. 46:11-14 (no one told him he had to respond immediately to customers' emails when he was off duty); Timper Dep. 52:14-19 (same); Sterling Dep. 43:18-44:9, 47:16-18 (while he had email on his COU device, no one ever instructed him to review emails off duty and he was never disciplined for not reading email off duty).  A few others testified to the contrary. *See, e.g.,* Walsh Dep. 60:20-25 ("[n]obody specifically stated but it was implied [that he had to check company email] since I had company issued e-mail on my BlackBerry").

[34]  Garrigues Dec. ¶ 14-15 (half of his RSCs leave COU devices at the store); Cardenas Dec. ¶ 11 ("When I was full time, I would occasionally leave my iPhone at the store."); Martin Dec. ¶ 30 ("I leave my work phone at work."); Alisa Dec. ¶ 7 (RSM suggests employees "leave their cell phones in my office during their off hours"); Index ¶¶ 103-04.

it was both reported and ultimately compensated.[35]  Some opt-ins reported they rarely receive

text messages from customers or managers, either on or off duty.[36]  Certain customers and

managers over the years have texted opt-ins repeatedly while others never texted them at all.

Opt-in Ibn Abdul-Rahman noted that "some managers just like to send more text messages than

others;" it was "just a different management style."  Abdul-Rahman Dep. 34:19-21.  *See also*

Hendricks Dep. 95:16-96:2 ("different managers approach things differently.").  Opt-in Christine

Gutierrez testified that she texted with two managers while off duty – noting that the frequency

varied from month to month and the responses were different every time – but that her other

store managers "did not really send text messages."  Gutierrez Dep. 33:20-22, 35:4-25, 36:12-14,

93:11-23; *see also* Index ¶ 108.  Some said that the 160 character limit on text size means that

any texting "conversations" must be short, while others say they get around the limit by sending

multiple texts.[37]  Others simply could not quantify how much time they have spent texting.[38]

 Some opt-ins testified that no one ever told them to review and respond to texts during

off-hours.[39]  One employee reported he gets 10 to 15 text messages per week from managers –

announcing good news about a recent sale or asking the group for an opinion – but has never

---

[35]   Charles J. Mullin, Ph.D., a labor economist at ERS Group, analyzed a sampling of texting data for several opt-ins to determine what proportion of time was spent on business related activity.  Expert analysis of six opt-ins' COU records suggests that their texting patterns varied widely.  Mullin Report, p. 21 (from 5 minutes v. 42 minutes a week).  *See* "Analysis of Phone Calls and Text Messages For Selected Opt-In Plaintiffs" ("Mullin Report").

[36]   Hendricks Dep. 56:18-57:6 (texts from customers were "rare" – "[m]aybe two to three a month"); Iracheta Dec. ¶ 12 (estimates receiving only 5 texts during 3 years with Mobility); Baker Dec. ¶ 12; Farthing Dec. ¶ 28; Cruz Dec. ¶ 24 ("one text message a week at most").

[37]   Cruz Dec. ¶ 24 (only a few seconds to read and 30 seconds to respond); Farthing Dec. ¶ 28 (occasional texts from the store only take a few seconds; e.g., wear this shirt, meeting cancelled).

[38]   Gutierrez Dep. 37:17-38:15, 39:24-40:10 (responses to texts varied from a couple of seconds to a longer amount she could not estimate); Opt-in Kaddoura Dep. 88:8-20 ("varies, sometimes less, sometimes more;" sometimes none and sometimes 50 text messages); *see also* Index ¶ 109.

[39]   Sanchez Dep. 59:10-16; Harrell Dep. 74:4-6 (never told to respond to texts while off duty); Bennett Dep. 70:24-72:9 (only work-related text messages as an RHSC were from RSM; no one instructed him to read them and they did not require a response); *see* Index ¶ 105.

been told he has to read them while off duty.  Villasenor Dec. ¶¶ 26-27.  Another pointed out that

he gets text messages about sales figures – which include reminders to review them during work

hours – and that he could not respond to those texts even if he wanted to because they are

generated by "dummy numbers" rather than a mailbox to which a response can be sent.  Gladura

Dec. ¶ 15.  Others say they felt compelled to respond with an "okay" or "will do" even when a

specific response was not required.  Gutierrez Dep. 37:21-38:11.  *See also* Index ¶ 107.

Many opt-ins conceded that, because they were allowed to use their COU devices for

personal as well as business use, the vast majority of numbers they texted were personal.[40]  In

fact, some employees befriended customers and then texted them for personal reasons.[41]  An

individual examination of text records indicates that even texts among co-workers are often not

work-related.  Zivali, for example, was terminated after forwarding racist text messages to her

co-workers while off duty.  Zivali Dep. 27:21-32:5.

Depending on the amount of time spent texting, employees made different choices as to

whether to report that time.  When one ASM gets occasional text messages: "I report the time it

took me to read and respond to the text message."  Haussling Dec. ¶¶ 23, 26 (total time for calls

and texts is "between zero and ten minutes a week, usually zero").  Opt-in Tony Sterling

admitted that whenever he requested a time adjustment for texting off duty, that adjustment was

made.  Sterling Dep. 54:20-61:4.  Others did not bother to report them because the time was

minimal.  Spraggins Dec. ¶ 21 ("few minutes here and there, at most"); Burcher Dec. ¶ 12

---

[40]   Valenzuela Dep. 97:16-100:23 (five of most frequently texted numbers on COU are
girlfriend, mother, friends, ex-girlfriend, and cousins); Hendricks Dep. 71:4-10 (80 percent
personal texts); Marshall Dep. 45:18-46:2 (spent 30 minutes to 10 hours/week on personal texts);
*see also* Index ¶ 101.
[41]   Iracheta Dec. ¶ 13 (texts frequently with a customer with whom she became friendly about
non-work issues).

("literally a few seconds a week"); Valdez Dec. ¶¶ 19-21 ("just a minute here and there").[42]

### 3. Opt-Ins Were Not Similarly Situated Regarding Off-Duty Telephone Calls and In-Person Customer Interactions

Varying testimony regarding answering business telephone calls while off duty demonstrates that the opt-ins are not similarly situated as to this claim. Some employees reported that they rarely receive customer telephone calls during non-working hours.[43] Some said that managers rarely or never called them when they were off duty.[44] Many opt-ins testified that the numbers they called most frequently while off duty were personal.[45] Expert analysis of a sampling of telephone activity between six opt-ins and their supervisors and potential business contacts revealed that the frequency and length of potentially work-related phone communication was all over the map. *See* Mullin Report, p. 21 (phone activity between six opt-ins and supervisors (whether or not work-related) while opt-ins were not punched in ranged from 2 times per week to 21 times per week; two minutes v. 1.7 hours/week on calls with potential business contacts).

