**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
                                                   :
GAMZE ZIVALI, Individually and on                  :   ECF Case
behalf of all other Similarly Situated             :
Employees,                                         :
                                                   :
                        Plaintiff,                 :
                                                   :   Case No.  08-cv-10310 (JSR)
        v.                                         :
                                                   :
AT&T MOBILITY LLC, et al.,                         :
                                                   :
                        Defendants.                :
                                                   :
                                                   :
                                                   X
-------------------------------------------------
```

## <u>DECLARATION OF THOMAS P. GIES</u>

I, Thomas P. Gies, do hereby swear, affirm and attest as follows:

I am one of the attorneys for the Defendant in the above-captioned case.  I make this declaration in connection with Defendant's Memorandum of Law in Support of Motion to Decertify Collective Action, which is filed contemporaneously herewith.  In the interest of providing the Court with a more complete list of this evidence, I offer the following catalogue of the evidence set forth in these declarations:

1.  Annexed hereto as Exhibit K.1 is a true and correct copy of the Declaration of Leihua Alisa (RSM, Santa Monica, California).

2.  Annexed hereto as Exhibit K.2 is a true and correct copy of the Declaration of Trevas Arce (RSC, Phoenix, Arizona).

3.  Annexed hereto as Exhibit K.3 is a true and correct copy of the Declaration of Karen Ashcraft (ASM, Muncie, Indiana).

4.  Annexed hereto as Exhibit K.4 is a true and correct copy of the Declaration of Crystal Baker (RSC, Tulsa, Oklahoma).

5.      Annexed hereto as Exhibit K.5 is a true and correct copy of the Declaration of Amanda Bellotti (ASM, Rochester, New York).

6.      Annexed hereto as Exhibit K.6 is a true and correct copy of the Declaration of Eric Brown (RSC, Austin, Texas).

7.      Annexed hereto as Exhibit K.7 is a true and correct copy of the Declaration of Jarrett Brown (ASM, Towson, Maryland).

8.      Annexed hereto as Exhibit K.8 is a true and correct copy of the Declaration of Dinean Hope Burcher (RSC, Oklahoma City, Oklahoma).

9.      Annexed hereto as Exhibit K.9 is a true and correct copy of the Declaration of Stephanie Burks (RSM, D'Iberville, Mississippi).

10.     Annexed hereto as Exhibit K.10 is a true and correct copy of the Declaration of John Butler (RSC, Everett, Washington).

11.     Annexed hereto as Exhibit K.11 is a true and correct copy of the Declaration of Elizabeth Cardenas (RSC, League City, Texas).

12.     Annexed hereto as Exhibit K.12 is a true and correct copy of the Declaration of Jason Casavale (ASM Cranberry Township, Pennsylvania).

13.     Annexed hereto as Exhibit K.13 is a true and correct copy of the Declaration of Darren Collins (RSM, Indianapolis, Indiana).

14.     Annexed hereto as Exhibit K.14 is a true and correct copy of the Declaration of Catalina Cruz (ASM, San Angelo, Texas).

15.     Annexed hereto as Exhibit K.15 is a true and correct copy of the Declaration of Mylisha Davis (RSC, Columbia, Maryland).

16.     Annexed hereto as Exhibit K.16 is a true and correct copy of the Declaration of Eric Decker, RSM (Durham, North Carolina).

17.     Annexed hereto as Exhibit K.17 is a true and correct copy of the Declaration of Chad Demiar (RSC, Lynwood, Washington).

18.     Annexed hereto as Exhibit K.18 is a true and correct copy of the Declaration of Alex Desai, RSC (Mid Pike Plaza, Maryland).

19.     Annexed hereto as Exhibit K.19 is a true and correct copy of the Declaration of Courtney Elkin (RSC, Washington, Missouri).

20.     Annexed hereto as Exhibit K.20 is a true and correct copy of the Declaration of Ted Esler (ASM, Joliet, Illinois).

21.     Annexed hereto as Exhibit K.21 is a true and correct copy of the Declaration of Adam Farthing (SSR, Taylors, South Carolina).

22.     Annexed hereto as Exhibit K.22 is a true and correct copy of the Declaration of Scott Fitzgerald (ASM, Cave Creek, Arizona).

23.     Annexed hereto as Exhibit K.23 is a true and correct copy of the Declaration of Amanda Frey (RSM, Merrillville, Indiana).

24.     Annexed hereto as Exhibit K.24 is a true and correct copy of the Declaration of Thomas Funchess (RSC, Snellville, Georgia).

25.     Annexed hereto as Exhibit K.25 is a true and correct copy of the Declaration of Derek Galloway (ASM, Gulfport, Mississippi).

26.     Annexed hereto as Exhibit K.26 is a true and correct copy of the Declaration of Justin Garrigues (RSM, Ocean Springs, Maryland).

27.     Annexed hereto as Exhibit K.27 is a true and correct copy of the Declaration of Banning Gladura (RSC, Mishawaka, Indiana).

28.     Annexed hereto as Exhibit K.28 is a true and correct copy of the Declaration of John Glump (ASM, Towson, Maryland).

29.     Annexed hereto as Exhibit K.29 is a true and correct copy of the Declaration of Christopher Gonzalez (RSC, Orlando, Florida).

30.     Annexed hereto as Exhibit K.30 is a true and correct copy of the Declaration of Jonathan Grimes (ASM, Atlanta, Georgia).

31.     Annexed hereto as Exhibit K.31 is a true and correct copy of the Declaration of Adalberto Guevara (RSM, Santa Ana, California).

32.     Annexed hereto as Exhibit K.32 is a true and correct copy of the Declaration of Mike Hanratty (ASM, Puyallup, Washington).

33.     Annexed hereto as Exhibit K.33 is a true and correct copy of the Declaration of Josh Harper (RSM, Aurora, Illinois).

34.     Annexed hereto as Exhibit K.34 is a true and correct copy of the Declaration of Cliff Hartman (RSM, Binghamton, New York).

35.     Annexed hereto as Exhibit K.35 is a true and correct copy of the Declaration of Heather Haussling (ASM, Tampa, Florida).

36.     Annexed hereto as Exhibit K.36 is a true and correct copy of the Declaration of Amanda Herman (RSM, Indianapolis, Indiana).

37.     Annexed hereto as Exhibit K.37 is a true and correct copy of the Declaration of Marc Holstein (RSC, Glendale, Arizona).

38.     Annexed hereto as Exhibit K.38 is a true and correct copy of the Declaration of Brandon Ibanez, (ASM, Austin, Texas).

39.     Annexed hereto as Exhibit K.39 is a true and correct copy of the Declaration of Hector Iracheta (RSC, Lakeland, Florida).

40.     Annexed hereto as Exhibit K.40 is a true and correct copy of the Declaration of Andrew Kazulak (RSM, Potsdam, New York).

