UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
:
GAMZE ZIVALI, Individually and on behalf : ECF Case
of all other Similarly Situated Employees, :
:
Plaintiff, :
:
v. : Case No. 08-cv-10310 (JSR)
:
AT&T MOBILITY LLC, :
:
Defendant. :
:
:
:
:
------------------------------------------------------- x


**DEFENDANT'S REPLY IN FURTHER SUPPORT OF
ITS MOTION TO DECERTIFY COLLECTIVE ACTION**

Dated: January 11, 2011
New York, New York

| | |
|---|---|
| *Of Counsel:* | Elizabeth Wallin |
| Thomas P. Gies (*admitted pro hac vice*) | General Attorney |
| Andrew W. Bagley (*admitted pro hac vice*) | AT&T Mobility LLC |
| Crowell & Moring LLP | 5601 Legacy Dr. |
| 1001 Pennsylvania Ave. | Plano, TX  75024 |
| Washington, DC  20004 | |

Gary A. Stahl (GS-3987)
Crowell & Moring LLP
590 Madison Ave., 20th Floor
New York, NY  10022

Attorneys for Defendant, AT&T Mobility LLC

**Table of Contents**

I.   Plaintiff Cannot Identify an Unlawful Uniform Policy or Practice ......................................... 1

II.  Plaintiff's Claim That the Opt-Ins Are Similarly Situated Is Unsupported ............................ 3

III. Fairness and Procedural Considerations Mandate Decertification ......................................... 6

    A.   Opt-In Testimony Is Not Representative and Cannot Be Extrapolated ........................... 6

    B.   Bifurcation into Liability and Damages Phases Is Not Feasible ..................................... 7

## Cases

*Aldous v. Honda Motor Co., Ltd.*, No. 94-CV-1090, 1996 WL 312189, at *1 (N.D.N.Y. May 30, 1996) .................................................................................................................................. 7

*Batiz v. Am. Commercial Sec.*, No. EDCV 06-00566-VAP, at p. 9 (C.D. Cal. Sept. 22, 2010) .... 7

*Bayles v. Am. Med. Response of Colorado, Inc.,* 950 F. Supp. 1053, 1065 (D. Colo. 1996) ......... 1

*Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) ................................................................... 8

*Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101 (D. Minn. 2009) ......................... 6, 10

*Cunningham v. Elec. Data Sys. Corp.*, Nos. 06-Civ-3530, 08-Civ-10409, 2010 WL 5076703, at *4-5 (S.D.N.Y. Dec. 13, 2010) ................................................................................................. 1

*Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008) .............................................. 10

*Frank v. Gold'n Plump Poultry, Inc.*, No. 04-CV-1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007) .................................................................................................................................. 4

*Hernandez v. United Auto Credit Corp.*, No. C-08-03404, 2010 WL 1337702, at * 5 (N.D. Cal. Apr. 2, 2010) ............................................................................................................................ 3

*In re Fresh Del Monte Pineapples Antitrust Litig.*, 2008 WL 5661873, at *9 (S.D.N.Y. Feb. 20, 2008) ...................................................................................................................................... 10

*Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 717 (2d Cir. 2001) ............................... 9

*L-3 Comm. Corp. v. OSI Systems*, 418 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) ............................. 7

*Levy v. Verizon Info. Servs. Inc.*, Nos. 06-CV-1583, 06-CV-5056, 2007 WL 1747104, at *3-5 (E.D.N.Y. June 11, 2007) ........................................................................................................ 6

*Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984) ..................................................... 9

*Lusardi v. Xerox Corp.,* 855 F.2d 1062, 1071 (3d Cir. 1988) ........................................................ 7

*Martin v. Selker Bros.*, 949 F.2d 1286, 1298 (3d Cir. 1991) ......................................................... 6

*Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 962-67 (W.D. Mich. 2009) ......... 2

*Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008) ................. 6

*Reed v. County of Orange*, 266 F.R.D. 446, 456 (C.D. Cal. 2010) ............................................... 1

*Reich v. New York City Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995) ....................................... 9

