UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
GAMZE ZIVALI, Individually and on   :
Behalf of All Others Similarly      :
Situated,                           :
                                    :
                Plaintiff,          :        08 Civ. 10310 (JSR)
                                    :
        v.                          :        OPINION AND ORDER
                                    :
AT&T MOBILITY, LLC, et al.,         :
                                    :
                Defendants.         :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

On November 26, 2008 plaintiff Gamze Zivali filed a Class &
Collective Action Complaint ("Complaint") on behalf of herself and
all others similarly situated.   The Complaint alleges that defendant
AT&T Mobility LLC ("Mobility" or "AT&T") failed to pay wages and
overtime compensation in violation of the Fair Labor Standards Act
("FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law.
Plaintiff subsequently filed a motion for conditional class
certification, which the Court granted on July 14, 2009.   See Zivali
v. AT&T Mobility LLC, 646 F. Supp. 2d 658 (S.D.N.Y. 2009)).
Following conditional certification, over 4,100 plaintiffs opted in
to the action.   Plaintiffs' Memorandum of Law in Opposition to
Defendant's Motion to Decertify ("Pls.' Opp'n to Decertification")
at 2.   The parties engaged in extensive discovery, including
deposition discovery of 29 randomly selected opt-in plaintiffs.   Id.
On the basis of a voluminous evidentiary record, Mobility moved to

decertify the collective action on November 8, 2010, and for summary judgment on November 16, 2010.  The parties submitted opposition and reply papers to each motion, and the Court held oral argument on January 24, 2011.

After careful consideration, the Court hereby grants Mobility's motion to decertify the collective action.  Overall, the Court concludes that plaintiffs have failed to demonstrate they are similarly situated for the purposes of a FLSA collective action.  It is now apparent that Mobility's timekeeping system and formal corporate policies are lawful under the FLSA, and plaintiffs have failed to show that these lawful policies are consistently violated in practice such that it would be possible to generalize across the 4,100 opt-in plaintiffs in this case.  To the contrary, the record shows an extremely wide variety of factual and employment settings among the individual plaintiffs, managers, and retail stores; this variety would in effect necessitate over four-thousand mini-trials, a result that is antithetical to collective action treatment. Hinojos v. Home Depot, Inc., No. 2:06-CV-00108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006).  Similarly, the defenses available to Mobility are inherently individualized.  Consequently, the Court finds that considerations of procedure and fairness weigh heavily in favor of granting decertification, as the Court harbors

2

considerable doubt that any fair determination could be achieved on the basis of representative evidence. See Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits -- for either side -- that is reached on the basis of purportedly representative evidence.").

The logical implication of the Court's conclusion regarding decertification is that Mobility's motion for summary judgment must be denied.  Given the wide range of factual and employment settings in this case, there are simply too many disputed issues of material fact for the Court to determine on a class-wide basis that Mobility is not liable for FLSA violations.  Indeed, some of the evidence in this case suggests that certain plaintiffs may be able to recover damages from Mobility for uncompensated overtime work.  Mobility's motion for summary judgment is therefore denied.

The Court now turns to a fuller elaboration of the above conclusions.  By way of background, the plaintiffs in this action are "non-exempt" employees of Mobility who work as retail sales consultants ("RSCs") and assistant store managers ("ASMs").  Zivali v. AT&T Mobility LLC, 646 F. Supp. 2d 658, 660 (S.D.N.Y. 2009). Plaintiffs record the hours they work using Mobility's timekeeping

3

system, "MyTime."  Id.  MyTime is a "punch in," "punch out" system
that can contemporaneously record hours worked only when employees
are physically present at the retail store or otherwise logged in
to MyTime.  Id. at 661-62.  Moreover, only a supervisor has the
ability to override the system and retroactively adjust an employee's
work hours as recorded in MyTime.  Id. at 662.  As a result,
plaintiffs allege, this system fails to capture all hours worked
because (i) employees are required to review and respond to company
e-mails and text messages regardless of whether they are "punched
in" to MyTime; (ii) employees "punch out" of MyTime for lunch breaks
despite working through them; and (iii) employees open and close
Mobility's retail stores off the clock, participate in a variety of
company-related activities outside of normal business hours, and
perform similar tasks that are not captured by MyTime or subsequently
recorded by supervisors.  Id.

At the conditional certification stage, the Court found these
allegations sufficient to satisfy the "modest factual showing"
required at that stage that the named plaintiff "and the potential
plaintiffs were victims of a common policy or plan violating FLSA."
Chowdhury v. Duane Reade, Inc., et al., No. 06 Civ. 2295 (GEL), 2007
U.S. Dist. LEXIS 73853, at *7 (S.D.N.Y. Oct. 2, 2007)).  In
considering Mobility's post-discovery motion for decertification,

4

however, the Court, now afforded a much fuller record, must apply a more "stringent standard" of proof in determining whether plaintiffs are similarly situated for the purposes of the FLSA. Damassia v. Duane Reade, Inc., No. 04 Civ. 8819, 2006 U.S. Dist. LEXIS 73090, at * 11 (S.D.N.Y. Oct. 5, 2006). See also Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010) ("At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."). Although the Second Circuit has yet to prescribe a particular method for determining whether members of a class are similarly situated, district courts in this circuit typically look to the "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." Laroque v. Domino's Pizza, LLC, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008) (citations omitted). The burden is on the named plaintiff to prove that the other employees are similarly situated. Ayers v. SGS Control Servs., No. 03 Civ. 9078 (RMB), 2007 U.S. Dist. LEXIS 19634, at *16 (S.D.N.Y. Feb. 26, 2007). If the plaintiffs are similarly situated, the collective action proceeds

5

to trial; but if they are not, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims." Lee v. ABC Carpet & Home, 236 F.R.D. 193, 197 (S.D.N.Y. 2006).