Accordingly, to the extent opt-ins seek damages for time spent on business calls while off duty, both fact and expert testimony will be required to assess the number of minutes spent on

---

[42]    *See also* Harrell Dep. 75:3-6 (familiar with adjustment process but never sought one for texting); Sterling Dep. 33:7-13 (same); Index ¶ 110.  The Court thus will have to determine, as to each opt-in, whether Mobility knew or should have known about the alleged off duty time they spent texting.  *See Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (no violation if employee fails to notify employer or deliberately prevents employer from acquiring knowledge of time worked).

[43]    Ashcraft Dec. ¶ 8; Villasenor Dec. ¶ 30 (2 per week); Iracheta Dec. ¶ 9; Burleigh ¶ 11 (5-10 per week, mostly during regular working hours).

[44]    Farthing Dec. ¶ 27 (1 such call every 3-4 months); Gladura Dec. ¶ 14 (calls from managers or co-workers do not take up more than 10 minutes a week).  Some managers make it optional for employees to even carry a data device.  Merzaian Dec. ¶ 9; Index ¶ 103.

[45]    Valenzuela Dep. 97:16-100:23 (five of most frequently called numbers on COU are girlfriend, mother, friends, ex-girlfriend, and cousins); Easdon Dep. 28:10-12, 52:2-14 (used COU for personal calls and recognizes wife's, mom's and dad's numbers); Index ¶ 100.

business and personal use.  *See* Mullin Report, pp. 11-21.

Employees' responses to telephone calls while off duty have also varied widely.  Some opt-ins simply ignore calls from a number they do not recognize.[46]  Some testified that there was no reason to answer because there was little they could do to help customers when they were not in the store.[47]  Others occasionally answer customer calls but immediately direct them to call back on the employee's next workday, call the store or Customer Service.[48]  Employees also are permitted, and in some markets encouraged, to program their voicemail to direct callers to call the store.[49]  Some opt-ins stated that, when they do answer the phone or respond to customer inquiries off duty, the types of customer questions they field away from the store are simple and take very little time, e.g., an inquiry about the store hours.  Cardenas Dec. ¶ 15 (2 minutes at most).  Others testified that the length of the calls depends on the types of questions customers have.  Gutierrez Dep. 77:15-23 (length "really just depended.  If the person didn't understand the phone, you know, you could spend a longer amount of time explaining a certain phone feature"); *see also* Index ¶ 114.  Some employees report all of their time spent on lengthy conversations

---

[46]   Sanchez Dep. 57:23-58:2 (no one instructed him to answer phone calls on his COU device during off-hours); Hendricks Dep. 39:1-5, 44:5-12 (no policy that required answering calls when off duty and never criticized or disciplined for not taking customer calls); Cardenas ¶ 14 (calls go to voicemail); Philebaum Dec. ¶ 5 (ignores unrecognized numbers); Index ¶ 111-12.

[47]   *See* Gutierrez Dep. 74:9-23, 76:25-77:7 (would have to work with her manager when she returned to the store to remove/block certain charges; could not do it at home or outside of work); Davis Dec. ¶ 5 (calls with customers while she is off duty are invariably brief because the RSC cannot provide much help to a customer outside the store).

[48]   Gutierrez Dep. 74:9-23, 76:25-77:7 (when she received calls from customers about billing issues, "[s]ometimes, you know, I would have to – just tell them I'll call them back when I'm at the store or I could refer them to my manager who could help them when they got to the store"); Index ¶¶ 111-12.

[49]   Collins Dec. ¶¶ 5, 6 ("The majority of RSCs let any off-hour calls go to their voicemail where they have a professional voicemail greeting requesting that the caller leave a message."); Herman Dec. ¶ 4 ("leave the store number in the voicemail greeting to direct any customer calls to the store."); Hartman Dec. ¶ 3 (instructs employees to program the store phone number into phones they sell).

with customers about buying a phone or service while others do not report it.[50]

Discovery also revealed varying testimony about employees being interrupted by customers while off duty.[51]  Some employees do their best to minimize any time spent speaking with customers during their off hours.[52]  Some respond to customer questions while they are off duty but always seek payment for that time.[53]  Additional analysis will have to focus on whether opt-ins sought compensation for this time, whether the time was compensated, and, if not, whether the opt-ins took any steps to complain.  *Compare* Opt-in D. Bennett Dep. 93:12-14 (admitted he never reported off-duty customer calls he allegedly took to his last RSM) *with* Cruz Dec. ¶ 30 (for lengthy calls with customers, "I would definitely tell my manager to adjust my time accordingly); Index ¶¶ 115-16.

### 4.    Opt-Ins Were Not Similarly Situated Regarding Work Allegedly Performed During Meal Breaks

There is likewise no consistent evidence about working during meal breaks.  It is undisputed that Mobility maintains a policy that employees are expected to take a meal break, that Mobility tracks whether employees are in fact getting these breaks, and that MyTime automatically records as compensable any break that is less than 30 minutes in length (thereby

---

[50]    Grace Thoburn, a Phoenix RSM, adjusted the time records of an employee to reflect a 45-minute telephone call with a customer on her day off.  Thoburn Dec. ¶ 12.  Stacey Parrish, an Austin RSM, adjusted the time of an ASM who informed her that he took a call at home from a customer needing assistance with a particular product.  Parrish Dec. ¶ 5.  *See also* Index ¶¶ 115-16.  *But see* D. Bennett Dep. 93:12-14 (never reported off-duty customer calls he allegedly took to his last RSM).

[51]    See Cruz Dec. ¶ 19 (assisted customers when they in a "hurry or are angry" before clocking in); Burcher Dec. ¶ 5 (sends email request for adjustment when intercepted by customer before punching in); Index ¶ 117.

[52]    Farthing Dec. ¶ 34 (quick question at a Waffle House); Elkin ¶ 17 (does not report because typically "brushes off" any questions received while off duty); *see* Index ¶¶ 113-14, 132.

[53]    Bonomo Dep. 54:24-56:3 (requests for time adjustments for customer service activities he performed after his shift ended and after logging out of My Time when the store was very busy were granted).  S*ee also* Index ¶¶ 118-19, 133.

paying employees for up to 29 minutes actually spent on a break that is less than 30 minutes).

Pallia Dec. ¶ 15.  Some opt-ins do not even assert a claim for interrupted or missed breaks.

Farley Dep. 9:20-10:2; Hopkins Dep. 9:22-10:9; Hendricks Dep. 13:17-21; Joven Dep. 23:7-16;

Index ¶ 120.