41.     Annexed hereto as Exhibit K.41 is a true and correct copy of the Declaration of Justin Kemp (RSC, Somerset, Pennsylvania).

42.     Annexed hereto as Exhibit K.42 is a true and correct copy of the Declaration of Jesse Kendall (RSC, Colonie, New York).

43.     Annexed hereto as Exhibit K.43 is a true and correct copy of the Declaration of Venessa Kinnebrew (RSM, Fayetteville, Georgia).

44.     Annexed hereto as Exhibit K.44 is a true and correct copy of the Declaration of Dmitry Kositsyn (RSC, Beaverton, Oregon).

45.     Annexed hereto as Exhibit K.45 is a true and correct copy of the Declaration of Baird Lane (RSC, Snellville, Georgia).

46.     Annexed hereto as Exhibit K.46 is a true and correct copy of the Declaration of Sid Langston (RSC, Santan, Arizona).

47.     Annexed hereto as Exhibit K.47 is a true and correct copy of the Declaration of Raymundo Linares (ASM, Temecula, California).

48.     Annexed hereto as Exhibit K.48 is a true and correct copy of the Declaration of Gabe Link (ASM, Austin, Texas).

49.     Annexed hereto as Exhibit K.49 is a true and correct copy of the Declaration of Jennifer Martin (RSC, Muskogee, Oklahoma).

50.     Annexed hereto as Exhibit K.50 is a true and correct copy of the Declaration of Ian Mengel, RSC (Indianapolis, Indiana).

51.     Annexed hereto as Exhibit K.51 is a true and correct copy of the Declaration of Sonia Merzaian (RSM, Burbank, California).

52.     Annexed hereto as Exhibit K.52 is a true and correct copy of the Declaration of Daniel Mianulli (RSM, Oakbrook Terrace, Illinois).

53.     Annexed hereto as Exhibit K.53 is a true and correct copy of the Declaration of Nick Mitchell (RSC, Gulfport, Mississippi).

54.     Annexed hereto as Exhibit K.54 is a true and correct copy of the Declaration of James Moore (RSC, Meridian, Michigan).

55.     Annexed hereto as Exhibit K.55 is a true and correct copy of the Declaration of Bobby Jo Morey (RSC, Kingston, New York).

56.     Annexed hereto as Exhibit K.56 is a true and correct copy of the Declaration of Ryan Myers (ASM, Indianapolis, Indiana).

57.     Annexed hereto as Exhibit K.57 is a true and correct copy of the Declaration of Edward Nickoloff (RSC, Scottsdale, Arizona).

58.     Annexed hereto as Exhibit K.58 is a true and correct copy of the Declaration of Patty Pagliaroni (RSC, Kingston, New York).

59.     Annexed hereto as Exhibit K.59 is a true and correct copy of the Declaration of Stacey Parrish (RSM, Austin, Texas).

60.     Annexed hereto as Exhibit K.60 is a true and correct copy of the Declaration of David Perlman (RSM, Scottsdale, Arizona).

61.     Annexed hereto as Exhibit K.61 is a true and correct copy of the Declaration of Alissa Philebaum (RSC, Muncie, Indiana).

62.     Annexed hereto as Exhibit K.62 is a true and correct copy of the Declaration of Michele Reznicek (ASM, Syracuse, New York).

63.     Annexed hereto as Exhibit K.63 is a true and correct copy of the Declaration of David Rice (ASM, Ocean Springs, Mississippi).

64.     Annexed hereto as Exhibit K.64 is a true and correct copy of the Declaration of Samantha Richardson (ASM, Crawfordsville, Indiana).

65.     Annexed hereto as Exhibit K.65 is a true and correct copy of the Declaration of Christopher Rizza (ASM, Kingston, New York).

66.     Annexed hereto as Exhibit K.66 is a true and correct copy of the Declaration of Kenny Rochez (ASM, New York, New York).

67.     Annexed hereto as Exhibit K.67 is a true and correct copy of the Declaration of Aaron Rodriguez (ASM, Brookline, New York).

68.     Annexed hereto as Exhibit K.68 is a true and correct copy of the Declaration of Emmanuel Sangar (RSC, Indianapolis, Indiana).

69.     Annexed hereto as Exhibit K.69 is a true and correct copy of the Declaration of Jason Senft (RSM, Lockport, New York).

70.     Annexed hereto as Exhibit K.70 is a true and correct copy of the Declaration of Eric Sentz (ASM, Cheektowaga, New York).

71.     Annexed hereto as Exhibit K.71 is a true and correct copy of the Declaration of Dejon Shepard (ASM, Austin, Texas).

72.     Annexed hereto as Exhibit K.72 is a true and correct copy of the Declaration of Riley Smith (RSC, Austin, Texas).

73.     Annexed hereto as Exhibit K.73 is a true and correct copy of the Declaration of Brant Spraggins (RSC, McKinney, Texas).

74.     Annexed hereto as Exhibit K.74 is a true and correct copy of the Declaration of. Kibwe Stanfield (ASM, Snellville, Georgia).

75.     Annexed hereto as Exhibit K.75 is a true and correct copy of the Declaration of Inetta Starks (RSM, Snellville, Georgia).

76.     Annexed hereto as Exhibit K.76 is a true and correct copy of the Declaration of Jeanette Sullivan (ASM, Crystal Lake, Illinois).

77.     Annexed hereto as Exhibit K.77 is a true and correct copy of the Declaration of Grayce Thoburn (RSM, Goodyear, Arizona).

78.     Annexed hereto as Exhibit K.78 is a true and correct copy of the Declaration of Anthony Tritto (ASM, Scottsdale, Arizona).

79.     Annexed hereto as Exhibit K.79 is a true and correct copy of the Declaration of Elizabeth Valdez (HSC, San Antonio, Texas).

80.     Annexed hereto as Exhibit K.80 is a true and correct copy of the Declaration of Jenny Velez (RSM, Austin, Texas).

81.     Annexed hereto as Exhibit K.81 is a true and correct copy of the Declaration of Eduardo Villasenor (RSC, Fairfield, California).

82.     Annexed hereto as Exhibit K.82 is a true and correct copy of the Declaration of Cedric Washington, RSC, Atlanta, Georgia.

83.     Annexed hereto as Exhibit K.83 is a true and correct copy of the Declaration of Melissa Whitehead, ASM, Surprise, Arizona.

84.     Annexed hereto as Exhibit K.84 is a true and correct copy of the Declaration of Greg Wilcox, ASM, Seattle, Washington.

85.    Annexed hereto as Exhibit K.85 is a true and correct copy of the Declaration of Byron Williams, RSC, Columbia, South Carolina.

86.    For the convenience of the Court, the following paragraphs catalogue, by topic, the contents of the attached declarations and depositions.