*Shim v. Ecosphere, LLC*, No. 10-60024-CIV, 2010 U.S. Dist. LEXIS 135984, at *4 (S.D. Fla. Dec. 20, 2010) ................................................................................................................... 1

*Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) ......................................... 8

*Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *6 (M.D.Tenn. Sept. 26, 2006) ......... 10

*Wong v. HSBC Mortgage Corp.*, No. C-07-2446, 2010 WL 3833952, at *1-3 (N.D. Cal. Sept. 29, 2010) ............................................................................................................................. 1

*Zivali v. AT&T Mobility, LLC*, 646 F. Supp. 2d 658, 661-62 (S.D.N.Y. 2009) ............................. 2

### Additional Authority

Manual for Complex Litigation (Fourth) § 21.24 (2004) ................................................................ 7

Plaintiff's attempt to bundle up individual stories of more than 4,100 opt-in plaintiffs into a package of generalities about the administration of Mobility's MyTime timekeeping system does not make this a collective action.[1] To the contrary, it "is oxymoronic to use . . . [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability." *Bayles v. Am. Med. Response of Colorado, Inc.*, 950 F. Supp. 1053, 1065 (D. Colo. 1996). Trial of this case would require thousands of mini-trials that would make it completely unmanageable.[2]

### I.  Plaintiff Cannot Identify an Unlawful Uniform Policy or Practice

Plaintiff fails to identify a single uniform policy or practice that *violated* the Fair Labor Standards Act ("FLSA") and which harmed a significant number of opt-ins.[3] Plaintiff does not seriously dispute that Mobility maintains lawful timekeeping policies and that these policies are widely communicated through training and other devices. Nor can Plaintiff contest the facts that MyTime records time on a per-minute basis, and that managers have the ability to, and routinely do, adjust time entries to ensure time worked away from the store is paid. Instead, Plaintiff focuses on the facts that opt-ins cannot enter time worked outside of the store *at the time* it is worked and that Mobility relies upon its store managers, rather than the opt-ins themselves, to

---

[1] Plaintiff minimizes the requirement that, during the second stage of the certification analysis, the Court must **more stringently** analyze whether opt-ins are similarly situated. *Cunningham v. Elec. Data Sys. Corp.*, Nos. 06-Civ-3530, 08-Civ-10409, 2010 WL 5076703, at *4-5 (S.D.N.Y. Dec. 13, 2010). Given this heavier burden, courts recognize that few cases will survive a motion to decertify. *See Shim v. Ecosphere, LLC*, No. 10-60024-CIV, 2010 U.S. Dist. LEXIS 135984, at *4 (S.D. Fla. Dec. 20, 2010).

[2] *See, e.g., Reed v. County of Orange*, 266 F.R.D. 446, 456 (C.D. Cal. 2010) (addressing various claims "in a single trial will not merely result in confusion and inefficiency, it will inject chaos into the fact-finding process").

[3] *See Wong v. HSBC Mortgage Corp.*, No. C-07-2446, 2010 WL 3833952, at *1-3 (N.D. Cal. Sept. 29, 2010) (granting motion to decertify FLSA action where plaintiffs failed to identify centralized rule, practice, or policy).

enter such time through the adjustment feature in MyTime.  Pl. Memo. of Law in Opposition to Motion to Decertify ("Opp."), pp. 17-18.  But Plaintiff's focus actually confirms Mobility's principal point that this case inexorably requires individual inquiries into, among other issues, the circumstances and duration of such work, the extent of Mobility's knowledge, whether adjustments were made, and if not, why not.[4]

Having largely abandoned her emphasis on purported design flaws in MyTime (which are dispatched in Mobility's motion for summary judgment), Plaintiff now claims Mobility's "culture" discouraged the reporting of off-duty overtime.  Opp. p. 9.  In addition to confirming the necessity of making individual inquiries into the various claims made by opt-ins, this argument is qualitatively different from the premise on which conditional certification was originally granted.  *See Zivali v. AT&T Mobility, LLC*, 646 F. Supp. 2d 658, 661-62 (S.D.N.Y. 2009).