As an initial matter, it is clear that both the MyTime system itself and Mobility's related policies are lawful. While the FLSA requires that employers "make, keep, and preserve" a record of hours worked by their employees, see 29 U.S.C. § 211(c), it does not prescribe any particular form of recordkeeping. See, e.g., 29 C.F.R. § 516.1(a) ("No particular order or form of records is prescribed by the regulations in this part."); Donovan v. Kaszycki & Sons Contractors, Inc., 599 F. Supp. 860, 867 (S.D.N.Y. 1984) ("While no particular form or order of recordkeeping is mandated by the statute or regulations, the employer is required to make and maintain certain records."). There is no legal requirement that employers maintain time clocks, see 29 C.F.R. § 785.48, that hours worked be contemporaneously recorded, or that employees be permitted to enter their own adjustments to a time record without verification by management.[1] Thus, MyTime is a lawful timekeeping system as long

---

[1] See, e.g., Saleen v. Waste Management, 649 F. Supp. 2d 937 (D. Minn. 2009); U.S. Dep't of Labor, "Fact Sheet #21: Recordkeeping Requirements under the Fair Labor Standards Act," available at http://www.dol.gov/whd/regs/compliance/whdfs21.htm. ("Employers may use any timekeeping method they choose. For example, they may

as it allows for the complete and accurate recording of all time worked by Mobility employees.

It is undisputed that the MyTime system is capable of capturing all time worked while employees are physically present in the store. MyTime employs a timestamp feature that records the precise time employees start and stop work.  Declaration of Terry Fogel, dated November 2010 ("Fogel Decl."), Def.s' Decertification Ex. D.  MyTime is also capable of capturing work performed off-site because it allows employees to obtain time adjustments.  See, e.g., Defendant's Local Rule 56.1 Statement of Undisputed Material Facts Supporting Defendant's Motion for Summary Judgment ("Def.s' 56.1") ¶¶ 7-9 (opt-in plaintiffs discussing MyTime's adjustment feature); Report of Lisa M. Disselkamp, dated September 16, 2010 ("Disselkamp Report"), Def.s' Summary Judgment Ex. I at pp. 6-7, 10; Declaration of Emmanuelle Pallia, dated November 6, 2010 ("Pallia Decl."), Def.s' Summary Judgment Ex. D ¶¶ 6-8 (adjustment feature commonly used to capture time employees engage in "selling activities or other work outside the store" and to correct human errors in applying time punches).  To obtain a time adjustment, employees need only report hours worked to their Retail Store Manager ("RSM"), or Assistant

—————————————————————————————————————

use a time clock, have a timekeeper keep track of employee's work hours, or tell their workers to write their own times on the records. Any timekeeping plan is acceptable as long as it is complete and accurate.")).

Store Manager ("ASM") if that duty has been delegated.   The RSM or ASM then manually adjusts the employee's time to reflect the work performed.   See, e.g., Def.s' 56.1 ¶ 9 (opt-in plaintiffs requested adjustments to time entries from managers); Pallia Decl. ¶ 7; Declaration of Karen Bennett, dated November 6, 2010 ("Bennett Decl."), Def.'s Summary Judgment Ex. A ¶ 23 ("This kind of reporting happens as a matter of routine, standard practice.").   Both employees and supervisors review the records for accuracy.   Fogle Decl. ¶ 7; Disselkamp Report. at p. 5, 10.   The MyTime System itself, therefore is a permissible recordkeeping system under the FLSA.

Mobility's formal policies regarding timekeeping and overtime are likewise legally acceptable.   It is undisputed that Mobility maintains official corporate policies that, on the one hand, prohibit working off-the-clock without pre-approval, but, on the other hand, mandate that all overtime, even if not authorized in advance, be paid. Mobility's Code of Business Conduct ("COBC"), for example, provides that "all overtime worked by non exempt employees must be paid regardless of whether the work was approved.   Managers are prohibited from requiring or permitting nonexempt employees to work 'off the clock.'"   Def.s' 56.1 ¶ 14; Fogle Decl.¶ 7.[2]   In practical

---

[2] See also COBC, Declaration of Andrew Bagley, dated November 16, 2010 ("Bagley Decl."), Def.'s Summary Judgment Ex. A.3 at MOBILITY 00002134 ("Nonexempt (overtime eligible) employees must accurately

terms, this means that, while employees may be disciplined for failing to obtain pre-approval for working off-the-clock, nonetheless, all such work that was actually performed will be paid for.[3]