Other evidence confirms wide variations in employee meal break practices.  Some

employees go home or to restaurants for lunch to avoid interruptions.  Easdon Dep. 14:13-17

(tried to go off-site); Smay Dep. 100:8-19 (often instructed by managers to make sure that he

took his lunch break).[54]  Some employees say they are not interrupted even when they take their

breaks at the store.[55]  Other employees ask customers to contact another employee or to return to

the store after their lunch break.  Cardenas Dec. ¶ 14.  Others claim they leave the store for lunch

but are occasionally interrupted by customers who approach them with questions during lunch.

*See* Villasenor Dec. ¶ 14.  Some opt-ins testified that lunch interruptions, when they happen at

all, vary with changes in RSM or ASM.  Opt-in Christine Gutierrez testified that her lunches

were interrupted one to two times a week during her first six months at Mobility but that this

changed after she got a new manager.  Gutierrez Dep. 11:10-15, 66:1-11.

Some employees testified that work during lunch is driven by customer needs, which

vary by store, day and season.  Opt-in Melissa Schneider was not instructed to work during lunch

breaks but said it "was more of a need-driven issue.  If we got lots of customers on the sales floor

I would do my due diligence to make sure that we didn't have people waiting and I would help

---

[54]   Villasenor Dec. ¶ 14 ("During my lunch break, I usually either go buy food, take a walk, do some shopping, use the computer located in the back room, or bring my lunch and eat it in the back."); Haussling Dec. ¶ 29 (leaves store for lunch and goes to mall food court or Starbucks"); Ashcraft Dec. ¶ 14; Index ¶ 120.

[55]   Philebaum Dec. ¶ 15 ("I'm rarely if ever interrupted during my lunch break.  I'm usually just in my own little world in the break room."); Farthing Dec. ¶ 33 (rarely interrupted during lunch); Burcher Dec. ¶ 15 ("I sometimes bring my lunch to work and eat it in the break room.  Other times I might go out to grab lunch and bring it back."); Index ¶ 122.

the customers." Schneider Dep. 38:24-39:19; Index ¶ 122-23. Some employees skip lunch altogether and stay on the clock during that time, thus getting paid for the entire time period. Bonomo Dep. 83:4-8, 93:5-24 (did not punch out when he was too busy for lunch); Index ¶ 121.

Some employees punch back into MyTime before helping a customer who stops them during a break.[56] Others do not punch back in but seek adjustments to their time for work performed while off duty. Mosblech Dep. 62:24-64:7 (manager adjusted time to reflect work when he was interrupted during meal breaks while off duty). Others testified that their decisions to punch back in varied. Opt-in Ladell Clark testified that her hour-long lunch breaks were interrupted when she was needed at the store. Clark Dep. 18:13-19:23. When asked if she punched back in to help a customer during lunch, Clark stated:  "Not all the time, no.  It varied." She said she did not punch in because the customer was right there and she "wouldn't remember to clock back in at that time."  She admitted the policy called for her to request a time adjustment.  Clark Dep. 18:13-19:23.  Opt-in Thomas Linnenbaugh also testified about the variance in lunch interruptions over time, noting that when he was an ASM his lunch was interrupted for about an hour a week, when he became an RSC the interruptions were reduced to about 30 minutes a week, and since late 2008 or early 2009, his lunches have rarely been interrupted.  Linnenbaugh Dep. 53:16-55:1, 63:1-64:11.  He never requested an adjustment to his time for any of these interruptions, but testified he had no reason to believe he would not have gotten an adjustment had he sought one.  *Id.* at 55:23-56:20; 60:24-62:22; 68:22-69:17.[57]

---

[56]    Cedric Washington, an RSC in Atlanta, stated that he takes an hour-long break "about 95% of the time," and that in the rare situation where "duty calls" because a customer asks for him while he is on break, he logs back into MyTime and then helps the customer.  Washington Dec. ¶ 10; Casavale Dec. ¶ 7; Index ¶¶ 124-25.

[57]    Still others say they have helped customers while punched out but then punch back in and continue their lunch breaks on the clock after helping customers. Gladura Dec. ¶ 18 ("If I have a customer that really wants help, I have occasionally helped out on my lunch break – but if that

**5.** **Opt-Ins Were Not Similarly Situated Regarding Opening/Closing**
**Activities**

Zivali claims that opt-ins were not compensated for time spent working prior to punching

in on MyTime when working an opening shift.  This claim should also be decertified.  Some opt-

ins testified they never or rarely are scheduled to work an opening shift and, thus, do not make a

claim for time spent opening the store.[58]  Others claim that the number of opening shifts they

have worked has varied over time.  Joven Dep. 55:11-56:6 (mid-shifts have increased from 30 to

60 and now 80 percent under different managers).  Some employees who work opening shifts

reported that any pre-punch activities – unlocking the door, disarming the alarm, walking to a

computer to log-in and actually punching in – take very little time (from a couple of seconds to a

couple of minutes).[59]  Some testified that, on rare occasions, they have to boot up a computer or

the MyTime system can take longer to load than usual.[60]  Employees stated that, while it

generally takes them very little time to log in and log out of MyTime, when there are computer

---

happens I go back and take the remainder of my 45 minutes."); Villasenor ¶¶ 15-16 (when he did
not get a full lunch break while working on a high-value "U-verse" sale, his manager directed
him to take another 15 minutes off to make sure he got a full lunch break); Gutierrez Dep. 68:9-
15 (during first six months was called down from break room to help customers; sometimes went
back up and finished lunch and other times just stayed down on the floor).

[58]   *See* Clark Dep. 16:1-6 (no claim); Opt-in Abdul-Rahman Dep. 11:3-17 (no claim); Gutierrez
Dep. 48:7-8 (opened once a week).  Some opt-ins have no claim for off-duty work because they
immediately punched in upon entering the store.  Sanchez Dep. 69:15-18 (not instructed to do
work activities before punching in for opening shift).

[59]   Bonomo Dep. 68:22-69:17 (approximately 1 minute 25 seconds per week opening the store,
which included unlocking the door, relocking it, disarming the alarm and logging into the
computer); Gutierrez Dep. 52:3-54:6, 54:20-22 ("a couple seconds" to unlock back door, "a
couple seconds" to walk to alarm, "a couple seconds" to disarm alarm, "a couple seconds" to
walk from inventory door to gate, "a couple seconds" to unlock gate unless it was broken, "a
couple seconds" to open door behind gate); Moehring Dep. 49:23-50:16 (2 to 5 minutes); *see
also* Index ¶¶ 126, 128-29.