**Training and Understanding Regarding Mobility's Timekeeping and Overtime Policies**

87.    **Training on Mobility timekeeping policies and adjustment feature.** Cruz ¶ 12 ("As part of the online Learning Solutions training courses, I had to review Mobility's Code of Business Conduct ("COBC"). The COBC addresses different topics such as how to record our expenses, our hours worked, the policy regarding off-the-clock work, and other rules and expectations. After taking the online training, I answered a few questions and acknowledged that I understood what was taught to me."); Tritto ¶ 4; Rochez ¶ 4; Gladura ¶ 8; J. Brown ¶ 10; Farthing ¶ 13; Williams ¶ 29; Baker ¶ 8; Rodriguez ¶ 3; Starks ¶ 11; Mianulli ¶ 14; Schneider Dep. 84:4-13 (received training regarding off the clock work); Valenzuela Dep. 41:3-13 (same); Moehring Dep. 9:19-10:8 (same); Harrell Dep. 27:19-28:2 (received training about requesting adjustments from manager); Sterling Dep. 34:1-16 (same); Galloway ¶ 5 ("I was trained as a manager" on how to make MyTime adjustments); Herman ¶ 8.

88.    **Varying methods to request adjustments by store.** Gutierrez Dep. 19:11-20:22 (in person, then sends email request); Moehring Dep. 9:19-10:8 (verbally); Timper Dep. 15:20-16:9 (verbally); Valdez ¶ 7 (email and verbally); Bellotti ¶ 6 (email); Nickoloff ¶ 5 (hand notes); Philebaum ¶ 13 (handwritten time sheet); Link ¶ 7 (text message); Tritto ¶ 9 (via "Time Sheet Edit Form"); Guevara ¶ 5 (same); Frey ¶¶ 6, 8 (post-it notes).

89.    **Adjusting time when employees forget to punch in or out during the shift.** Farley Dep. 41:1-42:1 (requested manager to adjust time for missed punches and adjustments were made); Sterling Dep. 19:15-20:15, 34:17-36:9, 37:12-18 (same); Hendricks Dep. 16:17-19, 50:10-20 (only requested time adjustments due to missed punches); Bennett Dep. 56:20-57:21

(mostly made time adjustments due to missed punches); Mitchell ¶ 6 ("If I forget to punch in or out, I tell a manager and they have the ability to go into the system and manually input the entry."); Collins ¶ 20 ("If I see what looks like a missed punch, I will talk to the employee to determine what happened and what the correct time entries should be" in order for employees to get paid properly because they're "not doing charity work."); Valdez ¶ 7 (manager has made time adjustments for missed punches); Baker ¶ 6 (same); Hendricks Dep. 29:9-18 (recalls a specific incident in summer of 2007 where managers changed Hendricks's time entries to reduce the total number of hours worked); Crockett Dep. 43:4-10, 76:4-14, 91:2-16 (stopped making any further requests after two store managers refused to make time adjustments for off the clock work performed).

90.     **Adjusting time when employees request adjustments for work performed away from the store or while off-duty.**  Sterling Dep. 19:15-20:15 (manager makes adjustments if off-duty work was reported); Hopkins Dep. 15:4-13 (same); Walsh Dep. 91:12-92:2 (same – for training); Sanchez Dep. 32:17-23, 43:1-17 (though manager would make time adjustments, manager also made Sanchez feel that such requests were "frowned upon"); Easdon Dep. 30:7-13 (although managers would make time adjustments for off the clock work performed, they would also roll their eyes and be "unpleasant"); Baker ¶ 5 ("[I]f I happen to do any work when I'm not in the store, I tell my manager and he will put the time into the system for me."); Haussling ¶ 13 ("In my experience, the three most common reasons why my RSCs need their time edited are for when they attend off-site trainings, take calls with customers during their off hours, or read and respond to work-related text messages during off hours."); Guevara ¶ 9 (received compensation for work performed away from store); Moore ¶ 7 (same).

91.     **Reviewing timecards and requesting corrections for improperly recorded**

**entries.** Sterling Dep. 20:16-20:21, 37:19-39:3, 39:19-42:4 (as an ASM, was required to review

and verify employees' time records every week to ensure accuracy and fix any errors for RSCs);

Joven Dep. 35:2-36:1 (instructed by manager to review timesheet); Bennett Dep. 82:16-21 (there

is "a process in place by which [one] could report inaccuracies in [one's] paycheck and would

receive payment in a separate paycheck later on); Moehring Dep. 15:20-22 (same); Valenzuela

Dep. 46:9-12 (must check time every pay period "to make sure everything's fine"); Villasenor ¶

20 ("We're supposed to approve our time card every week. I always review my time card every

week."); Collins ¶16 (made retroactive payment for employee who failed to record travel time);

Williams ¶ 27 (manager has revised incorrectly recorded time); Spraggins ¶¶ 12-14 (same);

Villasenor ¶ 20 (same); Burcher ¶ 6 (manager corrected time); Elkin ¶ 7 (manager fixed time).

**Overtime and Off-Duty Work**

92.     **Employees' varying understanding of Mobility's off-the-clock policies.**

Keyser Dep. 12:13-15 ("As far as I know, the policy would be I should be paid for every minute

that I worked, whether it was at work or outside"); Gutierrez Dep. 92:14-17 (unsure if Mobility

has a policy relating to timekeeping and off the clock work that was unlawful); Hendricks Dep.

13:14-16, 46:5-11 (same); Easdon Dep. 9:10-10:12 (same); Clark Dep. 28:17-29:15, 39:6-10

(same); Joven Dep. 34:8-11, 35:2-4 (same); Sterling Dep. 18:14-19, 18:20-19:6 (same); Collins ¶

3 ("It is company policy that hourly employees are not to perform any work when off the

clock"); Easdon Dep. 9:10-10:1, 10:2-12 ("I understood that I was to be paid for every minute

that I worked, so, you know, and adjustments would be made by the manager.").

93.     **Receiving compensation for reasonable overtime hours without pre-approval**

**varies.** Sterling Dep. 32:2-7 (paid for overtime hours though not pre-approved); Sanchez Dep.

41:14-42:10, 43:1-17 (managers have denied requests to work overtime because it was

"frowned-upon" after employee requested it too often); Williams ¶¶18-19 ("I know that I am supposed to seek approval for overtime, but realistically, when I work overtime without pre-approval – it isn't like my manager isn't going to approve it."); Decker ¶ 17 (never instructed by senior management to manage overtime hours and paid employees for all hours worked); Thoburn ¶ 13 (paid for overtime hours worked without pre-approval); Gonzalez ¶ 5 (works a few hours a week of overtime hours that are not pre-approved; always paid for that time); Spraggins ¶¶ 15-16; Cruz ¶ 22 ("I have never been disciplined or have received any type of negative treatment because I have reported off-the-clock work.  In fact, my manager encourages me to report that time."); Timper Dep. 70:2-6 (never threatened with discipline for reporting off-duty work); Walsh Dep. 17:21-18:3 (same).