Plaintiff fares no better with the new claim.  Her assertion that the opt-ins uniformly did not know what off-duty activities constituted legally compensable work and how to record their time outside of the store (Opp. pp. 19-20) is unsupported.[5]  To the extent an opt-in claims he or she did not receive or understand the training (or was told to disobey the direction given), individualized credibility determinations will be required.  *See*, *e.g.*, *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 962-67 (W.D. Mich. 2009).  Plaintiff fares no better with

---

[4] As an example, the fact that Mobility left to the discretion of each RSM how to receive adjustment requests – verbally, by e-mail, by text, or by form (Pallia Dec. ¶ 7; Fogle Dec. ¶ 10) – demonstrates Mobility's flexibility in promoting adjustment requests, not discouraging them.

[5] Mobility's Code of Business Conduct and training programs explain these matters in detail. *See* Bennett Dec. ¶¶ 22, 25-27, Exs. 3-4; Motion, p. 6, n. 13-15.  Plaintiff distorts training materials provided to employees (Opp. p. 28, Exs. 38-39) to educate them about situations where Mobility needed to pay unreported overtime when managers knew of it.  The materials address the situation of an employee offering to work gratis or expressing a preference not to be paid.

the argument that Mobility's overtime policies put employees in a Catch-22 in which they only can report overtime if they want to risk being disciplined and terminated for working unapproved hours. Opp. p. 3. In addition to being unsupported in the record,[6] it is the quintessential example of individual claims that are inappropriate for collective action treatment.[7] If anything, it is Mobility that faces a real Catch-22. Without a system that requires management approval of overtime hours allegedly worked away from the store, Mobility would be vulnerable to employees unilaterally adding to their work hours or other forms of time theft. *See* Disselkamp Report, p. 8 (discussing survey showing that 21% of employees admitted to cheating on timesheets).

## II.     Plaintiff's Claim That the Opt-Ins Are Similarly Situated Is Unsupported

Plaintiff's claims boil down to the theory that opt-ins were not paid for off-duty work *in spite of* lawful timekeeping policies and a sophisticated system designed to capture all hours worked in and outside of a retail store. Plaintiff's argument that the 29 opt-ins deposed during class discovery "consistently testified that they performed essentially identical categories of work off-the-clock without proper pay" (Opp. pp. 2, 18) ignores the varying factual

---

[6]   For example, Plaintiff's reference to an excerpt from a January 2006 Retail Sales Manager Training Guide (Opp. Ex. 60) mischaracterizes Mobility's efforts to control labor costs. Plaintiff alleges that a statement in the manual that "surplus labor and overtime costs inflate the cost of doing business and are not in the budget" implicitly instructed managers not to approve overtime. Opp. p. 16. Not true. The training manual simply instructed managers to be cognizant of MyTime hours and schedule labor to avoid the accumulation of unnecessary overtime during non-peak times. There is nothing illegal about that. Moreover, Plaintiff ignores the substantial amount of overtime Mobility paid to opt-ins.

[7]   *See, e.g., Hernandez v. United Auto Credit Corp.*, No. C-08-03404, 2010 WL 1337702, at * 5 (N.D. Cal. Apr. 2, 2010) (decertifying FLSA action where facts required case-by-case determinations and eliminated any procedural advantages of collective action; "The potential for a class-wide ruling on liability seems slim. And even if liability could be determined on a class-wide basis, the court would still face the prospect of having to determine individualized damages.").

circumstances identified in Mobility's motion papers.[8]  An examination of the testimony shows that even those opt-ins did not uniformly perform the "same tasks" off-duty.  For example:

- Whereas Jorge Ortiz interacted with customers outside of the store (while wearing his uniform voluntarily to restaurants, bars, the mall), Christine Gutierrez engaged in no such face-to-face customer interaction.  *Compare* SJ Opp. Ex. 86 (Ortiz Dep.) at 103:11-104:6 *with* SJ Opp. Ex. 74 (Gutierrez Dep.) at 68:16-69:3.[9]

- While Brandon Marshall allegedly spent two to three hours per week engaged in off-the-clock business-related texting and phone calls, most of the off-duty phone, text, and email conversations Christine Gutierrez had were with her friends, some of whom were coworkers, regarding personal matters.  *Compare* SJ Opp. Ex. 83 (Marshall Dep.) at 41:13-24 *with* SJ Opp. Ex. 74 (Gutierrez Dep.) at 27:14-30:21.