Plaintiffs acknowledge that these principles are reinforced in recurring training for both managers and non-exempt employees alike. Def.s' 56.1 ¶¶ 20-21 (plaintiffs discussing Mobility's training programs).  If either managers or employees violate Mobility' formal policies, they are subject to discipline.  See, e.g., "Do's and Don'ts for Managers," Declaration of Robert R. Rothman, dated December 13, 2010 ("Rothman Decl."), Pls.' Ex. 61 ("DO require overtime to be scheduled and approved before worked by an employee. DON'T fail to discipline managers or employees who violate this policy.").  If violations do occur, employees can seek redress through a variety of avenues, including: reporting the issue to Human Resources or a more senior manager, including the Area Retail Sales

---

report all hours worked each day and each week and may not work overtime unless it is approved by a supervisor in advance.  However, all overtime hours worked by nonexempt employees must be paid regardless of whether they were approved.  Managers are prohibited from requiring or permitting nonexempt employees to work 'off the clock.'").

[3] Requiring pre-approval for overtime, and disciplining employees for working overtime that has not been authorized, is not unlawful. See, e.g., Chao v. Gotham Registry, Inc., 514 F.3d 280, 291 (2d Cir. 2008).

Manager ("ARSM"); raising the issue with the Communications Workers of America (the union that represents most of Mobility's RSCs and other non-exempt employees) by filing a grievance under the applicable collective bargaining agreement; and anonymously reporting the issue through Mobility's toll-free Ethics Hotline. See Pallia Decl. ¶¶ 13-16.  From the face of Mobility's corporate policies alone, the Court can discern nothing that violates the FLSA. See, e.g., Eng-Hatcher v. Sprint Nextel Corp., No. 07 Civ. 7350 (BSJ), 2009 U.S. Dist. LEXIS 127262, at *10 (S.D.N.Y. 2009) (approving Sprint's policy of "prohibit[ing] working off-the-clock and mandat[ing] that all overtime, even if not pre-approved, be paid").

Plaintiffs essentially concede that neither the MyTime system nor Mobility's formal corporate policies violate the FLSA.  See, e.g., Plaintiffs' Opposition to Defendant AT&T Mobility, LLC's Motion for Summary Judgment ("Pls.' Opp'n to SJ") at 4.[4]  See also Colozzi v. St. Joseph's Hosp. Health Ctr., 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009) ("I reject the existence of the break deduction policy practiced through Kronos, standing alone, as being sufficient as a common denominator to permit a collective action on behalf of all of defendants' hourly employees subject to that practice, since

---

[4] See also 01/24/11 Transcript at 24 ("We aren't faulting that policy"); id. at 25 ("The fact that you can police against unauthorized overtime is not disputed by us.").

something more is required in order to establish that the putative class numbers were all subject to the same unlawful practice."); Diaz v. Elecs. Boutique of Am., Inc., No. 04-CV-0840E(SR), 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005) (formal policy requiring preapproval for overtime "insufficient to suggest that all ASMs and SAs were subject to a policy of requiring but not compensating employees for overtime work"); Simmons v. T-Mobile USA, Inc., No. H-06-1820, 2007 WL 210008, at *6 (S.D. Tex. Jan. 24, 2007) ("Simmons . . . has not persuaded the Court that the potential conflict between the sales quotas and policy discouraging overtime affects SRSRs in different stores equally, or even a meaningful number of SRSRs."). Accordingly, the fact that the opt-in plaintiffs track their hours using the MyTime system and are subject to Mobility's formal timekeeping policies is insufficient, without more, to demonstrate that plaintiffs are similarly situated for the purposes of a FLSA collective action.[5]

Plaintiff argues, however, that "[t]he 'legality' of MyTime's 'design and implementation' is not a determinative element to any of plaintiffs' claims.  That MyTime, in some contrived, theoretical way, could accurately capture plaintiffs' off-the-clock work is not undisputed proof that it actually did." Id. (emphasis removed).

---

[5]

11

Similarly, plaintiff argues that "policy statements do not protect employers when their established practices are to the contrary." Id. (citing Russell v. Ill. Bell Tel. Co., Inc., No. 08 C 1871, 2010 WL 2595234, at *9 (N.D. Ill. June 28, 2010) (otherwise "lawful . . . policies will not shield [an employer] from liability if [the employees] can show other companywide practices that may have been contrary to those policies and violated the FLSA")).  Plaintiff also argues that, notwithstanding Mobility's written policies prohibiting off-the-clock work, Mobility in fact fosters a corporate "culture" in which employees are expected to perform certain tasks off-duty.  For example, plaintiffs point out that Mobility requires employees to carry Company-owned cell phones and blackberries ("Company Official Use" or "COU" devices) and encourages employees to provide this number to customers.[6]  They argue that this practice reflects Mobility's policy decision to have employees conduct business outside the stores.  Pls.' Opp'n to Decertification at 14 (citing COBC, Rothman Decl., Pls.' Ex. 59 at MOBILITY06191438 ("Today, business is often conducted away from the office via