[60]   Gutierrez Dep. 52:3-54:6, 54:20-22 (30 seconds to a couple minutes to log into the computer:
"Sometimes the computer's really slow so it could take a couple minutes.  Sometimes it was
really fast."); Carrega Dep. 78:18-23 (took approximately 3 minutes for computer to boot up and
another 30 seconds to complete the MyTime login process); Index ¶ 127.

system delays and the log-in time exceeds 1 to 2 minutes, they have obtained adjustments to their time entries.[61]  Others did not report an occasional 3 to 5 minute computer boot up time because it was "inconsequential."[62]

　　　As with opening shifts, some opt-ins testified that they rarely worked closing shifts or performed closing tasks and, thus, do not make a claim for off-duty closing duties.  *See* Abdul-Rahman Dep. 11:3-17 (no claim).  Some opt-ins testified that the last thing they do before leaving the store is log-out on MyTime.[63]  Others reported that when closing the store, the process of logging out and setting the alarm is very short.[64]  Other opt-ins testified that their post-punch closing duties took longer.[65]

### 6.  Opt-Ins Were Not Similarly Situated Regarding Off-Duty Trainings, Other Meetings and Conference Calls Held Off-Site

　　　Variations also exist among opt-ins regarding compensation for on-site and off-site

---

[61]　Valenzuela Dep. 25:19-26:20 (long boot-up time of 10 minutes but RSM would adjust time); Gutierrez Dep. 45:19-22 (time was adjusted on two occasions when MyTime froze and she reported that she could not log in to her manager); Kemp Dec. ¶¶ 5-6; Cruz Dec. ¶ 15 (technical difficulties).

[62]　Farthing Dec. ¶ 17; *see also* Harrell Dep. 100:2-7 (never sought adjustments for time off-the-clock opening and closing store); Walsh Dep. 98:19-99:3 (never requested adjustments for closing his stores); Farley Dep. 24:7-11, 32:17-21, 39:22-40:25 (never sought an adjustment for time spent opening/closing the store or logging into MyTime); Index ¶ 131.

[63]　Valenzuela Dep. 31:11-16, 32:22-25 (clock out of MyTime immediately before leaving the store); Mosblech Dep. 55:14-21 (last thing before walking out and locking door); Hopkins Dep. 50:19-51:12 (punched out, set the alarm and walked out with no other activities after punching out); Sanchez Dep. 70:4-7 (never instructed to punch out before performing any other closing activities); Harrell Dep. 96:9-98:7 (closing process took only a few minutes and entailed shutting system down, navigating to MyTime, shutting lights off, arming alarm, unlocking gate, leaving, and locking gate behind him).  Index ¶¶ 128-29.

[64]　Gutierrez Dep. 54:20-56:8 (one minute on average to log out, go back through the door she came in, close it, pull down the inventory door, lock the gate, walk to the alarm, set the alarm, go to the back door, open it and lock the back door); Opt-in Hopkins Dep. 50:19-51:12 (exiting building after logging out of My Time took a couple of seconds); Index ¶¶ 126, 130.

[65]　*See* Keyser Dep. 46:6-7, 48:4-7 (had to vacuum or clean after punching out at times); Carrega Dep. 86:14-88:24 (waited around for 10 to 15 minutes after punching out for his manager to finish so they could leave together for "security reasons"); Opt-in Mosblech 56:14-24 (waited around a minute or two while others prepared to leave store); Index ¶ 132.

meetings and calls.  Some were unequivocal that they were paid for their attendance at off-site

events, meetings and conference calls through the adjustment feature.[66]  Some said they were

never instructed to participate in "table days," other types of sales promotions and/or vendor

phone trainings off duty.  Sanchez Dep. 74:17-21.  Some testified they punched in at the store

before leaving the store for a meeting or table day and were thus paid for all hours worked while

others testified they went directly to the events without stopping at the store.[67]  Some of these

employees sought time adjustments and others did not.[68]

### 7.   Opt-Ins Were Not Similarly Situated Regarding Off-Duty Work at Home/Reviewing Product Information

Some opt-ins reported there is no expectation that they review manuals or training

materials while not at work and that they never did.[69]  Pagliaroni ¶ 13 ("store policy forbids us

from removing any company materials from the store"); Nickoloff ¶ 8 (never does it); Myers

---

[66]   Cruz ¶ 14 (paid for work done in a hotel room as part of an off-site training); Hopkins Dep. 14:8-17, 15:4-13 (aware he could seek adjustments for training and sought an adjustment on at least one occasion); Crockett Dep. 61:23-62:2 (received adjustments for all scheduled conference calls); Sterling Dep. 32:2-33:6 (pretty sure any conference calls were entered in and received adjustments for meetings); Gutierrez Dep. 21:7-17 (sought and received adjustments to her time for out-of-store training); Index ¶¶ 134-35.

[67]   Sterling Dep. 92:4-93:5; 93:15-94:3 (would punch in at store, go to the table day, and then return to the store to punch out); Index ¶¶ 137-38.

[68]   *See* Joven Dep. 39:10-17 (manager adjusted time to reflect off-duty work for small business account).  Daniel Mianulli (Chicago RSM) ensured that his ASM was paid for time spent at a dinner finalizing a presentation.  Mianulli Dec. ¶ 5.  Likewise, opt-in Andrew Kazulak (now Potsdam, New York RSM) routinely made sure that his ASM, who occasionally participated in management conference calls on his day off by joining the call from home, was paid for that time.  Kazulak Dec. ¶ 7.  Sonia Merzaian (Burbank, California RSM) ensures that her employees are compensated for time spent at table days.  Merzaian ¶ 7.  Darren Collins (Indianapolis RSM) recalled ensuring that an employee who went to Dallas for training was paid for both the time spent in the training and travel time.  As he put it, "We're all here to make money and pay bills and I want to make sure that everyone gets paid for the time they work."  Collins Dec. ¶ 16.

[69]   Bonomo Dep. 132:4-8 (no one told him he was required to familiarize himself with products off duty and not be paid for it); Schneider Dep. 37:19-38:1 (never instructed to review product information during lunch break but when managers saw her doing it, she was "praised or acknowledged for working above and beyond"); Gladura Dec. ¶ 13.

¶ 15 (never does it); Richardson ¶ 15 (never does it).  Some report they review product

information off duty for fun.[70]  Still others claim they spend time learning about new products

off duty for which they have not been compensated.  Hopkins Dep 56:15-25 (20 minutes a month

from 2005-07 reviewing products); Hendricks Dep. 87:7-16 (did not think to report time spent

reviewing product materials off duty).

###### C.   Hours Worked, Triggering Overtime or Not, Vary By Plaintiff

Individual inquiries will also be required to determine whether employees even worked

sufficient hours to trigger a potential overtime claim.  For example, many opt-ins worked part-

time and, thus, do not have any claim for overtime pay.[71]  Based on expert analysis of opt-ins'

MyTime records, 293 opt-ins worked fewer than 35 hours per week for at least 90 percent of the

weeks in which they worked.  White Report, p. 44.  In total, 37.6 percent of weeks worked by

opt-ins did not include any overtime.  *Id.*  These opt-ins have little to no claim for overtime under

the FLSA even if they could establish they worked some time off duty that was not paid.