94.      **Scheduling overtime for various reasons to ensure adequate staffing.**
Casavale ¶ 3 (short staffed); Cruz ¶ 7 (manager on vacation); Farthing ¶ 12 (inventory count); Cruz ¶ 7 (iPhone launch); Guevara ¶ 11 (short staffed); Moore ¶ 9 (holidays); Mitchell ¶¶ 3-4 (short staffed); Iracheta ¶ 6 (short staffed);  Kemp ¶ 4 (iPhone launch); Gonzalez ¶ 5 (iPhone launch); Villasenor ¶ 9 (store refresh); Martin ¶ 15 (iPhone and holidays); Elkin ¶5 (iPhone launch); Lane ¶ 4 (new store opening); Spraggins ¶ 8 (store refresh).

95.      **Different hours for ASMs and RSCs.**  Schneider Dep. 68:5-16 (worked *fewer* hours as an ASM because "didn't have as many customers [to deal] with"); Casavale ¶ 5 (worked *more* overtime hours as ASM due to administrative and managerial tasks); Haussling ¶ ¶ 7-8 (same); Myers ¶ 3 (as an ASM, works 45-47 hours and as an RSC, only 40-45 hours).

96.      **Receiving compensation for overtime spent to complete customer transactions towards the end of their shift varies.**  Bonomo Dep. 54:24-56:3 (has requested time adjustments for helping customers after shift ended); Stanfield ¶ 10 (received compensation

10

because "might be an influx of customers near closing time and employees might need to stay late without any notice or pre-approval"); Valdez ¶ 11 (cannot "abandon" customers and received compensation); Holstein ¶ 7 (instructs RSCs to clock back in); Cardenas ¶ 7 (received compensation); Parrish ¶ 9 (same); Galloway ¶ 7 (same); Schneider Dep. 80:11:81:7 (did not receive compensation because instructed by managers to clock out when scheduled shift ends and to continue helping customers off the clock without compensation).

**Reporting Violations Of Mobility Policy Regarding Payment For All Hours Worked**

97.    **Employees' knowledge regarding being able to report timekeeping violations to senior management or Human Resources varies.**   Sanchez Dep. 44:17-45:2 (has contacted Human Resources ("HR") because when employee made time adjustment requests to store manager, they were not made); Myers ¶ 16 (can report to ARSM); Collins ¶ 21 (can report to HR and ARSM); Valenzuela Dep. 46:23-48:23 (unaware that HR addresses timekeeping issues); Carrega Dep. 35:19-37:5 (same); Smay Dep. 55:3-21 (store manager informed him that "any adjustment that [the store manager] made showed up in a report to his boss and that he wasn't going to continue to make adjustments for [hourly employees because it would] get himself in trouble"); Schneider Dep. 44-9:45:11 (would not contact senior management because "trusted" store manager); Hopkins Dep. 28:18-29:3 (unaware that senior management addresses timekeeping issues); Harrell Dep. 75:25-76:2 (same); Crockett Dep. 43:15-25 (same); Carrega Dep. 35:19-37:5 (same); Butler ¶ 16 (can report to HR).

98.    **Employees' knowledge regarding being able to report timekeeping violations to union representatives varies.**  Valenzuela Dep. 46:23-48:23 (once spoke to an in-store union representative about manager failing to make time adjustment requests and also attended a meeting about this topic in Fall 2009); Gutierrez Dep. 83:3-10 (though aware that someone at the union could be contacted, was afraid to contact a union representative out of fear that "key would

be taken away"); Hopkins Dep. 28:18-29:3 (did not know that complaints could be raised with union representative); Harrel Dep. 76:3-14 (same); Crockett Dep. 45:6-9 (never complained or raised issues associated with off the clock work with union representative); Carrega Dep. 35:19-37:5 (does not know that a union representative can address timekeeping issues); Philebaum ¶ 18 (aware that union representative can assist with timekeeping issues); Fitzgerald ¶ 14 (same); Holstein ¶ 12 (same).

99.     **Employees' knowledge regarding being able to report timekeeping violations to ethics hotline varies.**  Mosblech Dep. 88:24-89:3 (has used ethics hotline to complain about a manager who was allegedly being harassing); Joven Dep. 83:23-25 (aware of hotline); Harrell Dep. 63:17-23; 77:2-4 (same); Timper Dep. 39:12-21 (same); Wilcox ¶ 14; Fitzgerald ¶ 14; Holstein ¶ 12; Carrega Dep. 35:19-37:5 (unaware that hotline can address timekeeping issues).

100.     **Employees are counseled for non-compliance with Mobility policies requiring payment for all hours worked.**  Richardson ¶ 13 (spoke to employee who repeatedly would not clock in after lunch); Mitchell ¶ 9 ("When I first started, I would sometimes clock out for less than thirty minutes.  When I did this, I got paid for the entire break I took.  My manager would remind me that I needed to clock out for at least 30 minutes, but he never went into the system and changed the time if I happened to take less."); Perlman ¶ 10 (same); Starks ¶ 6; Ibanez ¶ 9.

**COU Device Usage Varies By Employee**

101.     **Use of COU devices for personal uses varies.**  Easdon Dep. 28:10-12, 52:2-14 (often uses COU device to contact wife, mom, and father); Valenzuela Dep. 97:16-100:23 (5 most frequently contacted numbers are for girlfriend, mother, best friend, friend, ex-girlfriend, and cousin); Harrell Dep. 79:6-84:21 (used to contact wife, sister, and friends); Gutierrez Dep. 27:25-33:6 (acknowledges at least 17 names of friends and family); Sterling Dep. 62:18-65:1 (contacts fiancée, sisters, and a good friend); Bennett Dep. 72:14-23 (frequently uses COU

device for personal purposes); Walsh Dep. 117:16-119:7 (same); Moehring Dep. 57:20-22 (same); Crockett Dep. 46:3-49:11, 63:23-65:9 (same); Timper Dep. 40:22-41:15 (same).

102. **Access to corporate email on COU devices varies.** Schneider Dep. 70:7-12 (no COU email); Bennett Dep. 19:11-19, 20:13-24 (received email as ASM); Joven Dep. 24:21-25:12 (around fall of 2006, had email access on COU device; in July 2009, email on COU device was again taken off due to change in store manager); Valenzuela Dep. 64:20-65:23 ("I had email on my phone [for approximately a year and a half] and I had to take it off because it was getting ridiculous how many emails we were getting per day.  At night I was hearing my phone chirp."); Moehring Dep. 32:16-33:1 (no COU email); Schneider Dep. 33:6-11 (received email as ASM); Mosblech Dep. 69:22-70:5 (no COU email); Sterling Dep. 43:18-44:9 (had email on COU device); Keyser Dep. 66:12-17 (no COU email); Easdon 27:24-28:2, 39:10-13 (no COU email); Gutierrez Dep. 44:2-3 (no COU email); Farley Dep. 42:2-24 (no COU email); Philebaum ¶ 7 (email removed 3-4 months ago); Collins ¶ 4 (at one point, about 5% of RSCs had email on COU); Butler ¶ 3 (email started 4 months ago); Desai ¶ 3 (had email for 2-3 months).