- Jeffrey Mosblech testified that providing customer service off-the-clock was part of the job but also testified that he often waited to return after-hours calls until the next shift, when he was back on the clock.  SJ Opp. Ex. 85 (Mosblech Dep.) at 67:4-23.

- Whereas several opt-ins' decisions to serve customers off-the-clock were driven by a desire to reap commissions for their own benefit, others simply forgot to clock back in or thought off-the-clock work was implied by the nature of the job.[10]

- Thomas Farley's only claim for uncompensated off-duty work is for the time required to open and close the store, for which he never requested an adjustment. SJ Opp. Ex. 73 (Farley Dep.) at 9:24-10:2.

Plaintiff likewise ignores evidence that a substantial portion of the opt-ins *did not* even receive corporate emails on their "company official use" ("COU") devices, that access to corporate email on COU devices was a function of market-specific policies, and that even within

---

[8]  Plaintiff's reliance on *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-CV-1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007) (Opp. p. 1) is misplaced.  Unlike here, the court in *Frank* noted both that the defendant lacked *any* corporate policy on payment for the donning/doffing time at issue there, and that not a single supervisor kept track of the time spent in those activities.  *Id.* at *3.

[9]  To avoid duplication of exhibits, Mobility cites here to the full deposition transcripts submitted as exhibits to Plaintiffs' Opposition to Defendant AT&T Mobility, LLC's Motion for Summary Judgment ("SJ Opp.").

[10]  SJ Opp. Ex. 83 (Marshall Dep.) at 49:11-20; SJ Opp. Ex. 63 (Rahman Dep.) at 89:19-90:7; SJ Opp. Ex. 69 (Clark Dep.) at 19:12-17, 25:14-17; SJ Opp. Ex. 95 (Valenzuela Dep.) at 76:23-78:20; *see also* Motion, n. 26-27.

markets, corporate email access and use varied over time based on manager and opt-in preferences. Plaintiff also neglects opt-ins' reports that off-duty text messages, telephone calls, and in-person interactions with customers and managers varied in number, length, content and frequency, and that individual determinations will be necessary to differentiate the vast majority of personal numbers that opt-ins texted and called. Furthermore, the substantial number of opt-ins who do not even assert a claim related to meal breaks confirms the lack of a uniform unlawful policy or practice in that area. Those who do make this claim tell different stories about why and how often they worked uncompensated meal breaks, which will also require individualized determinations.[11] Likewise, citing vague testimony about opening and closing stores without compensation (Opp. p. 18), Plaintiff neglects the opt-ins who testified they never or rarely opened or closed the store or testified their pre- and post-shift work varied widely.[12]

Ultimately, this is a case involving hundreds of individual choices made on a daily basis by thousands of employees.[13] Plaintiff simply cannot meet her burden by citing testimony from

---

[11] See SJ Opp. Ex. 73 (Farley Dep.) at 9:20-10:2 (no claim); SJ Opp. Ex. 77 (Hopkins Dep.) at 9:22-10:9 (no claim); SJ Opp. Ex. 76 (Hendricks Dep.) at 13:17-21 (no claim); SJ Opp. Ex. 79 (Joven Dep.) at 23:7-16 (no claim); Motion, n. 54-57.

[12] See SJ Opp. Ex. 69 (Clark Dep.) at 16:1-6 (no claim); SJ Opp. Ex. 63 (Abdul Rahman Dep.) at 11:3-17 (no claim); SJ Opp. Ex. 74 (Gutierrez Dep.) at 48:7-8 (opened once a week); SJ Opp. Ex. 89 (Sanchez Dep.) at 69:15-18 (not instructed to do work activities before punching in for opening shift); SJ Opp. Ex. 79 (Joven Dep.) at 55:11-56:6 (shifts without opening or closing duites have increased from 30 to 60 and now 80 percent under different managers); Motion, n. 61-65; Index ¶¶ 126-32.