---

[6] See, e.g., Rothman Decl., Pls.' Ex. 33, Deposition Testimony of Albert Martin Valenzuela ("Valenzuela Dep.") at 75: 1-5 ("they pretty much taught us and drilled in your head to put our cell phone number to the customer's phone as part of our selling process for us to get a first point of contact for that customer"); "RSM Execution Excellence," Rothman Decl., Pls' Ex. 58 at MOBILITY 03870603 (ASMs and RSCs "[p]rovide 1st contact customer resolution, own the problem and provide the solution").

portable devices such as wireless phones, personal digital assistants, pagers and laptop computers.")).  Similarly, plaintiffs argue that employees were often required or expected to perform the following tasks off-the-clock: working through lunch breaks; opening and closing Mobility's retail stores; reviewing product information; and servicing customers outside the store.  Id. at 18 (citing deposition testimony).  Plaintiffs contend that these practices and Mobility's unwritten expectations created a corporate culture in which FLSA violations are common.

For their arguments to be pertinent to certification, however, plaintiffs must demonstrate that the "practices" and "culture" of which they complain are sufficiently uniform and pervasive as to warrant class treatment.  See, e.g., Basco v. Wal-Mart Stores, Inc., NO. 00-3184 SECTION "K"(4), 2004 U.S. Dist. LEXIS 12441, at *22 (E.D. La. 2004) (finding alleged corporate policy of keeping wage low insufficient to justify conditional certification when "the 'policy' was not even uniformly or systematically implemented at any given store"); Bayles v. Am. Med. Response, 950 F. Supp. 1053, 1061-63 (D. Colo. 1996) (denying conditional certification when "each plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs, not what

13

the policy was"). This plaintiffs have failed to do. To the contrary, the evidence points to an extremely wide range of company practices in the context of varied factual and employment settings. Laroque v. Domino's Pizza, LLC, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008). Similarly, the defenses available to Mobility appear to be highly individual to each plaintiff. Id. Accordingly, the Court finds that plaintiffs are not similarly situated, and that fairness and procedural considerations counsel in favor of decertifying the class.

As Mobility argues, plaintiffs' off-duty claims involve highly individualized situations. For example, the extent to which plaintiffs received off-duty electronic communications appears to have varied widely. Some of the opt-in plaintiffs did not even receive business emails on their COU devices.[7] Other plaintiffs who did receive corporate communications on their COU devices signed acknowledgements that such devices were not to be used for business purposes off hours, but that any such use should be reported to

---

[7] See, e.g., Bennett Decl. ¶¶ 41-44, 42; Bagley Decl., Def.'s Decertification Ex. GG, Deposition of Melissa Schneider ("Schneider Dep.") at 70:7-12 (never received or responded to emails from customers while an RSC because no access to COU off duty); Bagley Decl., Def.'s Decertification Ex. R, Deposition of Derek Easdon ("Eadson Dep.") at 27:24- 28:2, 39:10-13 (no email on COU).

14

management for payment.[8]  Testimony regarding the expectations of

management is inconsistent, with some plaintiffs testifying that

Mobility managers never expected them to review company emails

off-hours;[9] others testifying that they left their COU devices at the

store or set out-of-office notifications on their email;[10] and still

---

[8] See, e.g., Bagley Decl., Def.'s Decertification Ex. II, Deposition
of Tony Sterling ("Sterling Dep.") at 44:18-47:18 (signed COU policy
requiring him to not review email while off-the-clock and requiring
him to report any off-the-clock work to management for payment);
Pallia Decl. ¶ 20 (attaching form signed by opt in Sterling); Bennett
Decl. ¶ 45; Declaration of Catalina E. Cruz, dated November 5, 2010
("Cruz Decl."), Def.'s Decertification Ex. K.14 ¶¶ 20-21;
Declaration of Elizabeth A. Valdez, dated November 5, 2010 ("Valdez
Decl."), Def.'s Decertification Ex. K.85 ¶ 13, 15.

[9] See, e.g., Bagley Dec., Def.'s Decertification Ex. U, Deposition
of Michael Harrell ("Harrel Dep.") at 46:11-14 (no one told him he
had to respond immediately to customers' emails when he was off duty);
Bagley Dec., Def.'s Decertification Ex. KK, Deposition of Patricia
Timper ("Timper Dep.") at 52:14-19 (same); Sterling Dep. 43:18-44:9,
47:16-18 (while he had email on his COU device, no one ever instructed
him to review emails off duty and he was never disciplined for not
reading email off duty).  But see Bagley Dec., Def.'s
Decertification Ex. MM, Deposition of Brian Walsh ("Walsh Dep.") at
60:20-25 ("[n]obody specifically stated but it was implied [that he
had to check company email] since I had company issued e-mail on my
BlackBerry").