As to those employees who worked close to 40 hours per week, the number of hours

worked in the store, as well as interruptions when off duty, fluctuated over time in light of

seasonal differences and promotions, such that in one week an employee could have worked

hours that triggered overtime and in the next week might not.  *See* Gutierrez Dep. 48:11-14

(opening and closing store hours changed on days such as iPhone launch); Opt-in Teran Dep.

78:24-79:13 (meal breaks were interrupted more frequently when store was busier during

Christmas season, holiday weekends, and promotions).  *See also* Index ¶¶ 121-22.  Variations in

---

[70]   Spraggins ¶ 32 (reads a lot of literature on Apple products for fun and does not see it as
"work"); Bonomo Dep. 131:24-132:24 ,138:2-11 (never required to spend time off duty to learn
about new products and even considered it just "playing with a new device" to get familiar).
[71]   Opt-in Kaddoura Dep. 37:3-5 (hours vary between 24 and 32); Baker Dec. ¶ 4 (usually 37 to
40 hours a week); Cardenas Dec. ¶ 2 (part-time).

schedules and peak sales times mandate individualized determinations about whether employees are entitled to overtime if they, in fact, worked uncompensated time off duty.[72]

###    D.    ASMs Are Not Similarly Situated to RSCs

Significant differences between the RSCs and ASMs also confirm the need to decertify this action.[73]  In some markets, ASMs have laptop computers from which they can perform work (and record their own time worked) outside of the store, unlike both the vast majority of RSCs and ASMs in other markets without laptop access who must seek time adjustments from RSMs or their delegates for time worked outside of the store.[74]  In some stores, ASMs are delegated timekeeping rights which allow them to modify the time of RSCs or other ASMs.  This delegation right potentially puts their testimony about compensation for off-duty work in direct conflict with their fellow opt-ins' testimony.[75]  In fact, opt-in ASMs may be at fault for failing to

---

[72]  *See Castle v. Wells Fargo Fin., Inc.*, No. C 06-4347 SI, 2008 WL 495705, at *1-2, 5 (N.D. Cal. Feb. 20, 2008) (denying conditional certification in off-duty case where variety of circumstances alleged by plaintiffs "would necessitate testimony from individual employees and their supervisors about the schedules actually worked").

[73]  Of the opt-ins, 6.6 percent (274 opt-ins) worked only as ASMs during the relevant statutory period, and 6.4 percent (266 opt-ins) held both ASM *and* RSC positions during the relevant time period.  *See* White Report, p. 20.  Most of Zivali's claims, which are premised on the theory that customer interactions required off-duty work, simply do not apply in the same way to ASMs, who are primarily managers, not sellers, and thus do not have the same level of customer contact that RSCs do.  While both positions are hourly paid, ASMs are subject to a commission structure tied to the entire store's sales performance while RSCs receive an individual commission based on the products, service plans, features, and accessories they personally sell.  Bennett Dec. ¶¶ 13-14.  Thus, ASMs have less of a direct monetary incentive to handle customer activities while off duty in order to achieve additional sales.

[74]  *See, e.g.,* Fleissner Dec. ¶ 8 (laptops not issued to ASMs in New York City, but issued in Upstate New York); Holland Dec. ¶ 7 (South Texas market issues laptops, but many markets do not); Cruz ¶ 33 ("I have a company-issued laptop.  If needed, I can sign into MyTime to keep track of my hours worked away from the store by using the VPN access."); Reznicek ¶ 6 (never takes company-issued laptop home); Grimes ¶ 5 ("Although I could use the VPN on my company-issued laptop to check my email, I do not use my laptop for work outside the store").

[75]  *See, e.g., Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at *22 (plaintiff's interests "conflict" with those of managerial class members who plaintiff claimed did not credit her for all time worked despite requests to do so); *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957,

correct the time of opt-in RSCs.[76]  Courts regularly conclude that significant differences in

positions makes collective action treatment inappropriate.[77]

### E.  Plaintiffs Are Left with Allegations of Policy Lapses Due to Human Error

The testimony of the 29 opt-ins who Mobility was permitted to depose demonstrates that

there is simply no common *unlawful* decision, policy, or plan that "binds" these claims so that

"hearing the cases together promotes judicial efficiency."  *Aguirre v. SBC Commc'ns, Inc.*, No.

H-05-3198, 2006 WL 964554, at *5 (S.D. Tex. Apr. 11, 2006).  It is only when individuals *do*

*not* use MyTime correctly that they are not compensated for time worked.  Mobility is a large

company that employs thousands of employees.  As in the "Naked City," it would not be

surprising to find the occasional supervisor who, because of misunderstanding or other human

---

965 (W.D. Mich. 2009) (court expressed concern about conflicts between plaintiffs, some of whom were themselves responsible for timing and length of breaks); *Mathews  v. ALC Partner, Inc.*, No. 2:08-CV-10636, 2009 WL 2591497, at *7 (E.D. Mich. Aug. 24, 2009) (noting potentially serious class conflict because some class members would have to prove that other class members were complicit in requiring them to work unpaid overtime); *cf. Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001) (adequacy not established where current or former managers are in proposed class with non-supervisors).  Opinions applying FRCP Rule 23, which precludes class certification when individual issues predominate over issues common to the class, are instructive as to whether opt-ins in an FLSA action are similarly situated.  *See Wong v. HSBC Mortgage Corp.*, No. C-07-2446, 2010 WL 3833952, at *1-3 (N.D. Cal. Sept. 29, 2010); *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 927-28 (D. Ariz. 2010) (Rule 23 cases are "instructive" to FLSA "similarly situated" analysis).

[76]  Some ASMs even corrected their own time, despite the policy requiring an RSM or another delegate to made any adjustments for them.  David Bennett testified that for a period after he was promoted to ASM in July 2008, he adjusted his own time to reflect time worked off duty but was then told by his RSM that he was not allowed to do that.  Bennett Dep. 37:1-38:12; *see also* Sanchez Dep. 35:9-21 ("I would make my own time adjustments, so there are times where I may have asked, and there are times I may have done it myself.  There are times that we just did it ourselves when we went into the MyTime.  Again, it definitely varies.").