103. **Employees have the option of turning off or ignoring COU device completely while off-duty.** Elkin ¶¶ 12-13 (puts it on silent); Sangar ¶ 6 (only takes device home to charge it); Haussling ¶ 22 (turns it off); Burcher ¶ 11 (never answers calls).

104. **Employees have option to address or ignore emails while off-duty.** Hopkins Dep. 32:13-19 (never required to review e-mails off the clock); Bennett Dep. 59:6-60:17 (same); Sanchez Dep. 59:10-16 (same); Myers ¶ 8 (instructed to set out-of-office notice when off-duty); Demiar ¶ 5 (not required); Collins ¶ 8 (not required).

105. **Frequency and time spent checking emails off-duty varies.** Keyser Dep. 67:21-69:5 (no claim for reviewing/responding to emails); Smay Dep. 76:21-77:4 (5 to 6.5 hours

per week on e-mails while off-duty); Schneider Dep. 28:21-29:5 (30-90 minutes/week on emails

and texts); Philebaum ¶ 7 (never); Stanfield ¶ 8 (glances at email subject lines occasionally);

Richardson ¶ 4 (once); Rice ¶ 10 (never); Hanratty ¶ 4 ("insignificant" amount); Esler ¶ 7

("occasionally"); Myers ¶ 8 (never).

106.    **Reporting off-duty time addressing emails varies.**  Carrega Dep. 47:24-48:3

(did not know time spent writing emails to ARSM developing new sales plan was compensable);

Hopkins Dep. 33:20-34:18 ("such a short amount of time"); Sterling Dep. 83:7-84:7 (did not

know 1-2 minutes during lunch was compensable); Harrell Dep. 53:9-54:7, 68:3-20 (did not

think to); Wilcox ¶ 3 (not work); Ashcraft ¶ 6 ("silly" to report 15-20 seconds); Myers ¶ 8 (can't

be bothered); Stanfield ¶ 8 (too "minimal"); Fitzgerald ¶ 9 (just "a second or two"); Grimes ¶ 5

("insignificant;" "a couple of minutes"); Rodriguez ¶ 5 ("10 seconds" per week); Sullivan ¶ 4

(few seconds on occasion); J. Brown ¶ 5 (ten seconds only); Washington ¶ 7 ("scans" emails; 1-2

minutes spent; "minimal"); Hanratty ¶ 6 (not "worthwhile" enough).

**Text Message Usage Off-Duty Varies By Employee**

107.    **Employees have the option to engage in text messaging while off-duty.**

Bonomo Dep. 113:21-24, 125:19-126:6 (never required to take texts while-duty); Harrell Dep.

74:4-6, 75:3-6 (same); Sanchez Dep. 57:23-58:2, 59:10-16 (same); Timper Dep. 33:7-24, 35:17-

22 (same, but did so anyhow out of "common courtesy").

108.    **Employees receive and exchange text messages with various parties.**

Hendricks Dep. 56:18-57:6 (with customers); Elkin ¶ 13 (with managers regarding required

uniform days); Mosblech Dep. 34:11-22 (with customers); Spraggins ¶¶ 19-2 (with customers);

Valdez ¶ 20 (co-workers); Valdez ¶19 (receives company announcements via text).

109.    **Off-duty time spent text messaging for work varies.** Hendricks Dep. 56:18-

57:6 (1 text message per week from customers); Gutierrez Dep. 10:3-11:4 (spends 30-45 minutes

per week); Schneider Dep. 28:21-29:5 (30-90 minutes/week on texts and emails); Bennett Dep.

22:7-17 (spent about 15 minutes a day); Mosblech Dep. 34:11-22 (30 minutes each week);

Spraggins ¶¶ 19-21 (hardly ever texts with customers off-duty because he is "old school" and

prefers to speak to customers); Iracheta ¶ 12 ("rarely"; maybe 5 text messages ever received);

Gonzalez ¶ 10 (1-2 text messages/week and seconds on each); Williams ¶¶ 15-16 (1-2

minutes/week; 15 seconds each); Cruz ¶ 24 (1 text message per week, at most; 30 seconds each).

110.    **Reasons for reporting or not reporting off-duty time spent text messaging**

**vary.**  Hopkins Dep. 27:6-23 ("such a small amount of time [. . .] a minute here, a minute

there"); Harrell Dep. 53:9-54:7, 68:3-20 (did not think to); Smay Dep. 52:20-55:21 (wanted to

avoid being penalized); Bennett Dep. 80:8-82:2 (previous requests did not lead to adjustments

and he "[n]ever thought about it"); Haussling ¶ 23 ("I report the time it [takes] me to read and

respond to the text message."); Villasenor Dec. ¶¶ 26, 28 ("not a big deal").

**Phone Call Usage Off-Duty Varies By Employee**

111.    **Employees have the option to take off-duty work-related calls.**  Hendricks

Dep. 44:5-12 (never instructed by managers to take calls off the clock but also never disciplined

by managers for actually taking calls off the clock); Burcher ¶ 10 (discouraged by managers, but

also paid when reported); Senft ¶ 10 (policy in his area is that employees should turn off COU

devices when not at work); Linares ¶ 8 (advises his employees to ignore calls so that customers

will call the store); Thoburn ¶ 12 (instructs employees not to include phone number on business

cards); Kinnebrew ¶ 17 (instructs employees to "manage customers' expectations").

112.    **Reasons for answering or ignoring off-duty calls vary.**  Valdez ¶ 15 (manager

instructs not to); Sangar ¶ 5 (prefers to address issues at the store); Sullivan ¶ 5 (answers

recognized numbers); Sentz ¶ 5 (never receives calls); Hartman ¶ 3 (rarely receives any because

store number, not COU number, is programmed into customers' phones); Farthing ¶ 24 (answers

customers he has "known for a long time"); Washington ¶ 6 (checks voicemail because light on phone drives him "crazy"); Williams ¶ 12 (answers "repeat customer[s]" and those with a "rapport"); Baker ¶ 11 (answers for special circumstances, such as issue with a business account needing urgent resolution); Valdez ¶ 16 (answers when "the same number" keeps calling, suggesting urgency).