[13] The claim for off-duty phone calls with customers, for example, can only be resolved by an examination of the numerous choices which opt-ins made that were not dictated by any common policy or procedure, including whether each opt-in (1) kept her phone on or turned it off when off-duty, (2) charged her phone or had a dead battery, (3) listed her COU number on a business card, (4) handed out businesses cards with a COU number, (5) answered calls from known or unknown numbers which happened to be customers (not personal), (6) directed callers to the store or Customer Service quickly or engaged the customers in lengthy conversation, (7) did or did not report the time to an RSM or ASM for a time adjustment, and (8) did or did not receive pay for time corrections that were reported.

a trivial number of opt-ins who alleged they were not paid for some amount of overtime worked and who describe differing "policies" or practices depending on the particular store or manager.

### III.     Fairness and Procedural Considerations Mandate Decertification

#### A.     Opt-In Testimony Is Not Representative and Cannot Be Extrapolated

Plaintiff's claims and Mobility's defenses cannot properly be addressed through representative testimony. Opp. p. 33-34. Where there is little consistency in the testimony, it is not "representative" and cannot be extrapolated to establish class-wide proof of liability or damages. In a case cited by Plaintiff, *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101 (D. Minn. 2009) (Opp. p. 23), the district court emphasized that, to determine liability for most of the alleged uncompensated work at issue, "the parties would need to engage in mini-trials for each Plaintiff" and "representative testimony would not be appropriate [given] widely varying allegations." *Id.* at 1122, citing *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008) (representative testimony not proper when "there is no consistency among the testimony, there is no consistently applied policy resulting in working off the clock, and the time spent working off the clock is not alleged to be uniform or of a predetermined duration"). Plaintiff has likewise demonstrated no evidence of common proof that would allow a fact-finder to make a class-wide determination.[14]

Plaintiff fails to explain how sample opt-in testimony could be fairly extrapolated to the class. Are the 4,100-plus non-testifying class members akin to Thomas Farley, who does not claim any uncompensated work (other than *de minimis* opening/closing the store)? If not, why

---

[14]     The cases Plaintiff cites in favor of the use of representative testimony (Opp. p. 34) are distinguishable. *See*, *e.g.*, *Martin v. Selker Bros.*, 949 F.2d 1286, 1298 (3d Cir. 1991) (misclassification case where no records of hours worked were kept for individuals classified as independent contractors); *Levy v. Verizon Info. Servs. Inc.*, Nos. 06-CV-1583, 06-CV-5056, 2007 WL 1747104, at *3-5 (E.D.N.Y. June 11, 2007) (conditional certification granted in action with 22 plaintiffs alleging *no system* of recording any hours worked at 19 offices).

6

not? How many of them are similar to the two opt-ins who withdrew their claims rather than face deposition? Will the claims of opt-ins who only worked part-time – and thus do not have overtime claims – be dismissed? How will evidence of fluctuations in off the clock work over time and by store be extrapolated on a class-wide basis? How will disputed allegations of manager knowledge be extrapolated? Plaintiff has no answers to these and numerous other questions about how this case could possibly be tried as a collective action.[15] Instead, this case presents "a monster that no one can deal with, made up with a lot of individual people with specific grievances." *Lusardi v. Xerox Corp.,* 855 F.2d 1062, 1071 (3d Cir. 1988).