[10] See, e.g., Declaration of Justin Garrigues, dated March 6, 2009
("Garrigues Decl."), Def.'s Decertification Ex. K.26 ¶ 14-15 (half
of his RSCs leave COU devices at the store); Declaration of Elizabeth
Cardenas, undated ("Cardenas Decl."), Def.'s Decertification Ex.
K.26 ¶ 11 ("When I was full time, I would occasionally leave my iPhone
at the store."); Declaration of Jennifer L. Martin, dated November
2, 2010 ("Martin Decl."), Def.'s Decertification Ex. K. 49 ¶ 30 ("I
leave my work phone at work."); Declaration of Leihua Alisa, dated
March 11, 2009 ("Alisa Decl."), Def.'s Decertification Ex. K.1 ¶ 7
(RSM suggests employees "leave their cell phones in my office during

15

others testifying that their off-duty email use varied in frequency based on factors such as daily sales.[11]  Testimony also varies as to whether off-duty email usage was reported and compensated.[12] Testimony concerning text messaging is similarly divergent, as the record contains different accounts as to whether the text messaging occurred off duty, whether it was for personal or business reasons, and whether it was ultimately reported and compensated.[13]  As to telephone use, some employees reported that they rarely received customer telephone calls during non-working hours,[14] some said that

their off hours").

[11] See, e.g., Bagley Decl., Def.'s Decertification Ex. O, Deposition of Brian Carrega ("Carrega Dep.") at 47:8-48:3 (would send emails to ARSM while off duty summarizing his future action plan only on days with no sales).

[12] For example, plaintiff Thomas K. Linnenbaugh requested, and received, a two-minute adjustment for time it took him to write an email to his manager after logging out of MyTime.  See Bagley Decl., Def.'s Decertification Ex. PP (Linnenbagh's request for adjustment); Ex. QQ (time record showing adjustment made).

[13] Charles J. Mullin, Ph.D., a labor economist at ERS Group, analyzed a sampling of texting data for several opt-ins to determine what proportion of time was spent on business related activity. The analysis of six opt-ins' COU records suggests that their texting patterns varied widely.  See "Analysis of Phone Calls and Text Messages For Selected Opt-In Plaintiffs," Report of Dr. Charles Mullin, dated September 16, 2010 ("Mullin Report"), Def.'s Decertification Ex. I at p. 21 (from 5 to 42 minutes a week).

[14] Declaration of Karen Ashcraft, dated March 5, 2009 ("Ashcraft Decl."), Def.'s Decertification Ex. K.3 ¶ 8; Declaration of Eduardo E. Villasenor, dated October 26, 2010 ("Villasenor Decl."), Def.'s

the numbers they called most frequently while off duty were

personal,[15] and some reported that they responded to customer/manager

calls off-the-clock while others did not.[16]  Expert analysis also

suggests that the frequency and length of work-related off-duty phone

calls varied widely.[17]  On the basis of this record, the Court cannot

conclude that Mobility had any uniform business practices or

"culture" across its 2,000-plus retail stores encouraging off-duty

_____

Decertification Ex. K.81 ¶ 30 (2 per week); Declaration of Hector
Iracheta, dated November 2, 2010 ("Iracheta Decl."), Def.'s
Decertification Ex. K.39 ¶ 9 ("I very seldom get calls on my COU device
during my non-working hours, and when I do, I typically just let them
go to voicemail . . . .").

[15] Valenzuela Dep. 97:16-100:23 (five of most frequently called
numbers on COU are girlfriend, mother, friends, ex-girlfriend, and
cousins); Easdon Dep. 28:10-12, 52:2-14 (used COU for personal calls
and recognizes wife's, mom's and dad's numbers).

[16] Bagley Decl., Def.'s Decertification Ex. V, Deposition of David
Hendricks ("Hendricks Dep.") at 39:1-5, 44:5-12 (no policy that
required answering calls when off duty and never criticized or
disciplined for not taking customer calls); Cardenas Decl. ¶ 14
(calls go to voicemail); Declaration of Alissa Philebaum, dated March
5, 2009 ("Philebaum Decl."), Def. Decertification Ex. K.61 ¶ 5
(usually ignores unrecognized numbers); Declaration of Darren
Collins, dated March 6, 2009 ("Collins Decl."), Def. Decertification
Ex. K.13 ¶¶ 5, 6 ("The majority of RSCs let any off-hour calls go
to their voicemail where they have a professional voicemail greeting
requesting that the caller leave a message."); Declaration of Amanda
Herman, dated March 5, 2009 ("Herman Decl."), Def. Decertification
Ex. K.36 ¶ 4 ("Many RSCs . . . leave the store number in the voicemail
greeting to direct any customer calls to the store.").

[17] See Mullin Report at 21 (phone activity between six opt-ins and
supervisors varied from 2 times per week to 21 times per week).

17

electronic communication.  Zivali v. AT&T Mobility LLC, 646 F. Supp. 2d 658, 660 (S.D.N.Y. 2009)).

The same problem exists with respect to plaintiffs' other allegations of practices and culture.  Although Mobility requires employees to take a meal break and MyTime automatically records as compensable any break that is less than 30 minutes in length,[18] some plaintiffs contend that they worked through lunch breaks without receiving proper compensation.[19]  However, other employees reported going home for lunch to avoid interruptions;[20] others reported few interruptions even while at work;[21] and still others reported punching in when interrupted (while others did not).[22]  Similarly,

---

[18] Pallia Decl. ¶ 10.