[77]  *See, e.g., Reed v. Mobile County School Sys.*, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003) (denying conditional certification where the proposed class consisted of multiple job titles "[w]ith significantly different job duties and work schedules"); *Vaicaitiene v. Partners in Care, Inc.*, No. 04-9125, 2005 WL 1593053, at *6 (S.D.N.Y. July 6, 2005) (granting conditional certification only to those employees in a particular job title); *Hallissey v. America Online, Inc.*, No. 99-3785, 2008 WL 465112, at *3 (S.D.N.Y. Feb. 19, 2008) (limiting class to workers in a specific program).

frailty, has not always followed policy. But these stores are idiosyncratic.[78] To the extent any

Mobility employee did not receive proper compensation for work performed, it was **in spite of**

Mobility's standards and practices, not because of them.[79]

**V.      Defenses Individual to Each Opt-In Preclude Collective Treatment**

This action must be decertified because of the individual determinations necessary to

resolve Mobility's defenses to the "hodgepodge of claims and allegations." *Mooney v. Aramco*

*Servs.. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995), *abrogated on other grounds by Desert*

*Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

**A.      Actual or Constructive Knowledge Varies**

To prove an off-duty claim, the opt-ins must demonstrate that Mobility had actual or

constructive knowledge of the off-duty work performed.[80] But where, as here, there is no single

policy or practice requiring or causing off-duty work, resolution of the claims requires individual

---

[78]   *See Thompson v. Speedway SuperAmerica LLC*, No. 08-CV-1107, 2009 WL 130069, at *2
(D. Minn. Jan. 20, 2009) (denying conditional certification where plaintiffs failed to show that
the reason for the alleged underpayment of certain employees "is not because of human error or a
rogue store manager, but because of a corporate decision to ignore [the company's] published
policies"); *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 173-74 (W.D.N.Y. 2007) (denying
conditional certification where evidence shows nothing "other than unilateral acts by a few
'rogue' managers" acting contrary to written policy).

[79]   *Hinojos v. Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, at *2-3 (D. Nev. Dec.
1, 2006) (denying conditional certification in case alleging off-duty work and improper alteration
of time records where analysis of plaintiffs' off the clock claims would require particularized
review of "specific employment conditions in each store and department in which each class
member worked and would likely require testimony from individual supervisors and other
employees about the circumstance"); *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 482
(C.D. Cal. 2008) (decertifying action where no evidence of class-wide *mis*classification).

[80]   *Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) (employee "is only
entitled to compensation for those hours of work performed of which the employer had actual or
constructive knowledge"); *Holzapfel*, 145 F.3d at 521; *Kuebel v. Black & Decker Inc.*, No. 08-
CV-6020T, 2010 WL 1930659, at *13 (W.D.N.Y. May 12, 2010) (plaintiff may only recover for
unpaid overtime hours of which defendant was aware); *Newton v. City of Henderson*, 47 F.3d
746, 749-50 (5th Cir. 1995) (employer is not liable under the FLSA for overtime work of which
it has no knowledge or was not reasonably aware).

determinations as to whether off-duty work was performed and the extent of any such work that was not compensated, as well as whether Mobility had knowledge of such work. Each opt-in plaintiff will have to testify regarding whether a manager required off-duty work and refused to compensate the employee for such time, or whether the employee worked such time without the knowledge of her manager.[81]

The degree to which managers were allegedly aware of uncompensated off-duty work varies among the opt-ins. Some claim they were never explicitly told to work off duty but that it was implied. *See* Walsh Dep. 60:20-25 ("[n]obody specifically stated but it was implied [that he had to check company email] since I had company issued email on my Blackberry"). Still others admit that they were expressly told not to work off duty and do not know whether their manager was aware that they were doing so. Timper Dep. 9:23-10:21 (not sure that manager was aware of all the off-duty work she claims to have done). Opt-in David Hendricks testified that his manager could not have known about his off-duty work because he was "not in my home when I'm doing it." Hendricks Dep. 87:11-16. Testimony of opt-ins' RSMs, ASMs, and other co-workers will be necessary to resolve these issues with respect to each such claim.

**B.**   **Use of Complaint Procedures to Report Timekeeping Issues Has Varied**

While Mobility makes it as easy as possible to raise concerns about time reporting and overtime issues, escalation of employee complaints has varied. *Compare* Sanchez Dep. 44:17-45:2 ("I recall calling HR and asking for an adjustment. And I believe I got an off-cycle check")

---

[81]   *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *4 (N.D. Ga. July 25, 2006) (denying conditional certification of off-duty claims where "every employee must testify about his awareness of the overtime policy, and his violation of that policy-and whether it was compelled by his or her branch manager"); *Castle*, 2008 WL 495705, at *1-2, *5 (denying conditional certification where variety of circumstances alleged by plaintiffs "would necessitate testimony from individual employees and their supervisors about . . . whether managers were aware of the overtime hours worked").

*with* Bonomo Dep. 77:5-20 (was aware of the Ethics Hotline and was a member of the union, yet never lodged any complaints).  Individual testimony will be required to elicit information about whether employees escalated their complaints and, if so, what action Mobility took in response.  Where necessary, cross-examination also will be required about why opt-ins did *not* escalate their complaints.[82]  *Compare* D. Bennett Dep. 66:19-67:4 (aware of complaint procedures but never thought to call about the alleged 17.5 hours per week he allegedly spent emailing while off duty) *with* Ortiz Dep. 20:2-31:25 (complained without satisfaction).  Such individualized issues mandate decertification.[83]

### C.  Some Off-Duty Work Is *De Minimis*

Individual mini-trials will be necessary to determine whether some of the stories about alleged unpaid off-duty work were *de minimis*.  *Singh v. City of New York*, 524 F.3d 361, 370-71 (2d Cir. 2008); *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984); 29 C.F.R. 785.47.  Many employees choose not to report the trivial amount of time it takes to read texts or take calls from customers or managers because they take only a few minutes and are too difficult to capture.[84]  Karen Ashcraft stated that she thinks it would be "silly" to count as time worked

---

[82]  *Debose v. Broward Health*, No. 08-61411-CIV, 2009 WL 4884535, at *11-12 (S.D. Fla. Dec. 17, 2009) (employer not liable for unpaid overtime because plaintiff failed to establish employer's actual or constructive knowledge of such work; testimony by some plaintiffs that "their supervisors were aware of their unpaid, unauthorized overtime . . . was contradicted by the testimony of defense witnesses as well as other Plaintiffs, who stated that supervisors had no way of knowing when an employee skipped a meal break without recording it or otherwise notifying someone").

[83]  *See Castle*, 2008 WL 495705, at *1-2, 5 (denying conditional certification where "claims of altered time cards would . . . require class member-specific testimony").