113. **Employees respond to customers' off-duty requests in a variety of ways.** Gutierrez Dep. 78:9-79:4 (tells customers they have "option to go in and speak with my manager that day or they could wait for me to go back to work and then we can work more on it then"); Herman ¶ 4 (voicemail greeting has store number and instructions to call the store); Valdez ¶¶ 6, 16-18 (briefly answers to inform customers that she is not at work and if needed, can call customer service); Mitchell ¶ 10 (only willing to answer quick questions that last 1-2 minutes); R. Smith ¶ 7 (informs customer of next scheduled work day and tables any further help); Farthing ¶¶ 24-25 (tells customers to visit him at the store instead).

114. **Frequency and length of time spent on off-duty calls varies.** Mosblech Dep. 27:212-19 (15 minutes to an hour/week); Gutierrez Dep. 77:15-23 ("short"; depends on customer's knowledge); Carrega Dep. 19:2-20:13 (5-7 hours/week); Sterling Dep. 61:5-62:17 (received 1-2 calls/week, each call 1-2 minutes); Casavale ¶ 15 ("rarely" as an ASM and more often as an RSC); Pagliaroni ¶ 7 (1 call per month); Moore ¶ 15 (15-20 calls per day, typically at night); Kemp ¶ 10 ("5-6 customer calls per week"); Burcher ¶ 10 ("brief" call; asked customers to call when on-duty); Funchess ¶ 9 ("only take[s] a minute or two."); Shepard ¶ 6 (1-2 times per month; each lasting 1-2 minutes); Demiar ¶ 3 (each call under a minute); Holstein ¶ 5 (30 seconds each); R. Smith ¶ 7 (checking voicemail and calling customer back takes 1-2 minutes);

Fitzgerald ¶ 7 ( 30 seconds each); Villasenor ¶ 30 (1-2 minutes per week); Farthing ¶ 25 (2 minutes per call).

115. **Reasons for declining to report off-duty time spent on calls vary.** Hendricks Dep. 52:21-53:3 (never thought to); Funchess ¶ 9 (too "short"); Spraggins ¶ 17 ("not worth my time"); Ibanez ¶ 4 ("not really work"); Ashcraft ¶ 8 (not "worth it"); Myers ¶ 9-10 ("The call did not even last 30 seconds, so it was not worth reporting"); Pagliaroni ¶ 7 ("don't consider it work"); Cruz ¶ 23 ("not a big deal"); Richardson ¶ 5, 6 ("too brief to be worth reporting"); Morey ¶ 6 (not "worth worrying about"); Grimes ¶ 4 (insignificant); Gladura ¶ 14 ("inconsequential"); Elkin ¶ 12 (never thought to); Williams ¶ 13 ("went over my head").

116. **Receiving compensation for off-duty time spent taking calls varies.** Kemp ¶ 10 (manager makes time adjustments); ¶ 22 (sends manager text message requesting time adjustment); Gonzalez ¶ 9 (asks manager to adjust time to reflect time spent, usually between 5-15 minutes, on calls taken off the clock); Crockett Dep. 16:12-17:18, 41:8-25 (managers Steven Powell and Julia Orr refused to adjust time entry for time spent because taking off-duty calls is "a part of [employee's] job"); Bennett Dep. 90:16-93:9 (stopped reporting time because never received compensation); Spraggins ¶ 18 (if lengthy period of time spent, shows manager COU device for time spent to receive compensation); Cruz Casavale ¶ 15 (always receives compensation); Iracheta ¶ 10 (same); Glump ¶ 5 (same); Herman ¶ 5 (same); Sentz ¶ 5 (same).

**Customer Interactions Off-Duty Vary By Employee**

117. **Engaging in networking activities while off-duty varies.** Sterling Dep. 94:14-19 (never); Valdez ¶ 28 (spends 5-10 minutes talking about products if at a bar waiting for a table); Gladura ¶ 19 (spends 5 minutes per month, at most, talking to strangers at the grocery store); Villasenor ¶ 17 (might have 1 minute conversation with friends and family about work); Williams ¶ 34 (unless actively trying to get a person to come into a store, does not consider time

spent discussing products "work"); Farthing ¶ 32 (never); Moore ¶ 20 (chooses to network, for example, at gas stations); Haussling ¶¶ 11, 34 ("I do not do so"); Cruz ¶¶ 30-31 (sometimes, if person seems "serious").

118.   **Reasons for reporting or not reporting off-duty customer interactions vary.**
Valdez ¶ 28 ("I do not report this time spent because it's just a few minutes here and there."); Cruz ¶ 29 ("crazy for me to report every single time a customer just said 'hi' to me while I was off work"); Burcher ¶ 16 (doesn't report because it rarely occurs); Martin ¶ 29 (doesn't see casual conversations as "work").

119.   **Employees are paid for off-duty customer interactions when the interactions are reported.**  Sterling Dep. 32:2-7 (when reported, employee always paid for time spent when engaging with customers while off-duty); Hopkins Dep. 72:16-73:5; 75:16-22 (never reported or compensated for 40 minutes per week spent engaging in networking activities, though was aware that he could); Harrell Dep. 25:14-26:5, 26:10-11 (was informed by managers that when an employee goes "off site for a business event, that time" should be reported); Valenzuela Dep. 76:23-78:20 (did not receive compensation for hour spent in Wal-Mart helping an elderly lady trouble-shoot her phone).

**Meal Breaks Vary By Employee**

120.   **Employees are able to take meal breaks of at least 30 minutes.**  Harrell Dep. 104:18-21 (was never instructed to interrupt lunch break to handle work-related activities); Abdul-Rahman 86:1-93:25 (was never told that it was corporate policy to work through a meal break and not get paid for it); Mosblech Dep. 62:17-23 (manager instructed RSCs that they have to take a 30-minute lunch break if working eight hours); Bonomo Dep. 86:13-22 (same); Sanchez Dep. 75:17-19 (same); Timper Dep. 74:20-25 (never required to have meal breaks interrupted); Carrega Dep. 104:5-7, 104:13-15 (was never instructed by managers that was not

allowed to clock back into MyTime when helping customers during lunch break); Schneider Dep. 37:19-38:1 (though never explicitly instructed to review product information during lunch, employee was "positively reinforced" to continue working during lunch because employee received "praise" and was "acknowledged for working above and beyond" by managers for doing so); Clark Dep. 23:12-23 (managers verbally instructed to resume work before lunch break ended, but to come in later on a following shift).

121.    **Employees have the option to take less than 30 minutes for lunch.**  Abdul-Rahman Dep. 86:1-93:25 (voluntarily chose to work through meal breaks because wanted to make a sale for the commissions); Gladura ¶ 18 (skips lunch "once in a great while"); Cruz ¶ 27 (only takes lunch during school year because needs to pick up children from school); Casavale ¶ 9 (voluntarily logs back into help customers, then logs back out and takes remainder of lunch); Iracheta ¶ 16 (same); Spraggins ¶ 26 ("opted" to work through lunch during iPhone lunch); Elkin ¶ 16 ("I have never been pressured not to take my breaks or been denied a break.").