**B.     Bifurcation into Liability and Damages Phases Is Not Feasible**

Plaintiff attempts to pigeon-hole Mobility's defenses as concerning only "differing damages," contending that a fair and manageable trial can be achieved through bifurcation. Opp. pp. 33-35. But this over-simplification fails to account for the myriad questions and credibility determinations which are inextricably tied to *both* liability and damages issues. "[B]ifurcation is *inappropriate* where the 'same witnesses may be needed to testify as to both the issues of liability and damages, and . . . evidence pertaining to these issues may very well overlap.'" *Aldous v. Honda Motor Co., Ltd.*, No. 94-CV-1090, 1996 WL 312189, at *1 (N.D.N.Y. May 30, 1996).[16] The "common" facts alleged by Plaintiff – that all class members used MyTime, that only time reported in MyTime is paid, that employees can only log into MyTime when present at

---

[15] *See, e.g., Batiz v. Am. Commercial Sec.*, No. EDCV 06-00566-VAP, at p. 9 (C.D. Cal. Sept. 22, 2010) (opinion attached) (decertifying FLSA action where only alternatives are to have 3,065 class members testify as to damages or extrapolate based on a smaller sample which would result in prejudice to some plaintiffs who are underpaid and to defendant who would overpay some claims).

[16] *See also L-3 Comm. Corp. v. OSI Systems*, 418 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) (rejecting bifurcation where "the issues of liability and damages [we]re markedly intertwined"); Manual for Complex Litigation (Fourth) § 21.24 (2004) ("A bifurcated trial must adequately present to the jury applicable defenses and be *solely a class trial on liability*.") (emphasis added).

a retail location, and that only a supervisor may retroactively adjust hours – do not establish liability for even a single opt-in, let alone pave the way towards a finding of liability on a class-wide basis.

Even if the Court were to accept Plaintiff's fallacious premise of a commonality amongst all class members because of the use of the MyTime system (Opp. p. 1), it cannot base a class-wide finding of liability or damages on this premise.  Only through examination of the individualized claims and defenses, including credibility determinations about what and how much work was performed off-duty, whether it was reported and paid, and Mobility's knowledge of unpaid work, can a liability determination be made as to each opt-in.  Rather than "go[ing] largely to the issue of damages," (Opp. p. 35), these issues defy exclusive categorization as either "liability" or "damages" issues and render bifurcation inappropriate.[17]

Plaintiff cannot relegate Mobility's actual or constructive knowledge of uncompensated work to the damages phase of a collective action trial because knowledge is a *prima facie* element that Plaintiff must prove to establish liability on an individual basis.  *Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005).  Despite having more than a year to conduct discovery, Plaintiff has simply failed to adduce evidence of widespread knowledge of uncompensated off-duty work here.[18]

---

[17] Bifurcation would also require impermissible re-examination of issues in violation of the Seventh Amendment.  *See, e.g.*, *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999).  Here, reexamination would be inevitable, as evidence in the "damages" phase could undo a finding of "liability" for a host of opt-ins.

[18] Rather, the opt-in testimony demonstrates the wide variance in manager knowledge.  *See, e.g.*, SJ Opp. Ex. 92 (Sterling Dep.) at 61:5-62:17 (neglected to report handful of off-the-clock calls and texts each week, but had he done so, his manager would have made proper adjustments to his time); SJ Opp. Ex. 82 (Linnenbaugh Dep.) at 15:20-22 (did not seek adjustments for off-the-clock work); SJ Opp. Ex. 65 (Bonomo Dep.) at 37:10-13 (never reported any off-the-clock work to manager).

8

Plaintiff's assertion that "FLSA compliance was not a priority for the Company" (Opp. pp. 25-26) is another "Hail Mary" that ignores the evidence of Mobility's policies, training, monitoring, and enforcement efforts. For example, when the test audits concluded, Mobility instructed its Area Retail Sales Managers to continuously address off-the-clock work in their store inspections – a process that continues today. SJ Opp. Ex. 87 (Robinson Dep.) at 66:11-68:12; SJ Opp. Ex. 66 (Britain Dep.) at 37:22-41:25.[19]

As with the employer knowledge defense, Mobility's *de minimis* arguments cannot be relegated to a damages phase because it bars liability as to those claims.[20] At deposition, many opt-ins effectively admitted that the alleged uncompensated off-the-clock work they performed was *de minimis*.[21] These admissions confirm that individual examination about the

---

[19] In fact, throughout the period at issue in this litigation, Mobility has conducted various types of store audits to confirm employees understood and abided by wage-and-hour policies. SJ Opp. Ex. 87 (Robinson Dep.) at 186:6-188:25 (HR conducted store visits in 2006-07), 129:12-130:18 (financial auditors in 2008), 131:4-132:22 (ARSMs have discussed off the clock issues with employees during every store visit since May 2008). Plaintiff's argument that Lewis Walker, Vice President, Human Resources Operations and Labor, "has known about off-the-clock work since at least 2006" (Opp. pp. 21-22) misconstrued Walker's testimony that, while field employees had informed him that employees received customer contacts off hours, the field employees did *not* advise him that employees were not being paid for the time they spent. SJ Opp. Ex. 96 (Walker Dep.) at 85:24-86:6.