[19] See, e.g., Carrega Dep. at 102:25-103:3; Easdon Dep. at 13:15-19; Sanchez Dep. at 17: 15-17; Timper Dep. at 10:22-11:3.

[20] See Easdon Dep. 14:13-17 (tried to go off-site).

[21] See, e.g., Philebaum Decl. ¶ 15 ("I'm rarely if ever interrupted during my lunch break. I'm usually just in my own little world in the break room."); Declaration of Adam C. Farthing, dated October 26, 2010 ("Farthing Decl."), Def. Decertification Ex. K.21 ¶ 33 (rarely interrupted during lunch).

[22] See, e.g., Declaration of Cedric Washington, dated March 9, 2009 ("Washington Decl."), Def. Decertification Ex. K.82 ¶ 10 ("The store provides a one hour paid lunch break. I take the full hour break about 95% of the time. Sometimes, when I am in the back eating, a customer who I have already done a significant amount of work for, will come into the store and ask for me specifically. When duty calls like that, I log back into MyTime and then go help the customer. When I'm done helping them I log back out of MyTime and finish my lunch.")

although many plaintiffs claim they were not adequately compensated

for time spent opening and closing Mobility's retail stores, others

testified that they were never or rarely scheduled to work an opening

shift;[23] others testified that "pre-punch" opening activities

required only a de minimis amount of time;[24] and still others

testified that they obtained time adjustments if pre- or post- punch

activities took longer than usual.[25]  The evidence also varies

greatly as to whether plaintiffs were adequately compensated for

meetings and trainings held off-site[26] and time spent working from

---

[23] See Clark Dep. 16:1-6 (no claim); Bagley Decl., Def.
Decertification Ex. L, Deposition of Ibn Abdul Rahman ("Abdul-Rahman
Dep.") at 11:3-17 (no claim); Sanchez Dep. 69:15-18 (not instructed
to do work activities before punching in for opening shift).

[24] See, e.g., Bagley Decl., Def. Decertification Ex. N, Deposition
of Mark Bonomo ("Bonomo Dep.") at 68:22-69:17 (approximately 1 minute
25 seconds per week opening the store, which included unlocking the
door, relocking it, disarming the alarm and logging into the
computer); Bagley Decl., Def. Decertification Ex. T, Deposition of
Christine Nicole Gutierrez ("Gutierrez Dep.") at 52:3-54:6, 54:20-22
("a couple seconds" to unlock back door, "a couple seconds" to walk
to alarm, "a couple seconds" to disarm alarm, "a couple seconds" to
walk from inventory door to gate, "a couple seconds" to unlock gate
unless it was broken, "a couple seconds" to open door behind gate).

[25] See, e.g., Valenzuela Dep. 25:19-26:20 (long boot-up time of 10
minutes but RSM would adjust time); Gutierrez Dep. 45:19-22 (time
was adjusted on two occasions when MyTime froze and she reported that
she could not log in to her manager).

[26] Some plaintiffs testified that they were paid for their attendance,
see, e.g., Cruz ¶ 14 (paid for work done in a hotel room as part of
an off-site training); some testified that they were never instructed

19

home performing such tasks as reviewing product information.[27]

Finally, the evidence shows substantial variation as to a key issue in this case: plaintiffs' use of the adjustment feature to capture otherwise unreported work.  Some opt-in plaintiffs testified that they understood the adjustment feature;[28] some acknowledged they regularly received payment for work reported through the adjustment feature;[29] some testified they felt

---

to participate in off-duty training, see, e.g., Sanchez Dep. 74:17-21; some testified that they punched in at the store before leaving for a meeting, see, e.g., Sterling Dep. 92:4-93:5; 93:15-94:3; some testified that they sought time adjustments and others did not, see, e.g., Bagley Decl., Def. Decertification Ex. X, Deposition of James Joven ("Joven Dep.") at 39:10-17 (manager adjusted time to reflect off-duty work for small business account).

[27] See, e.g., Bonomo Dep. 132:4-8 (no one told him he was required to familiarize himself with products off duty and not be paid for it).

[28] See, e.g., Easdon Dep. 9:10-10:1, 10:2-12 ("I understood that I was to be paid for every minute that I worked, so, you know, and adjustments would be made by the manager."); Harrell Dep. 27:19-28:2 (received training about requesting adjustments from manager); Sterling Dep. 34:1-16 (same); Farley Dep. 41:1-42:1 (requested manager to adjust time for missed punches and they were made); Hendricks Dep. 16:17-19, 50:10-20 (requested time adjustments due to missed punches); Sterling Dep. 19:15-20:15, 34:17-36:9, 37:12-18 (manager makes adjustments due to missed punches and as an ASM, would also do the same for RSCs).