[84]  Cruz ¶ 23 (sometimes will take a minute or two to call the customer back; "not worth it to me to record this time" because those "few minutes are really not a big deal to me"); Sterling Dep. 61:5-62:17 (got one to two calls a week off duty from store employees that would last on average 1 to 2 minutes each and did not report time); Gladura  ¶ 14 ("never actually thought to" report calls from managers or co-workers that do not take up more than 10 minutes a week "because it is so inconsequential"); Spraggins Dec. ¶ 21; Villasenor Dec. ¶¶ 27-28; Ashcraft Dec. ¶ 8; Cruz

every time she looks at her iPhone.[85]  Ashcraft Dec. ¶ 6.  These and similar instances of arguably *de minimis* work must be examined on an individual basis.[86]

## VI.   Fairness and Procedural Considerations Mandate Decertification

### A.   Due Process Must Be Guaranteed

The cornerstone of due process is the right to present at trial individualized defenses and evidence.  *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (in "almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses" at trial).  Defendants have a "right to present a full defense on the issues" and "must be allowed to present any relevant rebuttal evidence [it] choose[s], including evidence that there [is] no [liability to] one or more members of the class."  *W. Elec. Co. v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976) (rejecting plaintiff's recommendation that employer not be allowed to defend against individual cases at trial).

Plaintiffs have yet to provide any indication, through submission of a trial plan or otherwise, as to how this case could proceed to trial as a collective action without being

---

Dec. ¶ 29 (does not report time spent running into a customer because "it would be crazy to report every single time a customer just said 'hi' to me while I was off work").

[85]   This attitude calls for a common-sense interpretation of the FLSA.  In today's world, "smart phones" (e.g., iPhones, Blackberries) are ubiquitous – especially among technologically savvy (and mostly younger) employees.  Employees use them as constant communication devices, primarily for personal reasons.  The FLSA should not extend to the use of these devices in the typical situations alleged by the opt-ins.  After all, "the FLSA was written and the seminal cases interpreting the Act were decided at a time when work usually had to be done on the production line, in a mine, or at least in the office."  Comment, *Controlling Smart Phone Abuse, The Fair Labor Standards Act's Definition of "Work"* in *Non-Exempt Employee Claims For Overtime*, 58 U. KAN. L. REV. 737, 772-73 (Mar. 2010)."  No one alive in 1938 could have envisioned the implications of this technology.  As a result, "[c]ourts have yet to develop any precedent regarding the fair and proper method to calculate compensable time for smart-phone use."  *Id.* at 738.  Even for an employer like Mobility with state-of-the-art policies and practices, and the best of intentions "[t]here is a great potential for abuse with smart phones, especially when employees could spend countless hours scrolling through e-mails or even waiting to write e-mails after hours in order to accumulate overtime."  *Id.* at 753.

[86]   *See Basco*, 2004 WL 1497709, at *8; *Hinojos*, 2006 WL 3712944, at *2.

completely unmanageable.  *Smith v. T-Mobile USA, Inc.*, 2007 WL 2385131, at *8 (collective

action would be unmanageable given number of variables).[87]  The inability to do so is an

independent reason compelling decertification.

### B.    Cross-Examination Is Required to Test Credibility and Candor of Opt-Ins

The 29 opt-in depositions made clear that many of the opt-ins lack the candor, memory

and unbiased disposition[88] necessary to provide accurate testimony that could be representative

of and fairly extrapolated to thousands of other opt-ins.[89]  Many of the opt-ins readily recanted

their claims at deposition.  Clark testified that she never received overtime or an extra hour of

pay for missed meal breaks (provided under California law) *until* her memory was refreshed by

introduction of her wage statements showing such payment.  Clark Dep. 48:6-50:24.  When

questioned about the claim on her questionnaire for off-duty email time, opt-in Keyser suddenly

recanted and testified she was not making a claim for email time because she never received

corporate email on her COU device.  Keyser Dep. 66:18-69:8.  Carrega admitted that he double-

counted time he claims he waited after punching out while his manager finished his duties (10-15

---

[87]   *See, e.g., Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 252-53 (C.D. Cal. 2006)
(defendants have a "right to cross-examine each [employee] to determine whether there is
liability as to that specific person"); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020-21 (5th Cir.
1997) (citing due process concerns in rejecting trial plan calling for representative evidence to
obviate need for individual determinations of liability and damages); *Osuna v. Wal-Mart*, No.
C20014319, 2004 WL 3255430, at *7-8 (Ariz. Super. Dec. 23, 2004) (defendant's right to due
process in a wage and hour class action would be denied if it did not have "the right to examine
individual class members and to assert individual defenses").

[88]   Claims of disgruntled former employees are often unreliable.  *See, e.g., Seever*, 528 F. Supp.
2d at 172 ("It appears that the [plaintiffs], who, in part, occasioned this lawsuit, were nothing
more than disgruntled former employees who were fired for serious breaches of [] policy and for
falsifying their own time records").

[89]   In *Hinojos*, 2006 WL 3712944, at *3, the court expressed concern "about the contradictions
between plaintiffs' declarations and their deposition testimony, which show the importance of
cross-examination of each plaintiff."  The court explained that this need for individual cross-
examination "is the antithesis of collective action treatment and would overwhelm the judicial
system and eliminate any judicial efficiency that might be gained through a collective approach."
*Id.*

minutes/3 nights per week) and time he claims he spent drafting texts to his manager about sales numbers for the day (about 5 minutes a night, 3 nights a week), which he did at the same time. Opt-in Carrega Dep. 99:1-102:20.[90]  Among other things, the many contradictions Mobility already has uncovered between the opt-ins' questionnaire responses and their deposition testimony demonstrates the right of Mobility, consistent with due process, to cross-examine a significant number of opt-ins (not just fewer than one percent of them), as to their credibility and motives at trial.[91]

The opt-in depositions have also made clear that many of them arrived at their estimates of off-duty work via pure speculation.  Guess-work on the part of a tiny group of opt-ins cannot fairly be extrapolated to the entire opt-in population.[92]  To take just one example, Mobility must have the opportunity to examine at trial other opt-ins, like Andrew Kazulak, who were not selected as part of the sample.  Kazulak signed a declaration in March 2009 stating, among other things:

---

[90]   *See also* D. Bennett Dep. 121:22-123:8 (admitted claim of 22.5 hours/week is limited to when he was an ASM – when he was an HSC it was 5 hours/week), 85:1-88:24 (claimed he spent 15 minutes a day on texts from co-workers/managers but couldn't account for more than 4 minutes during his deposition); Abdul-Rahman Dep. 53:20-54:3, 57:11-60:8, Ex. RR (questionnaire stated off-duty email occurred three to four times a week, but in deposition testified to just one day a week on average, for only about five minutes, and only during first four to six months of employment).