122.    **Frequency of interruptions during meal breaks vary.**  Gutierrez Dep. 58:4-6, 58:18-24, 60:2-7 (hardly ever interrupted); Timper Dep. 83:2-18 (frequently interrupted to be a "good manager"); Schneider Dep. 38:24-39:19 (on occasion only when store was very busy); Bennett Dep. 119:25-120:11 (5 or 6 times per year); Sterling Dep. 85:17-19 (was not often interrupted and usually when Sterling was the only manager on duty); Abdul-Rahman Dep. 86-93 (for a period of 4-6 months when his store was short staff, had to often work through lunch because there was only 3 RSCs and not enough to help customers); Sanchez Dep. 75:17-19, 77:1-11 (was "always selling, even when eating" because wanted to increase sales commissions and "because of the pressure of everything, evaluations, customer retention"); Gutierrez Dep. 11:10-15, 66:1-11 ("worked through lunch about 1-2 times per week during first 6 months of

employment); Walsh Dep. 104:5-7-105:15-22 (frequently interrupted talking to co-workers to avoid being "rude"); Clark Dep. 18:13-19:23 (frequently interrupted); Kemp ¶ 8 (never interrupted); Myers ¶ 13 (rarely interrupted); Stanfield ¶ 4 (sometimes interrupted if lunch is taken in the store); Fitzgerald ¶ 12 (only interrupted twice and paid both times); Holstein ¶ 10 (never); J. Brown ¶ 9 (once or twice a week, but does not consider it "work"); Ibanez ¶ 8 (interrupted once every two weeks); Washington ¶ 10 (interrupted 5% of time); Esler ¶ 11 ("I have never gone back to the floor during my lunch break.") R. Smith ¶ 9 (4 times a month).

123.    **Duration of interruptions during meal breaks and skipping meal breaks vary.**  Harrell Dep. 103:2-7 (sometimes it was whole lunch period, sometimes "just a little bit of time, five minutes"); Mosblech Dep. 64:15-20 (averages about 15 to 45 minutes of off-duty work when lunches were interrupted in an average week); Bonomo Dep. 87:13-20 (1 minute to 15 minutes per interruption); Bennett Dep. 119:25-120:11 (each interruption lasted about 2 to 3 minutes each); Abdul-Rahman Dep. 86:1-93:25 (interruptions varied in length); Sterling Dep. 80:10-82:5, 82:6-83:6, 83:7-84:7 (majority of the instances where interrupted were to check email, go back on the sales floor for quick fixes to a computer or to assist a customer, which would take just a few minutes); Villasenor ¶¶ 15-16 (once interrupted for 15 minutes to complete a U-verse sale).

124.    **Employees have the option to stay logged in, or log back into, MyTime when performing work during lunch in order to receive compensation.**  Abdul-Rahman Dep. 86:1-93:25 (never logged out of MyTime when helping customer during a meal break); Bonomo Dep. 83:4-8 (when employee worked through lunch because a store was busy, employee would not punch out and would get paid for that time worked); Walsh Dep. 109:24-110:2, 112:3-5 (did not clock out for lunch when the store was very busy and was paid for all time worked); Teran Dep.

68:18-72:15 (sometimes stayed punched in during meal break to help customers and was compensated for that time while other times started meal break but went back to work in middle of break to assist customers without punching back in because customers were waiting for him and it "slipped [his] mind"); Wilcox ¶ 11 (would always clock back in to help a customer, then clock back out and take remaining lunch period); Haussling ¶ 28 (same); Galloway ¶¶ 8, 12 (same); Spraggins ¶ 28 (same); Hanratty ¶ 10 (same).

       125.    **Receiving compensation for interruptions during a meal break varies.**

Mosblech Dep. 62:24-64:7 (received time adjustments for instances where lunch break was interrupted); Schneider Dep. 36:4-11, 45:17-46:11, 44-9:45:11 (believes that manager manually adjusted time to show that a full 30 minutes at lunch was taken even when it was not based on "overtime mandates" that "came down from above"); Sterling Dep. 85:12-86:15, 88:13-89:5 (never reports time spent working during lunch, which happens regularly); Valenzuela Dep. 51:23-55:2 (worked through lunch on occasion and was not paid); Bonomo Dep. 85:19-24, 86:3 (uncertain if compensation was received for occasions when no lunch break was taken); Sanchez Dep. 19:14-20, 21:21-25, 75:20-25, 77:1-11 (chose to work through lunch periods without getting paid in order to make sales based on "the pressure of everything, evaluations, customer retentions"); Carrega Dep. 103:9-104:4 (never clocked back in during lunch when assisted customers because employee was concerned about helping customers right away and ensuring his commission); Valdez ¶ 25 (receives "short paid lunch"); Collins ¶ 18 ("If an employee takes less than 30 minutes, then they are paid for the full break."); Fitzgerald ¶ 12 (receives compensation); Ibanez ¶ 8 ("In every instance, I am paid for all the time I worked even if my lunch was interrupted briefly.").

**Opening and Closing Activities While Off-Duty Vary By Employee**

126. **Time spent to log-in and log-out of MyTime varies.** Farley Dep. 10:24-24:6 (3.5 to 5 minutes to log into MyTime); Mitchell ¶ 6 (two minutes); Butler ¶ 10 (15-20 seconds if the computer is on); Funchess ¶ 4 ("essentially no time at all"); Perlman ¶ 8-9 (10 seconds); Tritto ¶ 6 (20 seconds); Williams ¶ 22 (depends on computer; 2-5 minutes).

127. **Sporadic delays in logging in or out of MyTime occur due to different causes.** Valenzuela Dep. 24:6-24:10 (computer locked with another employee's password and must be rebooted); Valenzuela Dep. 23:5-23:12 (recalls occasions where the door would not open and had to wait 45 minutes to an hour for a locksmith to arrive, and other times where employee had to wait 5-15 minutes for co-workers to arrive for work before being able to begin opening procedures); Bennett Dep. 98:3-106:24, 106:25-109:16 (longer when using a laptop because it is slower than store computers); Walsh Dep. 87:21-88:16 (while working at a kiosk, often had to set up the displays before booting up the computer to log into MyTime); Joven Dep. 56:7-56:25 (recalls delays in logging in because had to (1) wait for keyholder to open, (2) when a computer needed to be rebooted because another employee failed to log out the day before, (3) when IT issues caused difficulty logging in, or when (4) the computer ran updates); Schneider Dep. 73:3-10 (issues with computer booting-up).

128. **Waiting in line to clock in or out varies.** Burcher ¶ 9 (has own workstation); Senft ¶ 5 (more terminals than employees); Myers ¶ 11 (never has to wait); Guevara ¶ 4 (same).