[20] To the extent Plaintiff suggests that varied off-the-clock claims of over 4,100 opt-ins can be aggregated to avoid the *de minimis* defense (Opp. p. 30), she is simply wrong. The analysis is strictly individual. The cases cited by Plaintiff – *Reich v. New York City Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995), *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984), and *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 717 (2d Cir. 2001) (not a collective or class action) – do not support her position.

[21] For example, Plaintiff cites David Hendricks' testimony that he received off-duty texts from customers (SJ Opp. Ex. 76 (Hendricks Dep.) at 53:12-21), but she ignores his testimony that he only received "two to three [text messages] a month." SJ Opp. Ex. 76 (Hendricks Dep.) at 57:6. Plaintiff cites Brandon Marshall's testimony that he was not compensated for time spent off-duty performing opening and closing activities (70:4-6), but she neglects his testimony that the time spent was irregular and *de minimis*. SJ Opp. Ex. 83 (Marshall Dep.) at 74:6-9, 13-18 (opening up door and turning off alarm "wasn't long, a minute or less" and alarm went off "less than five" times throughout his tenure). Plaintiff also cites Brian Carrega's testimony that he was not paid

circumstances of off-duty work is required.

Here again, Plaintiff's focus on *Burch v. Qwest*, (Opp. p. 23), is misplaced. In *Burch*, call center employees claimed they were required to perform a standard set of duties before and after their shifts for which they were not paid. 677 F. Supp. 2d at 1116-17. The court found that a collective action was *not* appropriate with regard to the plaintiffs' other claims, analogous to the claims asserted here, *i.e., claims* for uncompensated work during meal times, breaks, and before or after shifts (*e.g.,* customer call-backs and email review). The court likewise rejected the bifurcation argument made here: "Plaintiffs' suggestion of bifurcating the FLSA case into a liability and a damages stage does not address the manageability problems because individualized inquiry is required to determine liability, not just damages." *Id.* at 1122.[22] *See also In re Fresh Del Monte Pineapples Antitrust Litig.*, 2008 WL 5661873, at *9 (S.D.N.Y. Feb. 20, 2008) (manageability problem not solved by bifurcation where "'fact of injury' element of liability is not capable of proof on a class-wide basis and bifurcation would not 'remove or even alleviate the overwhelming burden of mini-trials'").

For all of the reasons cited herein, and in the Motion to Decertify the Action, Mobility respectfully requests that the Court decertify the class that was conditionally certified.

---

for responding to emails (SJ Opp. Ex. 68 (Carrega Dep.) at 12:5-10), but she ignores his testimony that, on average, he sent only two e-mails a week to his manager while off-duty to let her know that he made no sales that day. SJ Opp. Ex. 68 (Carrega Dep.) at 47:16-23.

[22] Plaintiff's cases supporting bifurcation (Opp. p. 31-35) are inapposite primarily because they involved some identifiable company-wide policy to be examined during the liability phase. *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *6 (M.D.Tenn. Sept. 26, 2006) (plaintiffs alleged unwritten company-wide policy of "shaving" overtime and "defendant's own submissions indicate that its stores' time-keeping and overtime practices were dictated at the national level, rather than in each different locality"); *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008) (assistant managers were subject to standard 40-hour/week labor constraint.

Respectfully submitted,

Dated: January 11, 2011
New York, New York

_____
Thomas P. Gies, Esq. (*admitted pro hac vice*)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: (202) 624-2500, Fax:  (202) 628-5116
Email: tgies@crowell.com