[29] See, e.g., Sterling Dep. 56:4-20 (his RSM or fellow ASMs made any and all adjustments he requested to his time); Linnenbaugh Dep. 18:11-20 (all adjustments he sought were made by managers).

comfortable asking for adjustments while others did not;[30] some
admitted that adjustments were promptly made when requested;[31] some
testified that they did not report time because they did not believe
it was compensable;[32] and some conceded that they performed off-duty
work for their own benefit without informing management.[33]
Additionally, expert analysis of MyTime data demonstrates a wide
range in the frequency of adjustments: in some stores none of the
plaintiffs' time records was edited, while in other stores greater
than 50 percent of the employees/days contained edits to what might
otherwise have appeared as a complete series of punches.  See White

---

[30] See, e.g., Wilcox Dec. ¶ 9 ("I always feel comfortable reporting
the time that I work, even if it was unscheduled. . . .  Mobility
explicitly requires me to report all overtime that I work and I have
always reported all of my time worked, both in Idaho and now in
Washington, since the start of my employment with Mobility, without
feeling any pressure about working too much overtime.").

[31] Bennett Dep. 55:10-56:3, 80:24-81:21 (plaintiff admitting that
when he asked his last RSM for adjustments to his time via email,
the RSM made the adjustments).

[32] Sterling Dep. 65:2-76:6 (never sought compensation for
2 minutes of time opening or closing because did not think it was
compensable work until he got
notice of the lawsuit).

[33] See, e.g., Sanchez Dep. 19:14-20 (chose to work through lunches
to make sales); Harrell Dep. 52:6-53:8 (chose to respond to emails
from customers off the clock because it helped drive sales and, as
a result, he would receive more commissions).

Report.[34]  Moreover, Mobility paid more than $412 million in overtime compensation between 2006 and 2010, a fact that strongly suggests Mobility managers routinely honored plaintiffs' requests for MyTime adjustments and claims for overtime.  Declaration of Christopher Dondzila, dated November 7, 2010 ("Dondzila Decl."), Def.'s Decertification Ex. B ¶ 3.

On the basis of this record, the Court finds that plaintiffs are not similarly situated with respect to their factual and employment settings.

Additionally, the defenses available to Mobility appear to be highly individual to each plaintiff.  For example, plaintiffs must demonstrate that Mobility had actual or constructive knowledge of the off-duty work performed.  See Singh v. City of New York, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005).  In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation.  The record suggests that the knowledge of each

---

[34] See also White Report at 24 ("The Kronos data provides information on the original employee time punches as well as the management edits. Of the 1,485,026 employee/days in the Kronos data during this time period for the opt-ins, 389,536 (or 26.2%) were edited in some way as part of the timekeeping process.") (footnote omitted).

individual manager varies widely.[35]   Similarly, Mobility can defend

against some of plaintiffs' claims by demonstrating that certain

off-duty work was de minimis.   The extent to which work was de

minimis, however, will necessarily vary widely according to the

particular situation of each individual plaintiff.[36]   Without

multiplying examples, it is clear that Mobility's potential defenses

in this case will be highly fact specific.   Accordingly, this factor

weighs heavily against proceeding with this case as a collective

action.

The Court must finally consider whether fairness and procedural

considerations counsel for or against decertification.   Plaintiffs

note that a collective action allows plaintiffs the "advantage of

lower individual costs to vindicate rights by the pooling of

---

[35] See Walsh Dep. 60:20-25 ("[n]obody specifically stated but it was
implied [that he had to check company email] since I had company
issued email on my Blackberry"); Timper Dep. 9:23-10:21 (not sure
that manager was aware of all the off-duty work she claims to have
done); Hendricks Dep. 87:11-16 (manager could not have known about
his off-duty work because he was "not in my home when I'm doing it.")

[36] See, e.g., Cruz Decl. ¶ 23 (sometimes will take a minute or two
to call the customer back; "not worth it to me to record this time"
because those "few minutes are really not a big deal to me"); Sterling
Dep. 61:5-62:17 (got one to two calls a week off duty from store
employees that would last on average 1 to 2 minutes each and did not
report time); Gladura ¶ 14 ("never actually thought to" report calls
from managers or co-workers that do not take up more than 10 minutes
a week "because it is so inconsequential"); Spraggins Dec. ¶ 21;
Villasenor Dec. ¶¶ 27-28; Ashcraft Dec. ¶ 6 (stating it would "silly"
to count as time worked every time she looks at her iPhone).

resources," and that the "judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." Hoffman La-Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989). They argue that the Court has the necessary tools to ensure a manageable trial, as the Court could bifurcate the trial into liability and damages phases, see Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008), and/or permit the plaintiffs to employ representative testimony in support of their claims, see McLaughlin v. Seta, 850 F.2d 586, 589 (9th Cir. 1988).