[91]   Mobility would be also be allowed to present the substantial evidence it has collected indicating that the opt-ins' claims are vastly exaggerated or downright untrue.  Not only will managers who are accused of violating Mobility's wage-and-hour policies tell their side of each such story, but current or former colleagues of the opt-ins will explain that they did not share the same experience – or work unpaid hours – while working for the same managers.  For example, Opt-in Plaintiff Jonathan Moehring claims his managers routinely refused to make the time adjustments that Moehring requested.  Dmitry Kositsyn, who worked with Moehring under the same managers, asserts that he was paid for any time he worked away from the store or not logged into MyTime.  *See, e.g.*, Kositsyn Dec. ¶¶ 4-7.

[92]   Many courts have required discovery from much larger samples to satisfy due process.  *See, e.g., Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2006 WL 1867471, at *1 (D. Kan. June 30, 2006) (more than 300 depositions out of approximately 1,700 opt in plaintiffs).

> I am surprised by the plaintiffs' allegations because they are inconsistent with my experience at Mobility. I was always compensated for all of the work I performed when I was an hourly employee. I never worked off the clock as an hourly employee. Nor was I ever asked to. . . . I am confident that plaintiffs' claims are not representative of the experience of the hourly employees that have worked in the stores where I have worked.

Kazulak Dec. ¶¶ 3-14. He thereafter opted into the action. Surely Mobility is entitled to question Mr. Kazulak about his apparent disavowal of a statement given under oath. In sum, due process simply does not allow collective action treatment of this case.[93]

## C.   The Mini-Trials Required Here Are Antithetical to Collective Treatment

The numerous idiosyncratic factual determinations required as to each opt-in – who tell difference stories about the reactions of different managers to a variety of circumstances in which they claim to have not been paid properly – will require the parties to call multiple witnesses as to each claim including the opt-ins, their managers, co-workers, possibly customers, and experts who will perform statistical analyses of their time and COU records.[94]

---

[93]   *See, e.g., Pacheco*, 671 F. Supp. 2d at 962-67 (denying certification where plaintiffs' allegations rest on credibility; inconsistencies between affidavits and deposition testimony, as well as evidence of disciplinary action and termination, show the importance of cross-examination of each plaintiff); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 371-73 (D.N.J. 1987) (collective actions permitted "only where employees are similarly situated in order that a defendant be afforded an opportunity to effectively defend. Requiring less would preclude [a defendant] from asserting defenses" in violation of due process). *Accord Reich v. S. Md. Hosp., Inc.*, 43 F.3d 949, 952-53 (4th Cir. 1995) (remanded for new trial where trial testimony was limited to employees representing 1.6% of employee population; court held this amount of testimony was not fairly representative).

[94]   The email claim illustrates this point. In resolving a claim by an opt-in plaintiff that she read work emails during her day off, the Court would have to address and resolve at least the following questions: (1) Did the plaintiff receive corporate email on her COU device during some or all of her employment? (2) Did the plaintiff's alleged review of corporate email occur outside her paid, scheduled shift? (3) How long did it take? (4) Is there documentary evidence that substantiates the alleged length of off-duty email use? (5) Did she report her off-duty email activities to someone in management? (6) If no, did the manager have any way of knowing that this off-duty work was occurring? (7) Did the manager make an adjustment to the time entry? (8) If not, on what basis? (9) Did the employee continue to review corporate email during off-hours despite being advised not to do so? These inquiries are only the tip of the iceberg.

An examination of Zivali's claim, as an illustration, belies any common Mobility policy to knowingly allow or require – and not pay for – work performed away from its stores.  Zivali was hired by Mobility in 2006 as a part-time RSC.  Until her promotion to ASM in April 2008, Zivali had no overtime claim under the FLSA because she was typically scheduled for 25 hours a week and did not work more than 40 hours per week (even with allegedly unpaid hours).  Zivali alleges that she engaged in various forms of off-duty work, including reading/writing emails and text messages, as an ASM between May and November 2008.  In defending the claims, Mobility will need to cross examine Zivali based on her (a) time records which show numerous time adjustments (including self-edits) to determine how each of these adjustments relate to alleged work performed off duty, (b) phone records, which show myriad calls with her supervisor, Felix Badia, late at night; and (c) text messages from just prior to her termination, many with colleagues that are not in the least business-related, including texts to Badia and her then-supervisor, Diane Boccio, on non-work topics, including the racist "jokes" for which she was terminated.  These records not only demonstrate that Zivali's breezy recollections of having worked 10 to 15 hours per week off duty are, at a minimum, suspect but also reflect how individualized each opt-in's claims – and Mobility's defenses – will be.[95]

The burdens on a jury, which would be required to apprehend and evaluate substantial

---

[95]   The claims of opt-in Andrew Waller's provide another example.  In a declaration filed at the inception of this case, Waller claimed he worked 10 to 15 hours off the clock without pay every week.  In his deposition, however, Waller presented a purely idiosyncratic claim.  Waller conceded that Mobility had compensated him fully for time worked off duty during his tenure as an RSC in Durham, North Carolina.  Waller Dep. 67:2-14.  When he moved to a store in Chapel Hill, the manager allegedly refused to make requested time adjustments, claiming he did not want to pay Waller any overtime.  *Id.* at 72:14-74:1.  Waller testified that his second manager offered to pay him a portion of the overtime in the form of fictitious mileage reimbursement, which Waller did submit and receive.  *Id.* at 74:18-79:3.  Waller is the only opt-in in this action who has made such an allegation.  These allegations paint the picture of a rogue manager in Chapel Hill, not a corporate policy that violates the FLSA.

disparate testimony of this nature relating to hundreds or thousands of opt-ins, would be overwhelming.  The *Diaz* court recognized that these sorts of inquiries end up as a never-ending series of mini-trials in concluding that the plaintiff's off-duty claims were "too individualized to warrant collective action treatment."  *Diaz*, 2005 WL 2654270, at *5.[96]

## VII.    CONCLUSION

Zivali cannot meet her burden to establish a nationwide policy or practice requiring hourly employees to work off duty, because no such policy or practice exists.  The record shows that the opt-ins are not similarly situated with respect to their inherently individualized claims.  There are over 4,000 different stories in this case.  The collective action should be decertified.


Dated:  November 8, 2010                  Respectfully submitted,

                                          _____
                                          Thomas P. Gies, Esq. (*admitted pro hac vice*)
                                          Crowell & Moring, LLP
                                          1001 Pennsylvania Avenue, NW
                                          Washington, DC  20004
                                          Telephone: (202) 624-2500, Fax:  (202) 628-5116
                                          Email: tgies@crowell.com

---

[96]   *See also, e.g., Mooney*, 54 F.3d at 1213-15; *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (certification inappropriate where the lack of uniformity in experiences would require mini-trials); *Marlo*, 251 F.R.D. at 486 (decertifying action where there was "a significant risk that the trial would become an unmanageable set of mini-trials on the particular individuals presented as witnesses").