129. **Time spent on opening procedures before logging into MyTime varies.** Carrega Dep. 85:6-85:13 (5 minutes); Sanchez Dep. 66:18-66:19 (on occasion would have to wait for someone to let employee in because the store was located in a mall and the mall doors would be locked); Bennett Dep. 98:3-106:24 (1.5 to 3 minutes total); Hendricks Dep. 72:19-73:10 (not that long); Bonomo Dep. 68:22-69:17 (1 minute 25 seconds to unlock door, relock it,

disarm alarm, and log into computer when opening a store); Gutierrez Dep. 49:20-50:4 (not very long); Cruz ¶ 14 ("seconds"); Gladura ¶ 10 (3 seconds to arm alarm).

130.    **Time spent on closing procedures after logging out of MyTime varies.**  Walsh Dep. 94:3-95:24 (45 seconds total after logging out of MyTime to make sure all employees were standing by the door, turn off lights, set alarm, walk out door, lock it, and do a visual inspection of the store); Bennett Dep. 106:25-109:16 (a few seconds to set the alarm); Farley Dep. 25:17-31:6 (5 minutes waiting for employees and arming alarm); Hendricks Dep. 74:16-75:1 (3-4 minutes to take trash out); Mosblech Dep. 55:14-21 (has to lock the door); Hopkins Dep. 50:19-51:12 (a few seconds to exit building); Easdon Dep. 28:18-22 (a few minutes to exit store); Timper Dep. 69:2-11 (1 minute to unlock doors, let himself out, then confirm doors are locked); Bonomo Dep. 73:6-14 (30 seconds to arm alarm); Sanchez Dep. 23:14-23:25, 71:20-71:22 (because kiosk locks broken, after clocking out, employee had to drive inventory from the kiosk to closest store, wait outside while the store employees finished their closing procedures, then put the kiosk inventory in storage for safekeeping; also assisted customers while leaving the mall where kiosk is located); Martin ¶ 22 (never); Shepard ¶ 8 (never); Perlman ¶ 11 (never).

131.    **Reasons for needing time adjustment due to opening/closing process vary.** R. Smith ¶ 8 (adjustment requested because one time forgot to close inventory door room and pull down security door before clocking out); Cruz ¶ 16 (requested adjustment for time spent creating new computer password); Williams ¶ 23 ("I don't want to keep on having to ask for my time to be adjusted for 2 minutes every single day."); Farthing ¶ 17 (does not report because "inconsequential"); Kemp ¶ 6 (will report when off-duty works takes 15 minutes or longer); Baker ¶ 9 (does not report time because it is "minimal"); Valdez ¶¶ 30, 32 (does not report time

spent before logging in because does not think certain activities, such as setting alarm, are "work"); Moore ¶ 13 (same).

132.    **Employees are intercepted by customers on the way in or out of the store before punching in or after punching out for various reasons.**  Ibanez ¶ 7 (assisted frustrated customer immediately upon returning from lunch break without clocking back in first); Burks ¶ 9 (assisted customer on the way out because had previously performed other transactions for that customer); Cruz ¶ 19 (assisted customers who are in a "hurry or are angry" before clocking in); Collins ¶13 (never because multiple exits make avoiding customers easy).

133.    **Employees are provided with the option to report time spent when they are intercepted by customers on the way in or out of the store before punching in or after punching out.**  Burcher ¶ 5 (sends email requesting adjustment to manager whenever employee is interrupted); Shepard ¶ 7 (same); Nickoloff ¶ 10 (same); Guevara ¶ 11 (same).

**Training, Table Days, and Conference Calls Outside Of The Store**

134.    **Receiving compensation for travel time and attendance at training sessions that are offered at other locations varies.**  Sterling Dep. 34:17-36:9, 37:12-18 (as an ASM, would perform time adjustments for RSCs who attended off-site trainings); Mosblech Dep. 46:7-16 (received adjustments for time spent at the off-site training); Gutierrez Dep. 19:11-20:22 (requested time adjustments for time spent at off-site trainings); Hopkins Dep. 14:8-17 (has made time adjustment requests for time spent at training while off the clock); Ashcraft ¶ 16 ("I have always been properly paid for any off-site training I have attended, including travel time."); Collins ¶ 16-17 ("[T]he only adjustment requests that I can recall from any employee have been for travel/driving time.  I have never denied any of these requests and they were all properly paid for their travel time."); Pagliaroni ¶ 11 ("I go to the store first, clock into the system, and then

drive to Albany for the training.  I then return to the store and clock out once the training is complete.").

135.    **Receiving compensation for "pre-work" necessary to study for management training.**  Shepard ¶ 4 (would receive overtime compensation due to all of the pre-work required for ASM trainings); Myers ¶ 6 ("did some work related to the training from home.  I wrote down the time I worked, gave it to [my manager], and she entered it into MyTime for me."); Cruz ¶ 34 ("[I]n the past I have had to take a class in preparation for a training I participated in . . . I clocked into MyTime through the VPN, took the class, then clocked out of MyTime when I was done.").

136.    **Receiving compensation for off-duty conference calls varies.**  Sterling Dep. 32:8-33:6 (not making claim for conference calls because received compensation for all conference calls taken off-duty); Sanchez Dep. 63:14-17 (supervisor never stated that employees must take off the clock conference calls without compensation); Schneider Dep. 51:9-17, 54:22-55:23 (sometimes spend about 45 minutes to an hour and a half on conference calls while off the clock and never receives compensation for that time); Kemp ¶ 9 ("I will take a conference call when I'm not on the clock.  If I take a call from home, I simply email the manager who makes the adjustment in MyTime for me."); Shepard ¶ 3 (clocks in on laptop); Richardson ¶ 7 (schedules RSCs to be in store during conference calls); Wilcox ¶ 6 (always paid); Collins ¶ 7 (made time adjustments for Home Sales Consultant at least 5-6 times for off-duty calls attended); Stanfield ¶ 6 ("If I'm in the car on a call, I just inform my manager of the time I worked and she adds it into MyTime for me.").

137.    **Receiving compensation for working at sales events such as "Table Days" held away from the store varies.**  R. Smith ¶ 11 (always paid to attend sales kickoff days);

Mitchell ¶ 12 (". . . this past Christmas, we set up a table at a local hospital to sell products.  My manager added the time I spent at the table to MyTime and I was paid for all the time I worked."); Easdon Dep. 51:15-52:1 (does not believe that he was properly paid for time spent working off the clock at Table Days); Galloway ¶ 15 ("Everyone working the table that day meets at the store, logs into MyTime . . . When . . . finished, . . . return to the store and clock out like usual."); Gladura ¶ 11 (drops off about five Individual Responsibility User flyers per week while on the clock, but if not, sends manager a request to adjust time spent working off the clock); Spraggins ¶ 23 (paid for off-duty flyering).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of November, 2010, in Washington, D.C.

_____

Thomas P. Gies

26