Again, however, there appear to be very few common issues of fact in this case. The testimony of the plaintiffs is not representative and cannot fairly be extrapolated to the 4,100 individuals who have opted into this action. See, e.g., Burch v. Qwest Commc'ns Int'l, Inc., 677 F. Supp. 2d 1101 (D. Minn. 2009) (finding that a collective action would be unmanageable as to claims involving meal times and breaks because the claims varied enormously among the employees and by location); Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 284 (N.D. Tex. 2008) ("Although the 2nd Circuit has affirmed representative testimony of only 2.7% of a class, that case involved 'actual consistency' among the testimony 'both within each category [of employee] and overall'; there was 'no

contradictory testimony'; the abuse arose from a policy that was consistently applied; and the uncompensated 'periods at issue were the employees' lunch hours, which are predictable, daily-recurring periods of uniform and predetermined duration.'") (quoting Reich v. S. New England Commc'ns Corp., 121 F.3d 58, 68 (2nd Cir. 1997)). Bifurcation of the trial would not resolve the issue as there is no consistent evidence as to either liability or damages.  See, e.g., Aldous v. Honda Motor Co., Ltd., No. 94-CV-1090, 1996 WL 312189, at *1 (N.D.N.Y. May 30, 1996) ("[B]ifurcation is inappropriate where the 'same witnesses may be needed to testify as to both the issues of liability and damages, and . . . evidence pertaining to these issues may very well overlap.'") (citation omitted).  Resolution of the many fact-specific issues in this case would essentially require 4,100 mini-trials in which each individual plaintiff could present evidence that he or she in fact failed to receive proper overtime compensation -- evidence that would then be subject to cross-examination and similar challenge by the defendant.  "Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach."  Hinojos v. Home Depot, Inc., No. 2:06-CV-00108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006).

25

Accordingly, the Court concludes that all three relevant factors favor decertification in this case.  Unlike cases in which courts have permitted plaintiffs to proceed as a class,[37] the record shows that there is simply no uniform policy or practice at Mobility that would result in systematic FLSA violations across the potential 4,000-plus plaintiff class.  Indeed, the Court finds that this case is far more closely analogous to those in which courts have granted motions for decertification as a result of plaintiffs' failure to present consistent evidence that they were subject to any uniform policy or practice.[38]

---

[37] See, e.g., Ayers v. SGS Control Servs., No. 03 Civ. 9078 (RMB), 2007 U.S. Dist. LEXIS 19634, at *19-20 (S.D.N.Y. 2007) (finding that plaintiffs' claims could be supported by generalized proof because all claims arose derived from company-wide policies); Torres v. Gristede's Operating Corp., 14 Wage & Hour Cas. 2d (BNA) 278, *28 (S.D.N.Y. 2006) (certifying class when plaintiffs alleged defendants violated their rights by implementing three company-wide policies); Searson v. Concord Mortg. Corp., No. CV 07-3909 (DRH)(ARL), 2009 U.S. Dist. LEXIS 88926, at *17-18 (E.D.N.Y. 2009) (granting conditional class certification when "plaintiffs' affidavits . . . set forth substantial allegations of a company-wide policy of denying overtime and minimum pay to loan officers, which are sufficient to support a finding that the part-time and full-time mortgage consultants are similarly situated"); Sexton v. Franklin First Fin., Ltd., No 08-CV-04950 (JFB) (ARL), 2009 U.S. Dist. LEXIS 50526, at *4-5 (E.D.N.Y. June 16, 2009) (granting conditional certification because "[p]laintiff alleges that all loan officers employed by defendants during the relevant period were subjected to defendants' uniform, company-wide, and centrally disseminated policies and procedures regarding compensation").

[38] King v. CVS/Caremark Corp., No. 07-21824-CIV-GRAHAM/TORRES, 2008 WL 5973490, at *2-5 (S.D. Fla. Sept. 11, 2008) (granting motion for

The Court has considered plaintiff's additional arguments and finds them without merit.  Accordingly, the Court grants Mobility's motion for decertification of the class.  Mobility's motion for summary judgment, however, is denied, and the named plaintiff, Ms. Zivali, may therefore proceed to trial.  To this end, counsel are directed to jointly call Chambers at 12:00 noon on May 13, 2011 to set a trial date.  Meanwhile, the Clerk of the Court is directed to close item numbers 162 and 167 on the docket of this case.

---

decertification even though plaintiffs were all subject to defendants' nationwide time keeping and payroll system because of "(i) the disparate factual and employment settings and, more precisely, the differing procedures for inputting employees' time, (ii) the various defenses available to Defendants and (iii) the concerns for procedure and fairness"); Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits -- for either side -- that is reached on the basis of purportedly representative evidence."); Reyes v. Texas EZPawn, L.P., 2007 WL 101808, *3 (S.D. Tex. Jan. 8, 2007) (granting motion for decertification because "[p]laintiffs' deposition testimony . . . reveals significant differences in each ASM's job duties, discretion, and authority, depending on the practices of individual store managers, store demographics, and location"); King v. West Corp., 2006 WL 118577, *15 (D. Neb. Jan. 13, 2006) (decertifying a class in part because defendant intended to offer individualized defenses regarding whether uncompensated work occurred, whether time spent performing such work was de minimis, and whether the plaintiffs had scheduling flexibility); Lugo v. Farmer's Pride Inc., 2010 U.S. Dist. LEXIS 88139 (E.D. Pa., Aug. 25, 2010) (decertifying class when it did not appear that the question of under-compensation could be answered in a manner common to all employees).

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:     New York, New York
           May  11 , 2011

28